# EXHIBIT 3

# U.S. District Court
# Middle District of Florida (Jacksonville)
# CIVIL DOCKET FOR CASE #: 3:26−cv−01807−MMH−SJH

Martinez v. Target Corporation
Assigned to: Judge Marcia Morales Howard
Referred to: Magistrate Judge Samuel J. Horovitz
Cause: 28:1332 Diversity−Other Contract

Date Filed: 07/14/2026
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Zuania Martinez**
*Individually and on behalf of all others similarly situated*

represented by **Michael Jay Fuller , Jr**
Farrell & Fuller LLC
270 Munoz Rivera Avenue
Suite 201
San Juan
Puerto Rico
939−293−8244
Fax: 939−293−8245
Email: mike@farrellfuller.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Target Corporation**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/14/2026 | 1 | **STRICKEN PER ORDER 7**>COMPLAINT against Target Corporation with Jury Demand (Filing fee $405 receipt number AFLMDC−25254049) filed by Zuania Martinez. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons) (Fuller, Michael) Modified on 7/15/2026 to edit duplicate text. (JVC) Modified on 7/27/2026 (CTR). (Entered: 07/14/2026) |
| 07/14/2026 | 2 | NEW CASE ASSIGNED to Judge Marcia Morales Howard and Magistrate Judge Samuel J. Horovitz. New case number: 3:26−cv−01807−MMH−SJH. (JVC) (Entered: 07/15/2026) |
| 07/15/2026 | 3 | SUMMONS issued as to Target Corporation. (JVC) (Entered: 07/15/2026) |
| 07/15/2026 | 4 | NOTICE TO COUNSEL Michael Jay Fuller, Jr of Local Rule 2.02(a), which states, "The first paper filed on behalf of a party must designate only one lead counsel who − unless the party changes the designation − remains lead counsel throughout the action." Counsel must file a **Notice of Lead Counsel Designation** identifying lead counsel. (Signed by Deputy Clerk). (JVC) (Entered: 07/15/2026) |
| 07/15/2026 | 5 | NOTICE of Lead Counsel Designation by Michael Jay Fuller, Jr. on behalf of Zuania Martinez. Lead Counsel: Michael J. Fuller Jr. (Fuller, Michael) (Entered: 07/15/2026) |
| 07/16/2026 | 6 | NOTICE of Local Rule 3.02(a)(2), which requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may have a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge. (Signed by Deputy Clerk). (JW) (Entered: 07/16/2026) |

| | | |
|---|---|---|
| 07/24/2026 | 7 | **ORDER striking 1 Plaintiff's Complaint. On or before August 5, 2026, Plaintiff shall file a corrected complaint consistent with the directives of this Order. Failure to do so may result in a dismissal of this action. See Order for details. Signed by Judge Marcia Morales Howard on 7/24/2026. (ASF)** (Entered: 07/24/2026) |
| 08/03/2026 | 8 | AMENDED COMPLAINT against Target Corporation with Jury Demand filed by Zuania Martinez. Related document: 1 Complaint filed by Zuania Martinez.(Fuller, Michael) Modified text on 8/4/2026 (TDC). (Entered: 08/03/2026) |

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ZUANIA MARTINEZ, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

Case No.: 3:26-cv-1807

v.

**AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

TARGET CORPORATION,

Defendant.

__________________________________/

**AMENDED COMPLAINT**

Plaintiff Zuania Martínez ("Plaintiff") on behalf of herself and all others similarly situated, by and through undersigned counsel of record, bring this action against Defendant Target Corporation ("Defendant"). The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to themselves and their own actions and counsel's investigations, and upon information and belief as to all the other matters, are as follows:

## I. INTRODUCTION

1. This action is brought on behalf of Plaintiff, purchaser of goods that Defendant sold throughout all the United States, who bore the economic burden of the President Donald Trump ("Trump") Administration's tariffs, imposed under the International Emergency Economic Powers Act ("IEEPA") (50 U.S.C. § 1701, et seq.), and against Defendant who shifted the economic burden of the IEEPA tariffs to consumers throughout the United States by means of price increases on imported goods as well as U.S.-sourced goods not subject to tariffs sold by Defendant to Plaintiff. The Defendant now receives an inequitable windfall by collecting refunds from the

federal government for tariff costs that were shifted to and paid by Plaintiff, who purchased goods from Defendant, and therefore, is the real party in interest to receive the IEEPA tariff refunds.

2. Target Corporation collected hundreds of millions of dollars in unlawful tariffs from consumers by raising prices on imported goods and U.S.-sourced goods while the tariffs imposed by the Trump Administration under IEEPA were in effect.

3. The refund process set in place by the federal government when the United States Supreme Court struck down the IEEPA tariffs established that only the importer of record is entitled to apply for and receive a refund for any moneys paid for the import of goods. However, Defendant shifted the cost of these tariffs to its customers by way of price increases to products subject to tariffs and items not subjected to tariffs, being Plaintiff and similarly situated consumers who bore the tariff costs in the first place.

4. Defendant has not returned any portion of those costs it passed on to consumers, and it has no intention of doing so. It has, in short, generated and retained a windfall from unlawful government action, and consumers — not Defendant — are the ones left paying for it.

5. This dispute arises from a fundamental inequity in the tariff refund process. Only the importer of record may seek a refund for an unlawfully assessed tariff — but importers merely advance the tariff cost at the border and recoup all or a substantial part of it through higher consumer prices. In economic reality, the consumer paid the tariff.

6. This inequity is compounded when, as here, a tariff is struck down by the courts. Consumers who bore the true economic burden have no direct avenue for redress — they both lack a statutory cause of action in the Court of International Trade and standing to seek a refund. That right belongs exclusively to the importer of record, here Defendant, regardless of who actually paid. The refund process as designed, establishes that large corporations that passed the entire tariff

cost onto their customers remain exclusively entitled to recover a full refund of tariffs the Supreme Court has since declared unlawful.

7. This lawsuit seeks to force Defendant to return funds collected from millions of consumers to cover IEEPA tariffs between February 2025 and February 2026. Defendant has made no commitment to compensate consumers for those payments. This act not only does not reimburse the consumer for the portion of the unlawful tariff that was forced upon him by the Defendant by means of across-the-board price increases, but it also unfairly enriches Defendant at the expense of the consumer.

8. Plaintiff seeks a judgment that requires Defendant to return to Plaintiff all IEEPA duties passed on to customers in the form of higher prices on products, with interest.

9. Plaintiff also seeks restitution of the tariff overcharges they paid, or a proportionate share of any tariff refunds Defendant recovers, together with interest, reasonable attorneys' fees, and costs.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events, omissions, and misrepresentations giving rise to Plaintiff's claims occurred in this District. Defendant has marketed, advertised, and made available for sale products subject to IEEPA tariffs within this District.

# III. PARTIES

## A. Plaintiff

12. Plaintiff Zuania Martínez is a resident of Puerto Rico, domiciled in Dorado, Puerto Rico. During the Class Period, Plaintiff purchased goods such as children's apparel, breastfeeding and infant-feeding accessories, baby and toddler food products, infant skincare and personal-care products and others, directly from Defendant, at Defendant's retail store located at 490 Marsh Landing Parkway, Jacksonville, FL 32250. Some or all of these products were imported from countries subject to IEEPA tariffs and sold at prices inflated by Defendant's pass-through of IEEPA tariff costs. Plaintiff also purchased other products that were sourced from within the United States and not subjected to tariffs but were sold at prices Defendant likewise inflated by spreading across its product line the IEEPA tariff costs incurred on its imported goods, so that purchasers of non-tariffed domestic goods also bore the tariff burden.

## B. Defendant

13. Target Corporation is an American national consumer goods company that conducts business in all 50 states. Defendant is a Minnesota corporation with principal executive offices located at 1000 Nicollet Mall, Minneapolis, Minnesota 55403. Target Corporation is one of the world's largest retail companies. At all relevant times, Defendant operated a brick and mortar and online store through which it sold imported products and U.S.-sourced products directly to consumers. Between February 4, 2025, and February 20, 2026, Defendant collected tariff costs from those consumers on goods subject to tariffs imposed under the IEEPA as well as goods not subject to tariffs imposed under IEEPA. On information and belief, the misconduct alleged herein originated from and was directed out of Defendant's headquarters and principal place of business

in Minneapolis, Minnesota. Plaintiff purchased goods from Defendant's brick and mortar retail location at 490 Marsh Landing Parkway, Jacksonville Beach, Florida.

## IV. FACTUAL ALLEGATIONS

### A. Defendant is an Enormous Retailer of Imported Good and U.S.-Sourced Goods

14. Defendant is a major retailer that imports a substantial volume of consumer goods into the United States and sells them to consumers throughout the country through both its physical locations and its online store.

15. Defendant purchases the goods it sells wholesale from vendors, suppliers, and manufacturers, including but not limited to, a substantial volume of goods imported from outside the United States, and resells them to consumers in its brick and mortar and online stores. Defendant owns the inventory it offers for sale and sets the retail prices its customers pay.

16. For the imported goods it sells, Defendant's involvement begins before the goods enter the United States. Defendant acts as the importer of record ("IOR") who signs the customs declaration, takes legal responsibility for compliance, and pays the tariff to U.S. Customs and Border Protection. On information and belief, Defendant serves as the IOR for a substantial portion of the imported goods it sells.

17. Defendant's product line is not limited to imported goods. Defendant also sources, stocks, and sells a substantial volume of consumer goods that originate within the United States and are not subject to IEEPA tariffs. Defendant offers these U.S.-sourced goods to consumers in its brick and mortar and online stores, alongside its imported goods. As with its imported goods, Defendant owns this inventory and sets the retail prices its customers pay.

18. The IEEPA tariffs increased the costs Defendant incurred on the imported goods for which it serves as the importer of record. On information and belief, rather than absorbing those

increased costs or confining them to the imported goods that generated them, Defendant recovered the tariff costs by raising prices across its product line, including on U.S.-sourced goods that were never subject to IEEPA tariffs.

19. As a result, Defendant sold its imported goods at prices inflated by its direct pass-through of IEEPA tariff costs and sold its U.S.-sourced goods at prices likewise inflated by Defendant's decision to spread those same tariff costs across its product line.

20. Consumers who purchased U.S.-sourced goods from Defendant therefore bore a portion of the IEEPA tariffs that Defendant incurred on imported goods those consumers never purchased.

**B. The Trump Administration Invokes the IEEPA to Implement Tariffs**

21. On February 4, 2025, Trump issued an executive order imposing a 10% tariff on Chinese imports.[1] In March 2025, Trump issued two more executive orders imposing a 25% on goods imported from Canada and Mexico respectively.[2] By April 2025, the Trump Administration had imposed tariffs on imports from most other U.S. trading partners.

22. The Trump Administration invoked the International Emergency Economic Powers Act ("IEEPA") as the legal basis for these tariffs. The IEEPA was originally designed to allow the President to regulate international commerce during declared national emergencies.[3] The Trump Administration pointed to drug trafficking across U.S. borders and the persistent American trade deficit as the legal emergencies justifying the IEEPA tariffs.[4]

---

[1] Andrea Shalal; Trump launches trade war with tariffs on Mexico, Canada and China. Reuters (Feb. 1, 2025) (https://www.reuters.com/business/trump-readies-order-steep-tariffs-goods-mexico-canada-china-2025-02-01/)
[2] *Id*.
[3] Christopher A. Casey, Library of Congress, R-45618, The International Emergency Economic Powers Act: Origins, Evolution, and Use (https://www.congress.gov/crs-product/R45618)
[4] Id. at *supra* note 1.

23. The IEEPA tariffs did not operate in isolation. For example, for much of 2025, the effective rate on most Chinese electronics was approximately 45%: a 20% IEEPA layer on top of an already existing 25% Section 301 tariff.[5] At the peak of the escalation in April-May 2025, average U.S. tariffs on Chinese imports reached 127.2% in early May 2025.[6]

24. On April 3, 2025, within days of the IEEPA tariffs going into effect, the first lawsuit challenging their legality was filed.[7] Despite palpable fear from business groups of incurring Trump's wrath,[8] other lawsuits would eventually follow.[9] These filings were widely reported and as a major retailer, Defendant certainly tracked their progress.[10]

25. On February 20, 2026, the U.S. Supreme Court issued its opinion in Learning Resources, Inc. v. Trump holding that the IEEPA did not authorize the President to impose the IEEPA tariffs and that they were invalid.[11]

26. The Supreme Court's decision in *Learning Resources, Inc*. eliminated the legal basis for the IEEPA tariffs and created a pathway for importers like Defendant to seek refunds of the tariffs previously collected by the federal government.

### C. Consumers Incurred Price Increases on Defendant's Products While the IEEPA Tariffs Were in Effect

---

[5] Section 301 of the US Trade Act of 1974 authorizes the President to take all appropriate action, including tariffs, to remove a foreign government's practice that violates an international trade agreement and that restricts US commerce. 19 U.S.C. § 2411. Trump implemented Section 301 tariffs in 2018.

[6] Chad P. Bown, US-China Trade War Tariffs: An Up-to-Date Chart, Peterson Institute for International Economics (Nov. 14, 2025) (https://www.piie.com/research/piie-charts/2019/us-china-trade-war-tariffs-date-chart)

[7] *Emily Ley, Paper, Inc., d/b/a Simplified v. Trump*, No. 3:25-cv-464-TKW-ZCB (N.D. Fla. Apr. 3, 2025).

[8] Caitlin Oprysko¸ 'Everyone is terrified': Business and government officials are afraid to cross Trump on tariffs, Politico (Apr. 4, 2025) (https://www.politico.com/news/2025/04/04/trump-tariffs-fear-lobby-business-congress-00006608)

[9] See. e.g. Doug Palmer¸ Trump's tariffs could face more than one legal challenge, Politico (Apr. 3, 2025), (https://www.politico.com/news/2025/04/04/first-lawsuit-filed-against-trumps-tariffs-00273646) Larry Neumeister, A dozen states sue the Trump administration to stop tariff policy, Associated Press (Apr. 23, 2025) (https://apnews.com/article/tariffs-lawsuit-what-states-sue-0d6531b7f60aaa2f7c6c35e0a944d4a9)

[10] *Id*.

[11] *Learning Resources, Inc. v. Trump*, 607 U.S. ___, 146 S. Ct. 628 (2026) (slip op. at 20).

27. The IEEPA tariffs increased the costs that retailers, including Defendant, incurred on imported goods. Across the retail industry, companies responded by passing those increased costs on to consumers through higher prices. A survey of U.S. CEOs found that a majority had already raised prices or were considering doing so in response to the tariffs,[12] and major retailers publicly announced tariff-driven price increases throughout 2025 and into 2026.[13]

28. Independent economic analysis confirms that a substantial portion of the tariff costs was passed through to U.S. consumers during the relevant period. The Federal Reserve found that pass-through to consumers for goods imported from China was at least 30 percent between April and December 2025.[14] Federal Reserve Bank of New York research found that U.S. businesses and consumers together bore nearly 90 percent of the cost of the 2025 tariffs.[15]

29. These price increases were not confined to imported goods. Analyses of retail pricing found that prices rose on both imported and domestically produced goods as retailers spread tariff-related costs across their product lines.[16] Researchers estimated that tariff pass-through added roughly 0.7 percentage points to the Consumer Price Index by September 2025, and that the lowest-priced product varieties saw the steepest increases (around 5 percent) because retailers had the least room to absorb the cost in their margins.[17]

---

[12] *Here Are the Retailers Raising Prices as Trump Tariffs Take Hold*, CNBC (May 31, 2025), (https://www.cnbc.com/2025/05/31/trump-tariffs-here-are-the-retailers-raising-prices.html) (reporting the Chief Executive Group/AlixPartners survey of U.S. CEOs and individual retailer price-increase announcements).
[13] Megan Cerullo, *Walmart and Other Big Companies Say Tariffs Are Forcing Them to Hike Prices*, CBS News (Feb. 20, 2026) (https://www.cbsnews.com/news/walmart-trump-tariffs-general-merchandise-inflation/)
[14] *The Slow Climb: How Tariffs Gradually Raised Retail Prices in 2025*, Bd. of Governors of the Fed. Reserve Sys., FEDS Notes (Mar. 5, 2026) (https://www.federalreserve.gov/econres/notes/feds-notes/the-slow-climb-how-tariffs-gradually-raised-retail-prices-in-2025-20260305.html)
[15] Cerullo, *Walmart and Other Big Companies*, supra (reporting Federal Reserve Bank of New York research that U.S. businesses and consumers together bore nearly 90% of the cost of the 2025 tariffs).
[16] *Are Tariffs Raising U.S. Retail Prices?* (updated), Econofact (Dec. 5, 2025) (https://econofact.org/are-tariffs-raising-u-s-retail-prices) (summarizing the Cavallo/Harvard Business School Pricing Lab analysis of online pricing at five major U.S. retailers, including price increases on domestically produced goods).
[17] *Id.*

30. The cumulative burden on consumers was enormous. After years of moderating prices, consumer goods prices rose throughout 2025 and into 2026.[18] According to the Budget Lab at Yale University, tariffs accounted for an estimated 86% of the rise in prices for imported household goods, with the effect most pronounced for long-lasting durable goods such as cars, appliances, and furniture.[19] American consumers paid more than $231 billion in tariff costs between February 2025 and January 2026, an average of roughly $1,745 per family.[20]

31. Defendant's product line is not limited to imported goods. Defendant also sources, stocks, and sells a substantial volume of consumer goods that originate within the United States and are not subject to IEEPA tariffs, which it offers to consumers alongside its imported goods. As with its imported goods, Defendant owns this inventory and sets the retail prices its customers pay.

32. The IEEPA tariffs increased the costs Defendant incurred on the imported goods for which it serves as the importer of record. On information and belief, rather than absorbing those increased costs or confining them to the imported goods that generated them, Defendant (like other major retailers) made a business decision to recover the tariff costs by raising prices across its product line, including on U.S.-sourced goods that were never subject to IEEPA tariffs.

33. As a result, Defendant sold its imported goods at prices inflated by its direct pass-through of IEEPA tariff costs and sold its U.S.-sourced goods at prices likewise inflated by its decision to spread those same tariff costs across its product line. Consumers who purchased U.S.-

---

[18] Yale Budget Lab, *Tracking the Economic Effects of Tariffs* (https://budgetlab.yale.edu/research/tracking-economic-effects-tariffs)
[19] *Id.*
[20] *American Families Have Paid More Than $1,700 Each in Tariff Costs Since Trump Entered Office*, Joint Economic Committee Minority (Feb. 2026) (https://www.jec.senate.gov/public/_cache/files/7cc03e65-d40a-465f-9e88-09dd53d3502f/jec-fact-sheet-on-cost-of-tariffs-for-families-update.pdf)

sourced goods from Defendant therefore bore a portion of the IEEPA tariffs that Defendant incurred on imported goods those consumers never purchased.

34. Defendant maintains detailed transaction, pricing, and customer records, including point-of-sale data, online order histories, and payment and loyalty-program records, through which Defendant is able to identify the consumers who paid tariff-inflated prices during the Class Period and the amount of the increase attributable to the IEEPA tariffs.

35. Target Corporation is one of the largest retailers and importers in the United States, with annual net sales of approximately $104.8 billion in fiscal year 2025.[21] Target's global sourcing operations operate from offices in 13 countries and support the design, development, and manufacturing of merchandise sold across its stores and digital channels. Approximately one-half of the merchandise Target offers is sourced from outside the United States, with China representing the largest country of origin for imported goods.[22] Target's exposure to imported goods subject to IEEPA tariffs was therefore enormous in both dollar volume and breadth of product category.

36. Target serves as the importer of record for most owned and exclusive, and certain national brand, merchandise. As importer of record, Target is responsible for customs compliance, including classification, import valuation, and payment of all applicable duties and fees.[23] As the importer of record for the merchandise it sold to Plaintiff and the Class, Target was the entity legally required to pay the IEEPA tariffs to U.S. Customs and Border Protection, and is the only entity entitled to file a refund request for those duties according to the current scheme that followed the invalidation of the tariffs.

---

[21] Target Corp., Annual Report. Form 10-K. Mar. 11, 2026. (Hereinafter "2025 Form 10-K").
[22] 2025 Form 10-K, at 5.
[23] Id.

37. China was Target's single largest source of imported merchandise. Because approximately one-half of Target's merchandise is imported, and China accounted for roughly 30%[24] of those imports, a substantial volume of the goods Target sold during the Class Period originated in China and was subject to the IEEPA tariffs on Chinese imports.

38. On information and belief, Target paid, and is now positioned to recover, tens or hundreds of millions of dollars in IEEPA duties during the Class Period, given that approximately one-half of its merchandise is imported, China is its single largest source, and total IEEPA duties collected nationwide exceeded $165 billion.[25]

39. Target made the decision to pass tariff costs to consumers immediately and publicly, on the very day the initial IEEPA tariffs took effect. On March 4, 2025, Target's then-CEO Brian Cornell appeared on CNBC and warned that consumers would face price increases almost immediately: produce categories were ones "where we'll try to protect pricing, but the consumer will likely see price increases over the next couple of days,"[26] and "[i]f there's a 25% tariff, those prices will go up."[27] These statements were widely reported.

40. That same day, Gomez described the specific mechanics: rather than limiting price increases to goods actually subject to tariffs, Target would spread tariff costs across its product line, raising prices on non-tariffed goods to offset the cost of tariff-affected goods. "We have $3 Christmas ornaments. We don't want to have $3.60 Christmas ornaments. We want to keep them at $3. That means we have to think about margin elsewhere. So maybe we'll take pricing up a little bit on stockings to cover where we are in Christmas ornaments," Gomez explained.[28] Applying

---

[24] Target Corp., Q4 2024 Earnings Call & Financial Community Meeting Tr., at 12. Mar. 4, 2025. (Hereinafter "Q4 2024 FCM Tr.".
[25] 2025 Form 10-K, supra note 1, at 5.
[26] *Trump's Mexico Tariffs Could Raise Produce Prices in the Next Few Days, Target CEO Says*, CNBC. Mar. 4, 2025.
[27] Id.
[28] CNBC, Produce Prices, supra note 6.

the same logic to Target's "$5 tees", Gomez stated Target might "look at dresses a little bit differently" because "it's actually not as simple as just like flowing through cost." These admissions confirm that Target's price-recovery strategy burdened consumers across categories regardless of whether the specific goods they purchased were themselves subject to tariffs.[29]

41. Independent academic research establishes that U.S. retailers passed the 2025 tariffs through to consumers, and did so beginning immediately after the tariffs took effect. Using high-frequency daily pricing data from major U.S. retailers, matched to product-level country-of-origin and tariff classifications across roughly 350,000 goods, the Harvard Business School Pricing Lab found that U.S. retail prices "began rising immediately after the broader tariff measures announced in early March" 2025 and continued to climb over subsequent months, producing an estimated retail tariff pass-through of 20 percent and contributing approximately 0.7 percentage points to the Consumer Price Index by September 2025.[30] The study further found that tariff costs were "gradually but steadily transmitted to U.S. consumers, with additional spillovers to domestic goods," with imported goods rising roughly twice as much as domestic ones—confirming that the tariff-driven increases reached consumers of both imported and U.S.-sourced goods.[31]

42. Third-party pricing data confirms that Target specifically raised prices during the Class Period. An analysis of online pricing by the research firm DataWeave found that prices at Target rose 1.7 percent between the start of 2025 and the end of September 2025, and that apparel prices at Target—a heavily imported category—rose 3.3 percent over the same period.[32]

[29] Id.
[30] *Tracking the Short-Run Price Impact of U.S. Tariffs*, at 1. Harvard Bus. Sch. Pricing Lab, Working Paper. 2025.
[31] Id.
[32] *Retailers Are Raising Prices to Meet Tariffs; Amazon Is Hiking More Than Others*, CNBC. Nov. 5, 2025.

DataWeave reached these figures by continuously collecting live pricing data on roughly 16,000 Target items.[33]

43. Target's own statements corroborate that it raised prices to recover tariff costs. Target conceded that it could offset only the "vast majority"—not all—of its incremental tariff exposure,[34] necessarily leaving a remainder to be borne by consumers through higher prices. When Goldman Sachs analyst Kate McShane asked directly "what price increases were taken during the second quarter as a result of tariffs," Target did not deny that prices had been raised, answering only that it would "take price as a last resort."[35] And Target's CEO described a cross-functional effort that revised "order quantities and pricing" and stated the team was "maintaining our focus on value by limiting the impact on our pricing"—confirming that Target's pricing was in fact impacted, with the company seeking only to limit, not eliminate, the increases.[36]

44. Target's own SEC filings admit that the IEEPA tariffs both raised its costs and led it to raise prices. In its 2025 Form 10-K, Target stated that the 2025 tariffs on goods from China, India, Vietnam, and Bangladesh "have resulted, and could continue to result, in us incurring substantial additional costs to procure a large portion of the merchandise we offer and impact the margin rate for certain products, raising prices on certain products."[37]

45. Target's cost disclosures confirm that the tariffs increased its product costs. Reporting its Q2 2025 results, CFO Jim Lee disclosed that Target's ending inventory "reflects higher product costs than a year ago, driven by tariffs and other pressures."[38] Higher tariff-driven product costs carried in inventory are a direct predicate to consumer price increases: Target's cost

[33] Id.
[34] Target Corp., Q1 2025 Earnings Call Tr., at 5. May 21, 2025.
[35] Target Corp., Q2 2025 Earnings Call Tr., at 11. Aug. 20, 2025.
[36] Q2 2025 Tr., supra note 17, at 3.
[37] 2025 Form 10-K, supra note 1, at 15.
[38] Q2 2025 Tr., supra note 17, at 8.

basis rose because of the IEEPA tariffs, and Target recovered those costs through higher retail prices.

46. Target's 2025 Form 10-K expressly identifies pricing as part of its tariff response, stating that "[t]he collective interaction of tariffs, sourcing strategies, pricing actions, consumer response and behaviors, and other factors, could materially impact our sales and results of operations."[39]

47. On February 20, 2026, the Supreme Court held, 6–3, that the IEEPA did not authorize the tariffs.[40] Target's 2025 Form 10-K acknowledges that the tariffs it paid were "imposed under IEEPA and were subsequently impacted by the February 2026 ruling, though the process, timing, and amount of any potential refund recovery for such tariffs remain" uncertain.[41]

48. Target is the party entitled to those refunds. In its 2025 Form 10-K, Target stated: "Target is the importer of record for certain merchandise that was previously subject to such tariffs under IEEPA."[42] As importer of record, Target is the only party that may seek and receive a refund of the IEEPA duties—regardless that Plaintiff and the Class bore the economic burden of those duties through the prices they paid.

49. On information and belief, Target has sought or will seek refunds of the IEEPA duties it paid. In its 2025 Form 10-K, Target stated that it is "evaluating the ruling and potential actions available to us."[43]

50. Target disclosed its position on the refunds in the Management's Discussion and Analysis section of its annual report: "The ruling does not establish a refund process, and

---

[39] 2025 Form 10-K, supra note 1, at 27.
[40] Learning Resources, Inc. v. Trump, 607 U.S. ___, 146 S. Ct. 628 (2026).
[41] 2025 Form 10-K, supra note 1, at 15.
[42] Id. at 72.
[43] Id. at 27.

significant uncertainty remains regarding how and when any amounts may be recovered. We are evaluating the ruling and potential actions available to us. Because the process, timing, and amount of any recovery are uncertain, we are unable to estimate the financial effects, if any, at this time."[44]

51. Target repeated this disclosure in substance in Note 28 (Subsequent Events) to its consolidated financial statements. Neither the annual-report narrative nor Note 28 contains any reference to compensating, refunding, or otherwise returning any portion of the anticipated IEEPA duty refunds to the consumers who paid tariff-inflated prices during the Class Period. Target disclosed its intent to evaluate and pursue the refund process for its own benefit, and disclosed nothing to suggest it would share those recoveries with the consumers who funded them.[45]

52. Target plainly retained the ability to adjust its prices throughout the period. At its Q3 2025 earnings call, Target disclosed that it had "lowered prices on thousands of everyday food and essential items,"[46] and COO Michael Fiddelke referenced "3,000 price cuts across Food & Beverage and Essentials."[47] Target's ability to selectively cut prices in some categories while maintaining elevated prices elsewhere demonstrates that Target had the ability and the knowledge to refund or offset the tariff-driven price increases at any time it chose, and elected not to do so.

53. Target maintains the data infrastructure to identify each consumer who paid tariff-inflated prices and to calculate the overcharge. Target Circle is one of the largest loyalty programs in the country, with active members spending three times more on average than nonmembers.[48] Through Target Circle records, point-of-sale data, digital order histories, and credit- and debit-card records (including its own Target Circle Card), Target maintains transaction-level records

---

[44] Id.
[45] Id. at 72.
[46] Target Corp., Q3 2025 Earnings Call Tr., at 6 (Nov. 19, 2025)
[47] Q3 2025 Tr., supra note 28, at 16.
[48] Q4 2024 FCM Tr., supra note 4, at 22.

sufficient to identify Class members and their tariff-affected purchases. Target deploys these same capabilities for granular assortment and pricing decisions,[49] and can equally deploy them to calculate consumer-level restitution.

54. Plaintiff and Class members paid tariff-inflated prices to Defendant during the Class Period. Defendant now seeks to retain the benefit of those consumer payments while also recovering, and keeping for itself, the government's refund of the same tariffs

**D. Defendant will receive an unjust windfall from IEEPA Tariff Refunds**

55. Following the Supreme Court's decision in Learning Resources, nearly 2,000 importers began attempting to recover tariff refunds from the federal government. On March 4, 2026, the Court of International Trade ordered refunds of IEEPA tariffs, holding that "[a]ll importers of record" are "entitled to the benefit" of the Supreme Court ruling that struck down the IEEPA tariffs.[50] The Court ordered Customs and Border Patrol ("CBP") to liquidate any and all unliquidated entries subject to IEEPA tariffs "without regard to IEEPA duties," and ordered that "[a]ny liquidated entries for which liquidation is not final shall be reliquidated without regard to IEEPA duties."[51]

56. The Executive Director of CBP's Trade Programs Directorate estimated that as of March 4, 2026, the total amount of IEEPA duties and estimated duty deposits collected pursuant to IEEPA is approximately $166 billion.[52] Given Defendant's size, Defendant is likely entitled to collect hundreds of millions of dollars in refunds on behalf of consumers.

---

[49] 2025 Form 10-K, supra note 1, at 5.
[50] *Atmus Filtration, Inc. v. United States*, No. 1:26-01259, Order at 1 (U.S. Ct. Int'l Trade Mar. 4, 2026), ECF No. 21.
[51] *Id* at 2-3
[52] Atmus, ECF No. 31 at 6.

57. Despite being well aware of the numerous challenges to the legality of the IEEPA tariffs, Defendant deceived consumers by not informing consumers that it wouldn't refund duties paid by consumers to cover IEEPA tariffs even if they were later invalidated.

58. These funds were wrongfully taken from consumers to cover IEEPA tariffs that have since been invalidated.

## V. CLASS ALLEGATIONS

59. Plaintiff brings this action on behalf of herself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief pursuant to federal and state law on behalf of the members of the following Class:

a. **Imported Product Subclass**: All persons who, during the period beginning on February 4, 2025 through February 20, 2026, purchased from Defendant a good that was itself subject to IEEPA tariffs, at a price that Defendant increased to pass through the IEEPA tariffs assessed on that good.

b. **US-Sourced Product Subclass**: All persons who, during the period beginning on February 4, 2025 through February 20, 2026, purchased from Defendant a U.S.-sourced good that was not itself subject to IEEPA tariffs, at a price that Defendant increased to spread, recover, or offset across its product line the IEEPA tariff costs it incurred on its imported goods.

60. Excluded from the Class are the Defendant and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

61. The identity of all products encompassed within the Class definition, i.e., Class Products, are readily identifiable from Defendant's records. The identity of Class members and their purchase records are available through multiple sources, including Class members' own

transaction and payment records, Defendant's records of Class Product purchases, and records maintained by PayPal, credit card companies, and other financial institutions.

62. **Numerosity**. Members of the Class are so numerous that joinder is impracticable. Plaintiff believes that there are tens of millions of members of the Class (if not more), geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

63. **Typicality**. Plaintiff's claims are typical of the claims of other Class members. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiff and all other members of the proposed Class.

64. **Adequate representation**. Plaintiff will represent and protect the interests of the proposed Class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiff has no interests that are antagonistic to those of the proposed Class, and his interests do not conflict with the interests of the proposed Class members they seek to represent.

65. **Commonality**. Common questions of law and fact predominate over questions that may affect only individual Class members because Defendant has acted on grounds generally applicable to the Class and because Class members share a common injury. Determining damages on a class-wide basis is therefore appropriate. The overcharge injuries incurred by Plaintiff and each Class member arose from the same conduct alleged herein.

66. There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

a. Whether the higher prices that consumers paid for products sold by Defendant are attributable to the cost of IEEPA tariffs;

b. Whether Defendant is obligated to return the cost of IEEPA tariffs to the consumers who paid them in the form of higher prices;

c. Whether Defendant's retention of elevated consumer payments constitutes unjust enrichment;

d. Whether Defendant's use of IEEPA tariff-related funds to benefit Defendant's business and political interests was unlawful;

e. Whether Defendant acted unlawfully by upcharging consumers in response to IEEPA tariff-related costs while making statements to the contrary;

f. Whether Defendant's conduct constitutes an unlawful practice under consumer protection statutes by collecting tariff-related surcharges from consumers while misrepresenting its pricing practices and failing to establish a consumer refund mechanism;

g. Whether Defendant's conduct has harmed Plaintiff and the Class uniformly; and

h. The measure of damages available to Plaintiff and the Class due to increased prices caused by Defendant's IEEPA tariff pass-through.

67. Prevention of inconsistent or varying adjudications: Individual prosecution of the claims alleged herein would likely yield inconsistent or varying results, establishing incompatible standards of conduct for Defendant. Certification of the proposed Class would prevent this outcome.

68. **Injunctive Relief**. By way of its conduct described in this complaint, Defendant has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

69. **Predominance and superiority**. A class action is superior to other available means for the fair and efficient adjudication of the Class's claims. The damages suffered by individual Class members are relatively small compared to the burden of individual prosecution of this complex litigation. Individual lawsuits would risk inconsistent judgments and increase delay and expense for all parties. A class action presents fewer administrative difficulties. Class members are ascertainable through methods typical of class action practice, including Defendant's own records and consumer's proof of purchase.

## VI. CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA) Fla. Stat. §§ 501.201–501.213

70. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 69 as though fully set forth herein.

71. Plaintiff brings this Count on behalf of all Class members.

72. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Defendant's acts complained of herein are a per se violation of the Florida consumer protection law as these tariffs were illegal and unlawful.

73. FDUTPA is remedial in nature and is intended to protect consumers and legitimate business enterprises from those who engage in unfair methods of competition or unconscionable, deceptive, or unfair acts or practices in the conduct of trade or commerce.

74. Defendant's practices, as alleged herein, are injurious to the public interest as they have the capacity to injure other persons, including the millions of consumers who shop in Defendant's brick and mortar and/or online stores.

75. Defendant's practices, as alleged herein, injured Plaintiff and the Class in their business or property. The increased charges to Plaintiff and the Class were the result of illegal tariffs and the retention of sums gained through illegal collection is a per se violation of FDUTPA. Defendant unlawfully and unfairly charged customers inflated prices to cover the costs of IEPPA tariffs while representing that Defendant's prices were not increasing in response to the IEPPA tariffs. Defendant also failed to disclose to consumers that it did not intend to seek a refund of IEPPA tariff payments from the federal government even if those tariffs were illegal and instead would use consumers' funds to pursue its own business interests and seek favorable treatment from Trump. This information is material to Plaintiff's purchasing decisions and if not for Defendant's deceptive and unfair conduct, Plaintiff and the Class would not have purchased products from Defendant.

76. Defendant is liable to Plaintiff for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under (FDUTPA).

**COUNT II – FALSE AND MISLEADING ADVERTISING IN VIOLATION OF FLA. STAT. § 817.41**

77. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 69 as though fully set forth herein.

78. Plaintiff brings this Count on behalf of all Class members.

79. Florida law prohibits the making, publication, dissemination, circulation, or placement before the public of any misleading advertisement. See Fla. Stat. § 817.41.

80. The purpose of Fla. Stat. § 817.41 is to protect consumers from advertisements and promotional statements that are deceptive, misleading, or likely to induce consumers to purchase goods based upon false or incomplete information.

81. A claim under Fla. Stat. § 817.41 may be established through affirmative misrepresentations of material fact or through the concealment or omission of material facts where such omissions render statements misleading.

82. At all relevant times, Defendant engaged in the regular course of trade and commerce in Florida by marketing, distributing, supplying, offering for sale, and/or selling merchandise to consumers in Florida.

83. Defendant unlawfully and unfairly charged customers inflated prices to cover the costs of IEEPA Tariffs while representing that Defendant's prices were not increasing in response to the IEEPA Tariffs. Defendant also failed to disclose to consumers that it did not intend to seek a refund of IEEPA Tariff payments from the federal government even if those tariffs were illegal and instead would use consumers' funds to pursue its own business interests and seek favorable treatment from Trump. This information was material to Plaintiff's purchasing decisions, and but for Defendant's misleading advertisements, representations, and omissions, Plaintiff and the Class would not have purchased products from Defendant or would have paid less for such products.

84. Defendant's representations, omissions, advertisements, and marketing practices constituted misleading advertising within the meaning of Fla. Stat. § 817.41 because they were likely to mislead reasonable consumers regarding the nature, basis, and justification for Defendant's pricing practices.

85. Defendant's practices, as alleged herein, are injurious to the public interest as they have the capacity to injure other persons, including the millions of consumers who shop in Defendant's brick-and-mortar and/or online stores.

86. Plaintiff and the Class reasonably relied upon Defendant's misleading advertisements, representations, and omissions and suffered injury in their business or property as a result.

87. As a direct and proximate result of Defendant's misleading advertising and deceptive conduct, Plaintiff and the Class suffered damages in an amount to be proven at trial.

88. Defendant is liable to Plaintiff and the Class for all damages available under Florida law, together with costs, interest, and such other relief as the Court deems just and proper.

**COUNT III – UNJUST ENRICHMENT**

89. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 69 as though fully set forth herein.

90. Plaintiff brings this Count on behalf of all Class members.

91. Plaintiff and the Class have conferred a benefit upon Defendant in the form of money paid through tariff-inflated prices on goods during the period February 4, 2025, through February 20, 2026.

92. Defendant received and accepted that benefit and was thereby enriched. Defendant has retained the benefit conferred by Plaintiff without paying or otherwise compensating Plaintiff for its value.

93. The circumstances surrounding Defendant's receipt and retention of this benefit make it unjust and inequitable for Defendant to retain it without payment to Plaintiff. Defendant obtained these funds through price increases on goods subject to unlawful tariffs and has retained the resulting profits.

94. Under principles of equity and good conscience, Defendant should not be permitted to retain those ill-gotten profits when Defendant is seeking a refund of the duties it paid.

95. Under Florida law, Plaintiff and the Class are entitled to full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT IV – MONEY HAD AND RECEIVED**

96. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 69 as though fully set forth herein.

97. Plaintiff brings this Count on behalf of all Class members.

98. Defendant received funds from Plaintiff and from each member of the putative Class in the form of an IEEPA tariff surcharge. The Supreme Court has determined that the IEEPA tariffs were unlawful.

99. The funds belonged to Plaintiff and to each member of the putative Class.

100. Defendant has not returned the funds. Under principles of equity and good conscience, Defendant should not be permitted to retain those ill-gotten funds. Plaintiff seeks the return of the funds in an amount to be proven at trial.

101. Plaintiff seeks all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to them.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant, as follows:

A. Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel;

B. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged herein;

C. Declaratory relief that Defendant must return to Plaintiff and the Proposed Class Members all funds paid by consumers to cover a IEEPA tariff surcharge, with interest;

D. Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

E. An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

F. An award of costs and attorneys' fees; and

G. Such other or further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated: August 3, 2026

Respectfully submitted,

**ZUANIA MARTINEZ, Individually And on Behalf of All Others Similarly Situated**

By: */s/ Michael J. Fuller, Jr.*

Michael J. Fuller, Jr., FL Bar No. 173797
**Farrell & Fuller Law**
270 Munoz Rivera Ave. Ste. 201
San Juan, PR 00918
Telephone: 939-293-8244
Fax: 939-293-8245
mike@farrellfuller.com

*Attorney for Plaintiff*