# EXHIBIT 15

# U.S. District Court
# Eastern District of New York (Brooklyn)
# CIVIL DOCKET FOR CASE #: 1:26-cv-04959

Browne v. Target Corporation
Assigned to:
Cause: 28:1332 Diversity-(Citizenship)

Date Filed: 08/13/2026
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Damany Browne**

represented by **David Avi Rosenfeld**
Robbins Geller Rudman & Dowd, LLP
58 South Service Road
Suite 200
Melville, NY 11747
631-367-7100
Fax: 631-367-1173
Email: drosenfeld@rgrdlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Target Corporation**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/13/2026 | 1 | COMPLAINT against Target Corporation filing fee $ 405, receipt number ANYEDC-20528419 Was the Disclosure Statement on Civil Cover Sheet completed -No,, filed by Damany Browne. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons) (Rosenfeld, David) (Entered: 08/13/2026) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 08/13/2026 17:42:47 | | | |
| **PACER Login:** | studavidson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-04959 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAMANY BROWNE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TARGET CORPORATION,<br><br>Defendant. | Civil Action No. ___________<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Damany Browne ("Plaintiff"), on behalf of himself and all others similarly situated, by and through undersigned counsel of record, brings this action against Defendant Target Corporation ("Target," "Defendant," or "Company"). The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to himself and his own actions and counsel's investigations, and upon information and belief as to all the other matters, are as follows:

## INTRODUCTION

1. This action is brought on behalf of Plaintiff, purchaser of goods that Target sold and shipped throughout the United States, who bore the economic burden of the tariffs imposed by President Donald Trump's ("Trump") Administration under the International Emergency Economic Powers Act, 50 U.S.C. §1701, *et seq.* ("IEEPA"), and against Target which shifted the economic burden of the IEEPA tariffs to consumers throughout the United States by means of price increases on imported goods as well as U.S.-sourced goods not subject to tariffs sold and shipped by Target to Plaintiff. As the importer-of-record ("IOR") on goods sold at Target stores or online at Target.com, Target now receives—or has the unilateral right to receive—an inequitable windfall by collecting refunds from the federal government for tariff costs that were shifted to and paid by Plaintiff, who purchased goods from and sold by Target, and therefore, is the real party in interest to receive IEEPA tariff refunds.

2. Target collected hundreds of millions of dollars in unlawful tariffs from consumers by raising prices on imported goods and U.S.-sourced goods while the tariffs imposed by the Trump Administration under the IEEPA were in effect.

3. The refund process set in place by the federal government when the United States Supreme Court struck down the IEEPA tariffs established that ***only*** the IOR is entitled to apply for and receive a refund for any moneys paid for the import of goods. However, Target shifted the cost of these tariffs to its customers by way of price increases to products subject to tariffs and

items not subjected to tariffs, burdening Plaintiff and similarly situated consumers who bore the tariff costs in the first place.

4. Target has not returned ***any*** portion of those costs it passed on to consumers, and it has no intention of doing so. It has, in short, generated and retained a windfall from unlawful government action, and consumers—not Target—are the ones left paying for it.

5. This dispute arises from a fundamental inequity in the tariff refund process. Only the IOR may seek a refund for an unlawfully assessed tariff—but IORs merely advance the tariff cost at the border and recoup all or a substantial part of it through higher consumer prices. In economic reality, the end-consumer paid the illegal tariff.

6. This inequity is compounded when, as here, a tariff is struck down by the courts, *ab initio*. Consumers who bore the true economic burden have no direct avenue for redress—they both lack a statutory cause of action in the U.S. Court of International Trade ("CIT") and standing to seek a refund. That right belongs exclusively to the IOR, here Target or its agents, regardless of who actually paid. The refund process as designed establishes that large corporations that passed the entire tariff cost onto their customers remain exclusively entitled to recover a full refund of tariffs the Supreme Court has since declared unlawful.

7. This lawsuit seeks to force Target to return funds collected from millions of consumers to cover IEEPA tariffs between February 2025 and February 2026. Target has made no commitment to compensate consumers for those payments. This conduct not only does not reimburse the consumer for the portion of the unlawful tariff that was forced upon her by Target by means of across-the-board price increases, but it also unfairly enriches Target at the expense of the consumer.

8. Plaintiff seeks a judgment that requires Target to return to Plaintiff all IEEPA duties passed on to customers in the form of higher prices on products sold at Target stores or on Target.com, with interest.

9. Plaintiff also seeks restitution of the tariff and tariff-related fee overcharges they paid, or a proportionate share of any tariff refunds Target recovers, together with interest, reasonable attorneys' fees, and costs.

## JURISDICTION

10. This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), because the proposed Class (defined below) consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

11. Venue is proper in this District under 28 U.S.C. §1391 because a substantial part of the events, omissions, and misrepresentations giving rise to Plaintiff's claims occurred in this District. Plaintiff's purchase(s) from Target at issue in case were made in this District. Target also marketed, advertised, made available for sale, and shipped products subject to IEEPA tariffs within this District.

## PARTIES

### A. Plaintiff

12. Plaintiff Damany Browne is a citizen and resident of New York domiciled in Brooklyn, New York. During the Class Period (February 4, 2025 through February 20, 2026, inclusive), Plaintiff purchased goods directly from Target, including Target's own "Cat & Jack" products, including at Target's Brooklyn Bay Parkway store. These products were imported from countries subject to IEEPA tariffs and sold at prices inflated by Target's pass-through of IEEPA

tariff costs. Plaintiff also purchased other products at Target that were sourced from within the United States and not subjected to tariffs, but were sold at prices Target likewise inflated by spreading across its product line the IEEPA tariff costs incurred on its imported goods, so that purchasers of non-tariffed domestic goods also bore the tariff burden.

**B. Defendant**

13. Defendant Target Corporation is a Minnesota corporation with its headquarters and principal place of business located in Minneapolis, Minnesota. Target is an American multinational consumer goods company that conducts business in all 50 states, the District of Columbia, and United States territories. Target is one of the world's largest retail companies. At all relevant times, Target operated more than 2,000 stores and an online store, Target.com, through which it sold imported products and U.S.-sourced products directly to consumers. During the Class Period, Target collected tariff costs from those consumers on goods subject to tariffs imposed under the IEEPA, as well as goods not subject to tariffs imposed under the IEEPA. On information and belief, the misconduct alleged herein originated from and was directed out of Defendant's headquarters and principal place of business in Minneapolis, Minnesota.

## FACTUAL ALLEGATIONS

**A. Target Is an Enormous Retailer of Imported Goods and U.S.-Sourced Goods**

14. Target is a major retailer that imports a substantial volume of consumer goods into the United States and sells them to consumers throughout the country through its eponymous online store.

15. Target is the eighth-largest retailer in the United States, and, as of 2024, is ranked No. 32 on the 2022 Fortune 500 list of the largest American corporations by total revenue. As of 2025, it operates more than 2,000 stores throughout the United States.

16. Target purchases the goods it sells wholesale from vendors, suppliers, and manufacturers, including, but not limited to, a substantial volume of goods imported from outside the United States, and resells them to consumers through its big-box stores and online store. Target owns much, if not all, of the inventory it offers for sale and sets the retail prices its customers pay on such products.

17. For the imported goods it sells, Target's involvement begins before the goods enter the United States. As the IOR, Target signs the customs declaration, takes legal responsibility for compliance, and pays the tariff to U.S. Customs and Border Protection ("CBP"). On information and belief, Target pays for all tariffs and tariff-related fees for the imported goods it sells.

18. Target's offered products are not limited to imported goods. Target also sources, stocks, and sells a substantial volume of consumer goods that originate within the United States and are not subject to the IEEPA tariffs. Target offers these U.S.-sourced goods to consumers in its stores and online, alongside its imported goods. As with its imported goods, Target owns this inventory and sets the retail prices its customers pay.

19. The IEEPA tariffs increased the costs Target incurred on the imported goods for which it was the IOR. On information and belief, rather than absorbing those increased costs or confining them to the imported goods that generated them, Target recovered the tariff costs by raising prices across its sold products, including on U.S.-sourced goods that were never subject to the IEEPA tariffs.

20. As a result, Target sold its imported goods at prices inflated by its direct pass-through of IEEPA tariff costs, ***and*** sold its U.S.-sourced goods at prices likewise inflated by Target's decision to spread those same tariff costs across its sold products.

21. Consumers who purchased U.S.-sourced goods from Target, therefore, bore a portion of the IEEPA tariffs that Target incurred on imported goods those consumers never purchased.

**B. The Trump Administration Invokes the IEEPA to Implement Tariffs**

22. On February 4, 2025, Trump issued an executive order imposing a 10% tariff on Chinese imports.[1] In March 2025, Trump issued two more executive orders imposing a 25% tariff on goods imported from Canada and Mexico.[2] By April 2025, the Trump Administration had imposed tariffs on imports from most other U.S. trading partners.

23. The Trump Administration invoked the IEEPA as the legal basis for these tariffs. The IEEPA was originally designed to allow the President to regulate international commerce during declared national emergencies.[3] The Trump Administration pointed to drug trafficking across U.S. borders and the persistent American trade deficit as the legal emergencies justifying the IEEPA tariffs.[4]

24. The IEEPA tariffs did not operate in isolation. For example, for much of 2025, the effective rate on most Chinese electronics was approximately 45%: a 20% IEEPA layer on top of

---

[1] Andrea Shalal et al., *Trump launches trade war with tariffs on Mexico, Canada and China*, Reuters (Feb. 1, 2025), https://www.reuters.com/business/trump-readies-order-steep-tariffs-goods-mexico-canada-china-2025-02-01/.

[2] *Id*.

[3] Christopher A. Casey et al., *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, Cong. Rsch. Serv. R45618 (Sep. 1, 2025), https://www.congress.gov/crs-product/R45618.

[4] Shalal, *supra* note 1.

an already existing 25% Section 301 tariff.[5] At the peak of the escalation in April-May 2025, average U.S. tariffs on Chinese imports reached 127.2% in early May 2025.[6]

25. On April 3, 2025, within days of the IEEPA tariffs going into effect, the first lawsuit challenging their legality was filed.[7] Despite palpable fear from business groups of incurring the Administration's anger,[8] other lawsuits would eventually follow.[9] These filings were widely reported and as a major retailer, Target certainly tracked their progress.[10]

26. On February 20, 2026, the U.S. Supreme Court issued its opinion in *Learning Resources, Inc. v. Trump*, holding that the IEEPA did not authorize the President to impose the IEEPA tariffs and that they were invalid *ab initio*.[11]

---

[5] Section 301 of the U.S. Trade Act of 1974 authorizes the President to take all appropriate action, including tariffs, to remove a foreign government's practice that violates an international trade agreement and that restricts U.S. commerce. 19 U.S.C. §2411. Trump implemented Section 301 tariffs in 2018.

[6] Chad P. Bown, *US-China Trade War Tariffs: An Up-to-Date Chart*, Peterson Inst. for Int'l Econ. (Nov. 14, 2025), https://www.piie.com/research/piie-charts/2019/us-china-trade-war-tariffs-date-chart.

[7] *Emily Ley Paper, Inc., d/b/a Simplified v. Trump*, No. 3:25-cv-00464-TKW-ZCB (N.D. Fla. Apr. 3, 2025).

[8] Caitlin Oprysko¸ *'Everyone is terrified': Business and government officials are afraid to cross Trump on tariffs*, Politico (Apr. 4, 2025), https://www.politico.com/news/2025/04/04/trump-tariffs-fear-lobby-business-congress-00006608.

[9] *See, e.g.*, Doug Palmer¸ *Trump's tariffs could face more than one legal challenge*, Politico (Apr. 4, 2025), https://www.politico.com/news/2025/04/04/first-lawsuit-filed-against-trumps-tariffs-00273646; Larry Neumeister, *A dozen states sue the Trump administration to stop tariff policy*, Associated Press (Apr. 23, 2025), https://apnews.com/article/tariffs-lawsuit-what-states-sue-0d6531b7f60aaa2f7c6c35e0a944d4a9.

[10] *Id*.

[11] *Learning Res., Inc. v. Trump*, 607 U.S. 229, 254-55 (2026).

27. The Supreme Court's decision in *Learning Resources* eliminated the legal basis for the IEEPA tariffs and created a pathway for IORs like Target to seek refunds of the tariffs previously collected by the federal government.

**C. Consumers Incurred Price Increases on Defendant's Products While the IEEPA Tariffs Were in Effect**

28. The IEEPA tariffs increased the costs that retailers, including Target, incurred on imported goods. Across the retail industry, companies responded by passing those increased costs on to consumers through higher prices. A survey of American chief executive officers ("CEO") found that a majority had already raised prices or were considering doing so in response to the tariffs,[12] and major retailers publicly announced tariff-driven price increases throughout 2025 and into 2026.[13]

29. Independent economic analysis confirms that a substantial portion of the tariff costs was passed through to U.S. consumers during the relevant period. The Federal Reserve found that pass-through to consumers for goods imported from China was at least 30% between April and

---

12 Ali McCadden, *Here are the retailers raising prices as Trump tariffs take hold*, CNBC (May 31, 2025), https://www.cnbc.com/2025/05/31/trump-tariffs-here-are-the-retailers-raising-prices.html (reporting the CEO/AlixPartners survey of U.S. CEOs and individual retailer price-increase announcements).

13 Megan Cerullo, *Walmart and other big companies say tariffs are forcing them to hike prices*, CBS News (Feb. 20, 2026), https://www.cbsnews.com/news/walmart-trump-tariffs-general-merchandise-inflation/.

December 2025.[14] Federal Reserve Bank of New York research found that U.S. businesses and consumers together bore nearly 90% of the cost of the 2025 tariffs.[15]

30. These price increases were not confined to imported goods. Analyses of retail pricing found that prices rose on both imported and domestically produced goods as retailers spread tariff-related costs across their product lines.[16] Researchers estimated that tariff pass-through added roughly 0.7 percentage points to the Consumer Price Index by September 2025, and that the lowest-priced product varieties saw the steepest increases (around 5%) because retailers had the least room to absorb the cost in their margins.[17]

31. The cumulative burden on consumers was enormous. After years of moderating prices, consumer goods prices rose throughout 2025 and into 2026.[18] According to the Budget Lab at Yale University, tariffs accounted for an estimated 86% of the rise in prices for imported household goods, with the effect most pronounced for long-lasting durable goods such as cars,

---

[14] Sinem Hacıoğlu-Hoke et al., *The Slow Climb: How Tariffs Gradually Raised Retail Prices in 2025*, Bd. of Governors of the Fed. Rsrv. Sys., FEDS Notes (Mar. 5, 2026), https://www.federalreserve.gov/econres/notes/feds-notes/the-slow-climb-how-tariffs-gradually-raised-retail-prices-in-2025-20260305.html.

[15] Cerullo, *supra* note 13 (reporting Federal Reserve Bank of New York research that U.S. businesses and consumers together bore nearly 90% of the cost of the 2025 tariffs).

[16] Alberto Cavallo et al., *Are Tariffs Raising U.S. Retail Prices?* (UPDATED), Econofact (Dec. 4, 2025), https://econofact.org/are-tariffs-raising-u-s-retail-prices (summarizing the Cavallo/ Harvard Business School Pricing Lab analysis of online pricing at five major U.S. retailers, including price increases on domestically produced goods).

[17] *Id.*

[18] *Tracking the Economic Effects of Tariffs*, Yale Budget Lab (Apr. 1, 2026), https://budgetlab.yale.edu/research/tracking-economic-effects-tariffs.

appliances, and furniture.[19] American consumers paid more than $231 billion in tariff costs between February 2025 and January 2026, an average of roughly $1,745 per family.[20]

32. Target has admitted that "[a]pproximately one-half of the merchandise that [Target] offer[s] is sourced, directly or indirectly, from outside the U.S., with China as [its] single largest source of merchandise we import."[21]

33. Target's products are not limited to imported goods. Target also sources, stocks, and sells a substantial volume of consumer goods that originate within the United States and are not subject to IEEPA tariffs, which it offers to consumers alongside its imported goods. As with its imported goods, Target owns this inventory and sets the retail prices its customers pay.

34. The IEEPA tariffs increased the costs Target incurred on the imported goods for which it served as an IOR. On information and belief, rather than absorbing those increased costs or confining them to the imported goods that generated them, Target (like other major retailers) made a business decision to recover the tariff costs by raising prices across its products, including on U.S.-sourced goods that were never subject to IEEPA tariffs.

35. As a result, Target sold its imported goods at prices inflated by its direct pass-through of IEEPA tariff costs and sold its U.S.-sourced goods at prices likewise inflated by its decision to spread those same tariff costs across its product line. Consumers who purchased U.S.-

---

19 *Id.*

20 *American Families Have Paid More Than $1,700 Each in Tariff Costs Since Trump Entered Office*, Joint Econ. Comm. Minority (Feb. 2026), https://www.jec.senate.gov/public/_cache/files/7cc03e65-d40a-465f-9e88-09dd53d3502f/jec-fact-sheet-on-cost-of-tariffs-for-families-update.pdf.

21 Target Corp. 2025 Form 10-K (Annual Report), at 5, https://corporate.target.com/getmedia/79214b4b-6331-4b1c-b76f-acff121b40f9/2025-Annual-Report-Target-Corporation.pdf.

sourced goods from Target therefore bore a portion of the IEEPA tariffs that Target incurred on imported goods those consumers never purchased.

36. Target maintains detailed transaction, pricing, and customer records, including point-of-sale data, online order histories, and payment and loyalty-program records, through which Target is able to identify the consumers during the Class Period who paid tariff-inflated prices on products that it sold, and the amount of the increase attributable to the IEEPA tariffs.

37. Target's own executives publicly acknowledged that the IEEPA tariffs would increase the prices its customers paid. In March 2025, Target CEO Brian Cornell told CNBC that consumers would "likely see price increases over the next couple of days" on Target-sold products, because of newly imposed tariffs, and "[i]f there's a 25% tariff, those prices will go up."[22] These statements were widely reported.

38. That same day, Target's Chief Commercial Officer Rick Gomez ("Gomez") described the specific mechanics: rather than limiting price increases only to goods subject to tariffs, Target would spread tariff costs ***across its product lines***, raising prices on non-tariffed goods to offset the cost of tariff-affected goods. "We have $3 Christmas ornaments. We don't want to have $3.60 Christmas ornaments. We want to keep them at $3. That means we have to think about margin elsewhere. So maybe we'll take pricing up a little bit on stockings to cover where we are in Christmas ornaments."[23] Applying the same logic to Target's "$5 tees," Gomez stated

---

[22] Emma Roth, *Best Buy and Target CEOs say prices are about to go up because of tariffs*, The Verge (Mar. 4, 2025), https://www.theverge.com/news/624254/best-buy-target-raise-prices-tariffs; *see also* Kelly Tyko, *Target CEO: Tariffs will cause food prices to rise in "next couple of days,"* Axios (Mar. 4, 2025), https://www.axios.com/2025/03/04/tariffs-food-prices-increase-mexico.

[23] Gabrielle Fonrouge, *Trump's Mexico tariffs could raise produce prices in the next few days, Target CEO Says*, CNBC (Mar. 4, 2025), https://www.cnbc.com/2025/03/04/trump-mexico-tariffs-will-raise-produce-prices-target-ceo-cornell-says.html.

Target might "look at dresses a little bit differently" because "it's actually not as simple as just like flowing through cost."[24] These admissions confirm that Target's price-recovery strategy burdened consumers across categories regardless of whether the specific goods were themselves subject to tariffs.

39. Independent analyses by Bank of America confirmed that Target was substantially more exposed to import tariffs than Walmart because a larger share of its merchandise was imported, concluding that Target might need to raise prices by roughly 8% to fully offset tariff costs, compared with about 4%-5% for Walmart.[25]

40. Third-party pricing data confirms that Target specifically raised prices during the Class Period. An analysis of online pricing by the research firm DataWeave found that prices at Target rose 1.7% between the start of 2025 and the end of September 2025, and that apparel prices at Target—a heavily imported category—rose 3.3% over the same period.[26] DataWeave reached these figures by continuously collecting live pricing data on roughly 16,000 Target items.

41. Target's own statements corroborate that it raised prices to recover tariff costs. Target conceded that it could offset only the "vast majority"—not all—of its incremental tariff

---

[24] *Id.*

[25] Bill Peters, *Target might need to raise prices nearly twice as much as Walmart to cushion tariff impact, analysts say*, MarketWatch (Aug. 15, 2025), https://www.marketwatch.com/story/target-might-need-to-raise-prices-nearly-twice-as-much-as-walmart-to-cushion-tariff-impact-analysts-say-7ede7247.

[26] Courtney Reagan, *Retailers are raising prices to meet tariffs. Amazon is hiking more than others*, CNBC (Dec. 5, 2025), https://www.cnbc.com/2025/11/05/amazon-target-walmart-raising-prices-tariffs.html.

exposure,[27] necessarily leaving a remainder to be borne by consumers through higher prices. When Goldman Sachs analyst Kate McShane asked directly "what price increases were taken during the second quarter as a result of tariffs," Target did not deny that prices had been raised, answering only that it would "take price as a last resort."[28] And Target's CEO described a cross-functional effort that revised "order quantities and pricing" and stated the team was "maintaining our focus on value by limiting the impact on our pricing"[29]—confirming that Target's pricing was in fact impacted, with the Company seeking only to limit, not eliminate, the increases.

42. Target's own SEC filings admit that the IEEPA tariffs both raised its costs and led to raised prices. In its 2025 Form 10-K, Target stated that the 2025 tariffs on goods from China, India, Vietnam, and Bangladesh "have resulted, and could continue to result, in us incurring substantial additional costs to procure a large portion of the merchandise we offer and impact the margin rate for certain products, raising prices on certain products."[30]

43. Target's cost disclosures confirm that the tariffs increased its product costs. Reporting its second quarter 2025 results, CFO Jim Lee disclosed that Target's ending inventory "reflects higher product costs than a year ago, driven by tariffs and other pressures."[31] Higher tariff-driven product costs carried in inventory are a direct predicate to consumer price increases:

---

[27] Target Corp., Q1 2025 Earnings Call Transcript, at 5 (May 21, 2025), https://corporate.target.com/getmedia/9c383747-166d-4310-b91f-cd77b7d06433/2025-May-21-TGT-Transcript.pdf.

[28] Target Corp., Q2 2025 Earnings Call Transcript, at 11 (Aug. 20, 2025), https://corporate.target.com/getmedia/c5751599-850d-4bb0-b599-d8ac55a91156/2025-august-20-tgt-transcript.pdf.

[29] *Id.* at 3.

[30] 2025 Form 10-K, *supra* note 21, at 15.

[31] Q2 2025 Earnings Call Transcript, *supra* note 28, at 8.

Target's cost basis rose because of the IEEPA tariffs, and Target recovered those costs through higher retail prices.

44. While collecting these tariff costs from consumers through higher prices, Target is simultaneously entitled to pursue a refund of the same IEEPA tariffs from the federal government following the Supreme Court's invalidation of those tariffs. On information and belief, Target will recover those tariffs in full. If Target retains that refund without compensating the consumers who already bore the tariffs' cost, Target will have recovered the same tariff ***twice***—once from its customers and once from the government—and will be made whole twice over at the Class's expense.

45. In its 2025 Form 10-K, Target stated: "Target is the importer of record for certain merchandise that was previously subject to such tariffs under IEEPA."[32] As importer of record, Target is the only party that may seek and receive a refund of the IEEPA duties, regardless that Plaintiff and the Class bore the economic burden of those duties through the prices they paid.

46. On information and belief, Target has sought or will seek refunds of the IEEPA duties it paid. In its 2025 Form 10-K, Target stated that it is "evaluating the ruling and potential actions available to us."[33]

47. Target disclosed its position on the refunds in the Management's Discussion and Analysis section of its 2025 Annual Report: "The ruling does not establish a refund process, and significant uncertainty remains regarding how and when any amounts may be recovered. We are

---

[32] 2025 Form 10-K, *supra* note 21, at 72.

[33] *Id.*

evaluating the ruling and potential actions available to us. Because the process, timing, and amount of any recovery are uncertain, we are unable to estimate the financial effects, if any, at this time."[34]

48. Target repeated this disclosure in substance in Note 28 (Subsequent Events) to its consolidated financial statements. Neither the Annual Report narrative nor Note 28 contains any reference to compensating, refunding, or otherwise returning any portion of the anticipated IEEPA duty refunds to the consumers, like Plaintiff, who paid tariff-inflated prices during the Class Period. Target disclosed its intent to evaluate and pursue the refund process for its own benefit and disclosed nothing to suggest it would share those recoveries with the consumers who funded them.

49. Target plainly retained the ability to adjust its prices throughout the period. At its third quarter 2025 earnings call, Target disclosed that it had "lowered prices on thousands of everyday food and essential items,"[35] and Chief Operating Officer Michael Fiddelke referenced "3,000 price cuts across Food & Beverage and Essentials."[36] Target's ability to selectively cut prices in some categories while maintaining elevated prices elsewhere demonstrates that Target had the ability and the knowledge to refund or offset the tariff-driven price increases at any time it chose, and elected not to do so.

50. Target maintains the data infrastructure to identify each consumer who paid tariff-inflated prices and to calculate the overcharge. Target Circle is one of the largest loyalty programs in the country, with active members spending three times more on average than non-members. Through Target Circle records, point-of-sale data, digital order histories, and credit- and debit-card

---

[34] *Id.* at 27.

[35] Target Corp., Q3 2025 Earnings Call Transcript, at 6 (Nov. 19, 2025), https://corporate.target.com/getmedia/1b701222-ff3c-4f65-b4b7-d0de5511f9a4/TGT-Transcript-2025-11-19.pdf.

[36] *Id.* at. 16.

records (including its own Target Circle Card), Target maintains transaction-level records sufficient to identify Class members and their tariff-affected purchases. Target deploys these same capabilities for granular assortment and pricing decisions, and can equally deploy them to calculate consumer-level restitution.

51. Plaintiff and Class members paid tariff-inflated prices to Target during the Class Period. Target now seeks to retain the benefit of those consumer payments while also recovering, and keeping for itself, the refund of the same tariffs.

**D. Defendant Will Receive an Unjust Windfall from IEEPA Tariff Refunds**

52. Following the Supreme Court's decision in *Learning Resources*, nearly 2,000 importers began attempting to recover tariff refunds from the federal government. On March 5, 2026, the CIT ordered refunds of IEEPA tariffs, holding that "[a]ll importers of record" are "entitled to the benefit" of the Supreme Court ruling that struck down the IEEPA tariffs.[37] The Court ordered CBP to liquidate any and all unliquidated entries subject to IEEPA tariffs "without regard to the IEEPA duties," and ordered that "[a]ny liquidated entries for which liquidation is not final shall be reliquidated without regard to those duties."[38]

53. The Executive Director of CBP's Trade Programs Directorate estimated that as of March 4, 2026, the total amount of IEEPA duties and estimated duty deposits collected pursuant to the IEEPA is approximately $166 billion.[39] Given Target's size, Target is entitled to seek

---

[37] Amended Order, *Atmus Filtration, Inc. v. United States*, No. 1:26-cv-01259-RKE (U.S. Ct. Int'l Trade Mar. 5, 2026), ECF 29 at 1.

[38] *Id.* at 2-3.

[39] Declaration of Brandon Lord, *Atmus Filtration, Inc. v. United States*, No. 1:26-cv-01259-RKE (U.S. Ct. Int'l Trade Mar. 6, 2026), ECF 31 at 6.

refunds from the government on products it sold and collect hundreds of millions of dollars in refunds on behalf of consumers.

54. Despite being well aware of the numerous challenges to the legality of the IEEPA tariffs, Target deceived consumers by not informing them that it wouldn't refund duties paid by consumers to cover the IEEPA tariffs even if they were later invalidated.

55. These funds were wrongfully taken from consumers to cover the IEEPA tariffs that have since been invalidated.

## CLASS ALLEGATIONS

56. Plaintiff brings this action on behalf of himself, and as a class action under Rule 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure, seeking damages and injunctive relief pursuant to federal and state law on behalf of the members of the following Class:

a. **Imported Product Subclass**: All persons who, during the period February 4, 2025 through February 20, 2026, inclusive, purchased a product or good from Target that was itself subject to the IEEPA tariffs, at a price that Target increased to pass through the IEEPA tariffs assessed on that good.

b. **U.S.-Sourced Product Subclass**: All persons who, during the period February 4, 2025 through February 20, 2026, inclusive, purchased a product or good from Target that was not itself subject to the IEEPA tariffs, at a price that Target increased to spread, recover, or offset across its product line the IEEPA tariff costs it incurred on its imported goods.

57. Excluded from the Class are Target and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

58. The identity of all products encompassed within the Class definition, *i.e.*, Class Products, are readily identifiable from Target's records. The identity of Class members and their purchase records are available through multiple sources, including Class members' own

transaction and payment records, Target's records of Class Product purchases, and records maintained by credit card companies, other financial institutions, and e-commerce payment platforms.

59. **Numerosity**. Members of the Class are so numerous that joinder is impracticable. Plaintiff believes that there are tens of millions of members of the Class (if not more), geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

60. **Typicality**. Plaintiff's claims are typical of the claims of other Class members. The factual and legal bases of Target's liability are the same and resulted in injury to Plaintiff and all other members of the proposed Class.

61. **Adequate Representation**. Plaintiff will represent and protect the interests of the proposed Class both fairly and adequately. She has retained counsel competent and experienced in complex class action litigation. Plaintiff has no interests that are antagonistic to those of the proposed Class, and her interests do not conflict with the interests of the proposed Class members they seek to represent.

62. **Commonality**. Common questions of law and fact predominate over questions that may affect only individual Class members because Target has acted on grounds generally applicable to the Class and because Class members share a common injury. Determining damages on a Class-wide basis is, therefore, appropriate. The overcharge injuries incurred by Plaintiff and each Class member arose from the same conduct alleged herein.

63. There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

(a) whether the higher prices that consumers paid for products sold by Target are attributable to the cost of IEEPA tariffs;

(b) whether Target is obligated to return the cost of IEEPA tariffs to the consumers who paid them in the form of higher prices;

(c) whether Target's retention of elevated consumer payments constitutes unjust enrichment;

(d) whether Target's use of IEEPA tariff-related funds to benefit Target's business and political interests was unlawful;

(e) whether Target acted unlawfully by upcharging consumers in response to IEEPA tariff-related costs while making statements to the contrary;

(f) whether Defendant's conduct constitutes an unlawful business or trade practice under consumer protection statutes by passing through illegal tariff fees and charging consumers more for products based on such illegal tariffs, misrepresenting its pricing practices, and failing to establish a consumer refund mechanism;

(g) whether Target's conduct has harmed Plaintiff and the Class uniformly; and

(h) the measure of damages or restitution available to Plaintiff and the Class due to increased prices caused by Target's IEEPA tariff pass-through.

64. Prevention of inconsistent or varying adjudications: Individual prosecution of the claims alleged herein would likely yield inconsistent or varying results, establishing incompatible standards of conduct for Target. Certification of the proposed Class would prevent this outcome.

65. **Injunctive Relief**. By way of its conduct described in this complaint, Target has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

66. **Predominance and Superiority**. A class action is superior to other available means for the fair and efficient adjudication of the Class's claims. The damages suffered by individual Class members are relatively small compared to the burden of individual prosecution of this complex litigation. Individual lawsuits would risk inconsistent judgments and increase delay and expense for all parties. A class action presents fewer administrative difficulties. Class members are ascertainable through methods typical of class action practice, including Defendant's own records and consumers' proof of purchase.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT ("MCFA"), Minn. Stat. §325F.69, subd. 1, and Minn. Stat. §8.31, subd. 3(a).

67. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 66 as though fully set forth herein.

68. Plaintiff brings this Count on behalf of all Class members.

69. The MCFA prohibits:

> [t]he act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

Minn. Stat. §325F.69, subd. 1.

70. The MCFA is "remedial in nature and [is] to be liberally construed in favor of protecting consumers." *State v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124, 133 (Minn. 2019) (cleaned up). "Additionally, the elements of MCFA claims are distinct from common-law fraud actions and broaden the relief against fraud available to consumers [and] reflects a clear legislative policy encouraging aggressive prosecution of statutory violations and thus should be generally very broadly construed to enhance consumer protection." *Id.* (cleaned up).

71. A cause of action under the MCFA requires that a plaintiff establish: (a) a public benefit; and (b) a misrepresentation sufficient to violate the statute. *Varela v. State Farm Mut. Auto. Ins. Co.*, 655 F. Supp. 3d 813, 823 (D. Minn. 2023).

72. A cognizable misrepresentation under the MCFA includes both an affirmative misrepresentation of a material fact or concealing or omitting disclosure of a material fact that the defendant had a duty to disclose, also known as fraudulent omission. *Id.*

73. Target has committed a violation of the MCFA by: (a) increasing charges to Plaintiff and the Class that were the result of illegal tariffs and the retention of sums gained through illegal collection, which is a *per se* violation of the MCFA; (b) unlawfully and unfairly charging customers inflated prices to cover the costs of IEEPA tariffs; and (c) failing to disclose to consumers that it did not intend to seek a refund of IEEPA tariff payments even if those tariffs were illegal and instead would use consumers' funds to pursue its own business interests. This information is material to Plaintiff's purchasing decisions and if not for Target's misrepresentation or fraudulent omission, Plaintiff and the Class would not have purchased products from and sold by Target.

74. Because of Target's special knowledge of material facts concerning its price increases due to tariffs, special circumstances triggered Target's duty to disclose.

75. The public interest is harmed by Target's conduct in charging, collecting, and later retaining billions of dollars in illegal IEEPA tariffs from consumers.

76. Plaintiff and the Class have been injured by paying more for products sold or shipped by Target than they should have paid, or would have been willing to pay, were it fully disclosed that the IEEPA tariffs were illegal *ab initio*.

77. These considerations are material to Plaintiff and the Class as reasonable consumers. Had Plaintiff and the Class known the IEEPA tariffs were illegal, and Target's concomitant increase in prices false and deceptive, they would not have purchased the products from and sold by Target or would have located them elsewhere.

78. Plaintiff and the Class members have been deprived of money or property by Target.

79. There is a causal link between the false or deceptive acts complained of and the injuries alleged.

80. Plaintiff and the Class are entitled to damages, other equitable relief as determined by the Court, reasonable attorneys' fees, and costs, pursuant to Minn. Stat. §8.31, subd. 3(a).

**COUNT II**
**VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT ("MDTPA), Minn. Stat. §325D.44, subd. 1(13), *et seq.***

81. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 66 as though fully set forth herein.

82. Plaintiff brings this Count on behalf of all Class members.

83. The MDTPA prohibits a person from "engag[ing] in a deceptive trade practice when, in the course of business, vocation, or occupation, the person: . . . engages in (i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices." Minn. Stat. §325D.44, subd. 1(13).

84. Like the MCFA, the MDTPA is "remedial in nature and [is] to be liberally construed in favor of protecting consumers." *Minn. Sch. of Bus.*, 935 N.W.2d at 133 (cleaned up).

85. The elements of an MDTPA claim are: (a) commission of an act prohibited by §325D.44; (b) the act creates or is likely to create confusion, misunderstanding, or deception; and

(c) the plaintiff is likely to be damaged by that conduct and therefore is entitled to injunctive relief. Plaintiff need not prove actual confusion or misunderstanding. *See* Minn. Stat. §325D.44 subd. 2.

86. Target has committed unfair methods of competition and unfair or unconscionable acts or practices, in violation of the MDTPA, by: (a) increasing charges to Plaintiff and the Class that were the result of illegal tariffs and the retention of sums gained through illegal collection, which is a per se violation of the MDTPA; (b) unlawfully and unfairly charging customers inflated prices to cover the costs of IEEPA tariffs; and (c) failing to disclose to consumers that it did not intend to seek a refund of IEEPA tariff payments even if those tariffs were illegal and instead would use consumers' funds to pursue its own business interests. This information is material to Plaintiff's purchasing decisions and if not for Target's deceptive and unfair conduct, Plaintiff and the Class would not have purchased products from and sold by Target.

87. Plaintiff and the Class are threatened with irreparable injury and future harm because they have paid overinflated prices for Target products due to illegal tariffs and Target has refused to commit to returning any refunds to Plaintiff and the Class.

88. Plaintiff and the Class are entitled to injunctive relief to prohibit Target from retaining any windfall from refunds received from the government from the illegal tariffs, plus attorneys' fees and costs.

**COUNT III**
**UNJUST ENRICHMENT**

89. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 66 as though fully set forth herein.

90. Plaintiff brings this Count on behalf of all Class members.

91. Plaintiff and the Class have conferred a benefit upon Target in the form of money paid through tariff-inflated prices on goods sold by Target during the Class Period.

92. Target received and accepted that benefit and was thereby enriched. Target has retained the benefit conferred by Plaintiff without paying or otherwise compensating Plaintiff for its value.

93. The circumstances surrounding Target's receipt and retention of this benefit make it unjust and inequitable for Target to retain it without payment to Plaintiff. Target obtained these funds through price increases on goods subject to unlawful tariffs and has retained the resulting profits.

94. Under principles of equity and good conscience, Target should not be permitted to retain those ill-gotten profits when Target is seeking or must seek a refund of the duties it paid.

95. Plaintiff and the Class have no adequate remedy at law.

96. Plaintiff and the Class are entitled to full disgorgement and restitution of any money Target has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT IV**
**MONEY HAD AND RECEIVED**

97. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 66 as though fully set forth herein.

98. Plaintiff brings this Count on behalf of all Class members.

99. Target received funds from Plaintiff and from each member of the putative Class in the form of increased prices on products based on the IEEPA tariffs. The Supreme Court has determined that the IEEPA tariffs were unlawful.

100. The funds belonged to Plaintiff and to each member of the putative Class.

101. Target has not returned the funds. Under principles of equity and good conscience, Target should not be permitted to retain those ill-gotten funds. Plaintiff seeks the return of the funds in an amount to be proven at trial.

102. Plaintiff seeks all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to them.

**COUNT V**
**VIOLATION OF THE NEW YORK CONSUMER PROTECTION LAWS**
**N.Y. Gen. Bus. Law ("GBL") §§349-350**

103. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 66 as though fully set forth herein.

104. Plaintiff brings this Count on behalf of all New York Class members.

105. The statute prohibits unfair, deceptive, or abusive acts or practices in business, trade, commerce, or service provision in New York State.

106. Target's acts complained of herein are a *per se* violation of the New York consumer protection law as these tariffs were illegal and unlawful.

107. Target's practices, as alleged herein, are injurious to the public interest as they have the capacity to injure other persons, including the millions of consumers who shop on Target's online stores.

108. As a direct and proximate result of Target's deceptive and unlawful acts and practices, as alleged herein, Plaintiff and the Class were injured in their business or property. The increased charges to Plaintiff and the Class were the result of illegal tariffs and the retention of sums gained through illegal collection is a *per se* violation of the GBL. Target unlawfully and unfairly charged customers inflated prices to cover the costs of the IEEPA tariffs. Target also failed to disclose to consumers that it did not intend to seek a refund of IEEPA tariff payments even if those tariffs were illegal and instead would use consumers' funds to pursue its own business interests. This information is material to Plaintiff's purchasing decisions and if not for Target's

deceptive and unfair conduct, Plaintiff and the Class would not have purchased products from and sold by Target.

109. Target's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large.

110. Target is liable to Plaintiff for damages in amounts to be proven at trial, including statutory and treble damages, injunctive relief, as well as attorneys' fees, costs, and any other remedies the Court may deem appropriate under GBL §§349-350.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant, as follows:

A. Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel;

B. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged herein;

C. Declaratory relief that Defendant must return to Plaintiff and the proposed Class all funds paid by consumers to cover the IEEPA tariffs, with interest;

D. Costs, restitution, damages, including treble, statutory, punitive, and nominal damages, and disgorgement in an amount to be determined at trial;

E. An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

F. An award of costs and attorneys' fees; and

G. Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: August 13, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
DAVID A. ROSENFELD

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
drosenfeld@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
STUART A. DAVIDSON
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
sdavidson@rgrdlaw.com

*Attorneys for Plaintiff and the Class*