BEFORE THE
UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

IN RE: RETAILER TARIFF LITIGATION | MDL No. _________

AMENDED MEMORANDUM IN SUPPORT OF MOTION FOR TRANSFER AND CENTRALIZATION PURSUANT TO 28 U.S.C. §1407

Pursuant to 28 U.S.C. §1407 and the Rules of Procedure of the Judicial Panel on Multidistrict Litigation ("Panel"), Movants[1] respectfully submit this Memorandum in Support of their Motion for Transfer and Centralization of all federal cases listed in the Schedule of Actions attached hereto, and any subsequently filed "tag-along" actions, to the United States District Court for the Northern District of Illinois.[2]

## I. INTRODUCTION

There are currently 25 related class action lawsuits ("Actions") pending in 11 jurisdictions against one or more common defendants alleging that defendants, all major big-box and online retailers, including Amazon, Target, Walmart, Nike, Costco, Shein, and Temu, among others (collectively, "Retailer Defendants"),[3] collected billions of dollars from consumers by raising prices on imported goods and U.S.-sourced goods while tariffs imposed by the Trump administration under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §1701 *et seq.*, were in effect.

---

[1] Movants are, collectively, Don Polistico, plaintiff in *Polistico v. Amazon.com., Inc.*, No. 1:26-cv-04194 (E.D.N.Y.), Tonysha Emerson, plaintiff in *Emerson v. Amazon.com, Inc.*, No. 2:26-cv-12614 (E.D. Mich.), Sharon Lasseter, plaintiff in *Lasseter v. Amazon.com, Inc.*, No. 8:26-cv-02019 (M.D. Fla.), *Zuania Martínez*, plaintiff in *Martinez v. Target Corp.*, No. 3:26-cv-01807 (M.D. Fla.), *Parveen Sangha*, plaintiff in *Sangha v. Amazon.com, Inc.*, 26-cv-01777 (N.D. Ohio), Patricia Cavallaro, plaintiff in *Cavallaro v. Target Corp.*, No. 7:26-cv-06165 (S.D.N.Y), Gregory Rittenhouse, plaintiff in *Rittenhouse v. Amazon.com, Inc.*, No. 2:26-cv-03392 (E.D.N.Y.), and Luisa Spadafino, plaintiff in *Spadafino v. Amazon.com, Inc.*, No. 2:26-cv-10023 (D.N.J.).

[2] On August 1, 2026, Plaintiffs Mari Cartagenova, Kathleen Holm, Jerry Kmiec, Jeffrey Price, and Howard Rosen filed a Motion for Transfer of Actions to the Western District of Washington Pursuant to 28 U.S.C. §1407 for Consolidated or Coordinated Pretrial Proceedings, captioning their proposed MDL as *In re Amazon Tariff Litigation*, MDL No. 3197. Movants' motion seeks to subsume that proposed MDL into their proposed MDL. Creating this broader MDL will allow the Panel to easily determine if future cases presented to the Panel are appropriate for transfer. It will also avoid having to send multiple MDLs in the future to the transferee court.

[3] The Retailer Defendants' full legal names are below.

Plaintiffs in the Actions allege that one or more Retailer Defendants engaged in the same or substantially similar misconduct after the Trump administration imposed tariffs on goods imported from foreign countries under the IEEPA, and the Retailer Defendants publicly acknowledged raising prices on both imported and non-imported goods to pass the costs of these tariffs onto American consumers. After the Supreme Court held that the IEEPA does not authorize the President to impose tariffs in *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 255 (2026), none of the Retailer Defendants have refunded any money consumers paid, even though the Retailer Defendants are positioned to seek billions of dollars in refunds of those duties.

Every Action alleges, in one form or another, that the Retailer Defendants have been unjustly enriched by their retention of excess profits from shifting the economic burden of the unlawful tariffs onto consumers, or violated state consumer protection laws. The substantial factual (and legal) similarities across the Actions, as set forth more fully below, warrant transfer to a single multidistrict litigation ("MDL") transferee court for coordinated or consolidated proceedings pursuant to 28 U.S.C. §1407. This will streamline discovery, pretrial motions (including class certification), and administrative management, and will also minimize any waste, confusion, and delay that may arise as a result of prosecuting each Action, and any subsequently filed actions, separately. And, to the extent necessary, the MDL transferee judge may establish separate "tracks" for each Retailer Defendant in the exercise of his or her discretion.

Movants respectfully submit that the Northern District of Illinois is the most suitable forum for transfer and centralization of the Actions into a single MDL for the following reasons: ***First***, the Northern District of Illinois has a well-established track record of handling complex consumer-related MDL class actions, like the Actions here. ***Second***, the vast majority of Retailer Defendants have major business operations and contacts in or near Chicago, and multiple law firms currently

representing the Retailer Defendants and plaintiffs have offices in or near Chicago. ***Third***, four of the 25 Actions are currently pending in the Northern District of Illinois while the rest are dispersed across seven other districts, including the Southern and Eastern Districts of New York, the Middle District of Florida, the Central District of California, the Northern District of Ohio, the Western District of Washington, and several others.

## II. BACKGROUND

For almost a year, the federal government charged tariffs, purportedly under the IEEPA, on certain products imported into the United States. The President sought to impose tariffs under the IEEPA by declaring a national emergency tied to two alleged foreign threats: the rise of illegal drugs from foreign nations and large trade deficits. On February 20, 2026, the Supreme Court in *Learning Resources* held that the President does not possess the authority to impose tariffs under the IEEPA. 607 U.S. at 255. The tariffs imposed under the IEEPA were, therefore, collected without legal authority.

The Retailer Defendants are importers-of-record ("IORs") for goods they import from foreign countries into the United States. In that capacity, the Retailer Defendants were responsible for making payments to U.S. Customs and Border Protection ("CBP") for tariffs and related fees. The Retailer Defendants were unwilling to shoulder the economic burden of the tariffs. Instead, they raised their prices on consumer goods to reimburse themselves for the tariff costs. Indeed, a survey of American chief executive officers ("CEO") found that a majority had already raised prices or were considering doing so in response to the tariffs,[4] and major retailers publicly

---

[4] Ali McCadden, *Here are the retailers raising prices as Trump tariffs take hold*, CNBC (May 31, 2025), https://www.cnbc.com/2025/05/31/trump-tariffs-here-are-the-retailers-raising-prices.html (reporting the CEO/AlixPartners survey of U.S. CEOs and individual retailer price-increase announcements).

announced tariff-driven price increases throughout 2025 and into 2026.[5]

The Retailer Defendants admitted as much. For example,

- In December 2024, Costco's Chief Financial Officer ("CFO"), warned that "[t]ariffs raise costs[.]"[6]

- In March 2025, Target CEO Brian Cornell told CNBC that consumers would "likely see price increases over the next couple of days" on Target-sold products, because of newly imposed tariffs, and "[i]f there's a 25% tariff, those prices will go up."[7]

- In January 2026, Amazon's CEO, Andy Jassy, acknowledged that the IEEPA tariffs had begun to "creep" into Amazon's prices and that price increases were unavoidable.[8] Months earlier, Mr. Jassy had predicted that sellers on Amazon's marketplace would pass their increased tariff costs on to consumers.[9]

- In April 2025, both Shein and Temu issued ***identical*** public statements: "Due to recent changes in global trade rules and tariffs, our operating expenses have gone up. To keep offering the products you love without compromising on quality, we will be making price adjustments starting" April 25, 2025.[10]

---

[5] Megan Cerullo, *Walmart and other big companies say tariffs are forcing them to hike prices*, CBS News (Feb. 20, 2026), https://www.cbsnews.com/news/walmart-trump-tariffs-general-merchandise-inflation/.

[6] Sasha Rogelberg, *Costco CFO warns Trump's tariffs could mean widespread price hikes: 'When it rains, it rains on everybody'*, Fortune (Dec. 13, 2024), https://fortune.com/2024/12/13/costco-cfo-gary-millerchip-price-increases-donald-trump-tariffs/.

[7] Emma Roth, *Best Buy and Target CEOs say prices are about to go up because of tariffs*, The Verge (Mar. 4, 2025), https://www.theverge.com/news/624254/best-buy-target-raise-prices-tariffs; *see also* Kelly Tyko, *Target CEO: Tariffs will cause food prices to rise in "next couple of days,"* Axios (Mar. 4, 2025), https://www.axios.com/2025/03/04/tariffs-food-prices-increase-mexico.

[8] Annie Palmer, *Amazon CEO Jassy says Trump's tariffs have started to 'creep' into prices*, CNBC (Jan. 20, 2026), https://www.cnbc.com/2026/01/20/amazon-jassy-trump-tariffs-prices-shoppers.html.

[9] Annie Palmer, *Amazon CEO Andy Jassy says he believes sellers will pass increased tariff costs on to consumers*, CNBC (Apr. 10, 2025), https://www.cnbc.com/2025/04/10/amazon-ceo-andy-jassy-says-he-believes-sellers-will-pass-increased-tariff-costs-on-to-consumers.html.

[10] Max Zahn, *These companies said they will raise prices in response to Trump's tariffs*, ABC News (May 15, 2025), https://abcnews.com/Business/companies-raising-prices-response-trumps-tariffs/story?id=120900637; Bonny Chu & Stephen Sorace, *Temu, Shein to raise prices for US consumers starting next week as Trump administration closes tariff loophole*, Fox Bus. (Apr. 17,

- In May 2025, Walmart's CFO, John David Rainey, told CNBC, that, due the "magnitude of these [tariff] increases, . . . [the] consumer is going to start seeing higher prices. You'll begin to see that, likely towards the tail end of this month, and then certainly much more in June."[11]

- In June 2025, Nike told its shareholders that it planned to raise prices to help offset an expected $1 billion in additional tariff costs in fiscal year 2026, describing the move as a "surgical price increase[.]"[12]

Importantly, the Retailer Defendants did not confine their price increases to imported goods. Analyses of retail pricing found that prices rose on both imported and domestically produced goods as retailers spread tariff-related costs across their product lines.[13] Researchers estimated that tariff pass-throughs added roughly 0.7 percentage points to the Consumer Price Index by September 2025, and that the lowest-priced product varieties saw the steepest increases (around 5%) because retailers had the least room to absorb the cost in their margins.[14]

As the IORs for imported goods for which they paid IEEPA tariffs (and passed on the costs to consumers), the Retailer Defendants are entitled to pursue a refund of the same IEEPA tariffs

2025), https://www.foxbusiness.com/retail/temu-shein-raise-prices-us-consumers-starting-next-week-trump-administration-closes-tariff-loophole.

[11] Melissa Repko, *Walmart CFO says price hikes from tariffs could start later this month, as retailer beats on earnings*, CNBC (May 15, 2025), https://www.cnbc.com/2025/05/15/walmart-wmt-q1-2026-earnings.html.

[12] Jordan Hart, *Nike plans 'surgical' price increases as it expects $1 billion hit from tariffs*, Bus. Insider (June 26, 2025), https://www.businessinsider.com/nike-raising-prices-us-expects-1-billion-tariff-hit-2025-6.

[13] *Are Tariffs Raising U.S. Retail Prices?* (updated), Econofact (Dec. 5, 2025), https://econofact.org/are-tariffs-raising-u-s-retail-prices (summarizing the Cavallo/Harvard Business School Pricing Lab analysis of online pricing at five major U.S. retailers, including price increases on domestically produced goods).

[14] *Id.*

from the federal government following the Supreme Court's invalidation of those tariffs.[15] Consumers who paid the Retailer Defendants inflated prices, however, are not IORs and, thus, not entitled to request a refund. If the Retailer Defendants obtain refunds (plus interest) without compensating the consumers who actually bore the tariff costs, the Retailer Defendants will have recovered the same tariff twice—once from their customers and once from the government—and will be made whole twice over at the consumers' expense.

### A. Plaintiffs

Movant, along with the plaintiffs in every other Action, filed class actions arising from illegal IEEPA tariffs and the Retailer Defendants' improper charging of inflated prices. Each plaintiff paid tariff-inflated prices to one or more of the Retailer Defendants, and seeks to ensure that the Retailer Defendants are not unjustly enriched at consumers' expense—whether by retaining tariff refunds or retaining profits from inflated prices on goods that were never subject to IEEPA tariffs. The Actions are being pursued on behalf of similar classes of consumers, present a common core of similar facts, and allege the same misconduct.

### B. Retailer Defendants

- **Defendants Amazon.com, Inc. and Amazon.com Services LLC** (collectively, "Amazon"), are headquartered at 410 Terry Avenue North, Seattle, WA 98109.
- **Defendant Target Corporation ("Target")** is headquartered at 1000 Nicollet Mall, Minneapolis, MN 55403.
- **Defendant Nike, Inc. ("Nike")** is headquartered at One Bowerman Drive, Beaverton, OR 97005.
- **Defendant Costco Wholesale Corporation ("Costco")** is headquartered at 999 Lake

[15] *See International Emergency Economic Powers Act (IEEPA) Duty Refunds*, U.S. Customs & Border Protection, https://www.cbp.gov/trade/programs-administration/trade-remedies/ieepa-duty-refunds (last visited Aug. 4, 2026) (describing process for IORs to submit valid refund requests for duties imposed under the IEEPA).

Drive, Issaquah, WA 98027.

- **Defendant Walmart Inc. (“Walmart”)** is headquartered at 702 SW 8th Street, Bentonville, AR 72716.

- **Defendant Whaleco Inc. d/b/a Temu (“Temu”)** is headquartered at 31 St. James Avenue, Suite 355, Boston, MA 02116.

- **Defendants Shein US Services, LLC, Shein Distribution Corporation, and Shein Technology LLC (collectively, “Shein”)**, are headquartered at 777 South Alameda Street, 2nd Floor, Los Angeles, CA 90021.

- **Defendant adidas America, Inc.**, a subsidiary of Germany-based adidas AG, is headquartered at adidas Village, 5055 North Greeley Avenue, Portland, OR 97217.

- **Defendant Luxottica of America Inc.**, a subsidiary of France-based EssilorLuxottica, is headquartered at 4000 Luxottica Place, Mason, OH 45040.

- **Defendant IKEA US, LLC**, a subsidiary of Inter IKEA Systems B.V., is headquartered at 420 Alan Wood Road, Conshohocken, PA 19428.

- **Defendant The J.M. Smucker Company** is headquartered at One Strawberry Lane, Orrville, OH 44667.

- **Defendant Microsoft Corporation** is headquartered at One Microsoft Way, Redmond, WA 98052.

- **Defendant Puma North America** is headquartered at 455 Grand Union Boulevard, Assembly Row, Somerville, MA 02145.

- **Defendant Sony Interactive Entertainment LLC** is headquartered at 2207 Bridgepointe Parkway, San Mateo, CA 94404.

- **Defendant Zara USA, Inc.** is headquartered at 500 5th Avenue, Suite 400, New York, NY 10110.

### C. Status of the Actions

The Actions were all filed within a few weeks or months after the Supreme Court handed down *Learning Resources*. Undersigned counsel anticipates that additional class actions will be filed in other federal courts alleging similar claims against one or more of the Retailer Defendants.

Each of the Actions names one or more of the Retailer Defendants as defendants, contains

similar causes of action, including claims for unjust enrichment and violations of state consumer protection laws, and alleges substantially similar damages. Further, each of the Actions is a putative class action, and each is filed on behalf of classes of consumers who either: (1) purchased a product or good from a Retailer Defendant that was subject to the IEEPA tariffs at an inflated price; or (2) purchased a product or good from a Retailer Defendant that was not subject to the IEEPA tariffs, but nonetheless at an inflated price.

Finally, each of the Actions is in its infancy and, upon information and belief, no discovery has commenced in any Action. Some have motions to dismiss pending, others have motions to remand pending, and still others have no responsive pleading filed yet.

## III. ARGUMENT

### A. The Actions and Any Tag-Along Actions Are Appropriate for Transfer and Centralization Pursuant to 28 U.S.C. §1407(a)

The Actions should be transferred to the Northern District of Illinois for pretrial proceedings because they share the same common core of factual (and legal) issues involving the Retailer Defendants' retention of profits after charging consumers higher prices for products based on the illegal IEEPA tariffs, including for products not subject to the tariffs. Under 28 U.S.C. §1407(a), the Panel may transfer and consolidate cases that meet three requirements: (1) the cases "involv[e] one or more common questions of fact"; (2) transfer and consolidation or coordination will further "the convenience of parties and witnesses"; and (3) transfer and consolidation or coordination "will promote the just and efficient conduct of [the] actions." 28 U.S.C. §1407(a).

"The objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." *Manual for Complex Litig.* §20.131 (4th ed. 2004). Transfer and centralization of the Actions for pretrial proceedings would achieve those objectives here.

**1. The Actions Involve Common Questions of Fact**

Transfer under Section 1407(a) requires one or more common questions of fact for centralization. This threshold requirement is satisfied where, as here, two or more complaints assert consistent core factual allegations against similar defendants arising from similar transactions and events. *See, e.g.*, *In re UnumProvident Corp. Sec., Deriv. & "ERISA" Litig.*, 280 F. Supp. 2d 1377, 1379 (J.P.M.L. 2003) (finding centralization appropriate where "all actions [could] be expected to focus on a significant number of common events, defendants, and/or witnesses").[16] The focus is not on "strict identity of issues and parties but rather on the existence of one or more common questions of fact." *In re Japanese Elec. Prods. Antitrust Litig.*, 388 F. Supp. 565, 567 (J.P.M.L. 1975); *see also, e.g.*, *In re Treasury Sec. Auction Antitrust Litig.*, 148 F. Supp. 3d 1360, 1362 (J.P.M.L. 2015) (centralizing actions against several banks); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 52 F. Supp. 3d 1381, 1381 (J.P.M.L. 2014) (same); *In re Rembrandt Techs., LP, Patent Litig.*, 493 F. Supp. 2d 1367, 1369 (J.P.M.L. 2007) (Section 1407 "does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer.").

Here, this requirement is satisfied because the Actions all arise out of and seek to hold the Retailer Defendants responsible for the same exact alleged misconduct. The Actions share a common and overlapping core of factual allegations relating to a common practice and concerning parallel conduct, the genesis of which sprang from a common actor: the federal government, including, without limitation:

- how the IEEPA tariffs were assessed and collected by CBP from IORs—the mechanics, timing, and amounts (which will all be answers from a single common counterparty,

[16] Unless otherwise noted, all emphasis is added and citations are omitted.



4921-4244-0903.v1

the federal government);

- how CBP's refund process operates following *Learning Resources*, and the refunds (plus interest) it makes available to IORs;
- whether and to what extent the IEEPA tariffs were passed through to consumers in the form of higher retail prices—including on goods not subject to any tariff—a question governed by a common economic pass-through methodology and common expert testimony warranting uniform *Daubert* treatment;
- the industry-wide pricing response the IEEPA tariffs produced, as reflected in parallel public statements announcing tariff-driven price increases; and
- whether retention of both the consumer overcharges and the government refunds flowing from the same invalidated tariffs amounts to unjust enrichment.

These common questions merit centralization of the Actions for the sake of efficiency and to avoid inconsistent rulings. *In re Insulin Pricing Litig*., 688 F. Supp. 3d 1372, 1375 (J.P.M.L. 2023) (centralizing actions alleging a common scheme among three competing insulin manufacturers and three pharmacy benefit managers).

*In re 100% Grated Parmesan Cheese Mktg. & Sales Pracs. Litig*., 201 F. Supp. 3d 1375 (J.P.M.L. 2016), is instructive. There, the Panel was faced with a number of cases involving the alleged "presence of significant amounts of cellulose in several brands" of "100%" grated parmesan cheese, after the release of one news article describing independent testing of the products. *Id.* at 1376. Cases were pending against multiple retailers, including Walmartand Target, involving different Parmesan cheese products. *Id.* Some parties moved for centralization of "separate MDLs, grouped by the primary corporate defendant but assigned to the same district," while others supported "a single, multi-product MDL." *Id.* at 1376-77. The proponents of the single MDL argued, among other things, that all actions stemmed from the same news article and independent laboratory testing; that nearly identical labeling would generate overlapping discovery, expert work, and *Daubert* practice; that a common supplier made separate MDLs

inefficient and impracticable; that retailer-specific issues could be managed through protective orders; and that several actions named two or more unaffiliated defendants and could not readily be severed into separate MDLs. *Id.* at 1377-78.

In concluding that "a single, multi-product MDL [was] necessary to ensure the just and efficient conduct of th[e] litigation," the Panel noted,

> In many situations, we are hesitant to bring together actions involving separate defendants and products, but when, as here, there is significant overlap in the central factual issues, parties, and claims, we find that creation of a single MDL is warranted. A single MDL is the most appropriate vehicle for resolving defendants' challenges to the validity of the laboratory testing at issue, the anticipated common third-party discovery, discovery of any common suppliers, and management of the competing putative classes. Although the advocates of separate MDLs have identified certain product-specific issues, Section 1407 does not require a complete identity of factual issues or parties as a prerequisite to transfer, and the presence of additional facts is not significant when the actions arise from a common factual core. We are confident that the transferee judge can accommodate any issues involving the different products and defendants, including confidentiality and defendant-specific resolutions, in a manner that guarantees the just and efficient resolution of all cases.

*Id.* at 1378.

Substitute "IEEPA tariffs" for "news article" and "independent testing," and the Actions look quite similar to those in *Parmesan Cheese*: the common factual core is externally supplied, the discovery bearing on it is common to every Action, and the retailer-specific issues that remain are the kind the Panel has repeatedly left to the transferee judge. As in *Parmesan Cheese*, moreover, the anticipated third-party discovery is common—here, the entry, duty-payment, and refund records held by CBP for every Retailer Defendant.[17]

[17] The Actions are also similar to *In re Hair Relaxer Mktg., Sales Pracs., & Prods. Liab. Litig.*, 655 F. Supp. 3d 1374 (J.P.M.L. 2023), where separate defendants argued against centralization because "the actions name multiple competing defendants who manufactured and sold different lines of hair relaxer products[.]" *Id.* at 1376. The Panel "acknowledge[d] that, to some extent, the claims against the various defendants may turn on facts specific to the defendants and their products, and that in some instances we have been hesitant to centralize litigation against

In short, while Movants acknowledge that the Panel is "typically hesitant to centralize litigation against multiple, competing defendants which marketed, manufactured and sold similar products," *In re Proton-Pump Inhibitor Prods. Liab. Litig.*, 273 F. Supp. 3d 1360, 1362 (J.P.M.L. 2017) (denying centralization) (quoting *In re Yellow Brass Plumbing Component Prods. Liab. Litig.*, 844 F. Supp. 2d 1377, 1378 (J.P.M.L. 2012)), here, the Actions present a common factual core—one set of unlawful tariffs, one federal refund process, and one industry-wide pricing response—and, as in *Parmesan Cheese* and *Hair Relaxer*, a single MDL is the only practical vehicle for managing the overlapping classes, common third-party discovery of the federal government, and common expert issues the tariffs have produced.

These Actions also differ fundamentally from litigation in which the Panel has declined industry-wide centralization. In *In re COVID-19 Business Interruption Protection Insurance Litigation*, 482 F. Supp. 3d 1360, 1362-63 (J.P.M.L. 2020), the common catalyst—the pandemic and government closure orders—left "little potential for common discovery across the litigation," and each insurer's liability turned on the wording of its own policies under the laws of 50 States. Here, by contrast, the common actor is a counterparty: the federal government assessed and collected the IEEPA tariffs from every Retailer Defendant, its refund process extends the same entitlement to each, and its records are third-party discovery common to every Action. And where the Panel did centralize on a defendant-by-defendant basis in that litigation, it did so only because each such docket was confined to a single insurer operating in a handful of States—a limit that has no application to a single federal tariff regime applied identically nationwide. *Compare In re Soc'y*

competing defendants that marketed, manufactured, and sold similar products. In the circumstances presented here, however, we conclude that centralization will allow this litigation to be managed most efficiently and will best serve the convenience of the parties, witnesses, and courts." *Id.*

*Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 492 F. Supp. 3d 1359, 1362 (J.P.M.L. 2020), and *In re Erie COVID-19 Bus. Interruption Prot. Ins. Litig.*, 509 F. Supp. 3d 1370, 1372 (J.P.M.L. 2020) (each centralizing actions against a single regional insurer whose "defined geographical scope" was "a critical factor"), *with, e.g.*, *In re Hartford COVID-19 Bus. Interruption Prot. Ins. Litig.*, 493 F. Supp. 3d 1358 (J.P.M.L. 2020), and *In re Travelers COVID-19 Bus. Interruption Prot. Ins. Litig.*, 492 F. Supp. 3d 1341 (J.P.M.L. 2020) (each declining centralization where dispositive motions were already fully briefed in dozens of transferor courts).

And unlike *In re Cash Sweep Programs Contract Litig.*, 766 F. Supp. 3d 1346, 1349 (J.P.M.L. 2025), where the ostensibly common question "likely w[ould] have defendant-specific answers" because each defendant's program had its own "contractual terms, . . . interest rates and fees, . . . [and] disclosures," the questions here—how the IEEPA tariffs were assessed against each Retailer Defendant, what refunds each is owed, and how those duties were built into retail prices—turn on a single federal tariff regime and a single federal refund process applied identically to every Retailer Defendant. Also unlike the cash-sweep actions, which were "already . . . largely organized by defendant in different districts," *id.* at 1350, the Actions here are in their infancy.

### 2. Transfer and Centralization Will Further the Convenience of the Parties and Witnesses

Centralization of the Actions will also be "for the "convenience of parties and witnesses" by saving the parties from prosecuting and defending nearly identical class actions in multiple federal district courts across the country. 28 U.S.C. §1407(a). As this Panel has held, the convenience of the parties is furthered by avoiding duplicative discovery. *See In re Pilot Flying J Fuel Rebate Cont. Litig. (No. II)*, 11 F. Supp. 3d 1351, 1352 (J.P.M.L. 2014) ("Centralization will avoid repetitive depositions . . . and duplicative document discovery regarding the alleged scheme."); *In re Multidistrict Litig. Involving Banking Agreements with Stirling Homex Corp.*, 388

F. Supp. 572, 573 (J.P.M.L. 1975) (transfer will "prevent unnecessary duplication of discovery").

Given that each of the Actions arises from a common core of factual issues involving the overcharging of consumers based on the exact same IEEPA tariffs, counsel in all of the Actions will seek the same essential testimony, documents, and other information from the Retailer Defendants and third parties, including: (a) internal communications regarding decisions to raise prices, including on products not subject to IEEPA tariffs; (b) documents and testimony regarding the Retailer Defendants' status as an IORs; (c) documents and testimony regarding the Retailer Defendants' entitlement to refunds from the federal government; (d) documents and structured data illustrating the amount of overcharges for consumer products both subject to and not subject to IEEPA tariffs; and (e) testimony from experts—all which will be the same across the Actions. Therefore, centralization of the Actions for consolidated or coordinated pretrial proceedings into a single MDL is appropriate to accommodate the convenience of parties and witnesses.

### 3. Transfer and Centralization Will Promote the Just and Efficient Conduct of These Actions

Transfer of the Actions for consolidated or coordinated pretrial proceedings will also "promote the just and efficient conduct of [the] actions." 28 U.S.C. §1407(a). Consolidation will promote the just and efficient conduct of these Actions for all the reasons discussed above. It will also prevent inconsistent pretrial rulings on many central issues, which would present significant problems due to the substantial consistency in factual and legal allegations among all Actions. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 363 F. Supp. 3d 1372, 1374 (J.P.M.L. 2019) (observing that centralization would "prevent inconsistent pretrial rulings on class certification and other issues").

Indeed, the Actions will involve many of the same pretrial issues, such as the nature and scope of discovery, the sufficiency of the allegations, and class determinations. If 11 (or more)

districts were required to resolve these issues in separate proceedings, valuable judicial resources would be wasted, and the parties face a substantial likelihood of inconsistent rulings. *See, e.g.*, *In re Republic Nat'l-Realty Equities Sec. Litig.*, 382 F. Supp. 1403, 1406 (J.P.M.L. 1974) (finding it "necessary to have all class action questions resolved by a single judge in order to eliminate the possibility of conflicting class determinations"); *see also In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1394 (J.P.M.L. 2018) (creating single MDL involving numerous defendants and noting, "[T]he AFFF manufacturers likely will assert identical government contractor defenses in many of the actions. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings (including with respect to discovery, privilege, and *Daubert* motion practice); and conserve the resources of the parties, their counsel, and the judiciary."); *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968) ("It is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest.").

A single MDL judge coordinating pretrial discovery and ruling on pretrial motions in all these Actions at once will help reduce the cumulative burden on the courts and the litigation's overall expense, as well as minimizing this potential for conflicting rulings. *Id.* at 495. Centralization will mitigate these problems by enabling a single judge to manage discovery and the parties to coordinate their efforts. *In re Am. Med. Collection Agency, Inc., Customer Data Sec. Breach Litig.*, 410 F. Supp. 3d 1350, 1353 (J.P.M.L. 2019) ("[A] single MDL encompassing [multiple defendants] . . . is necessary to ensure the just and efficient conduct of this litigation."). This will reduce litigation costs and minimize inconvenience to the parties and witnesses, to the benefit of litigants, third parties, and the courts. *See id.* at 1354 ("centralization will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this

litigation"); *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 109 F. Supp. 3d 1382, 1383 (J.P.M.L. 2015) (same).

Here, the Retailer Defendants' parallel decisions to increase prices on consumers based on the IEEPA tariffs, and their failure to return the profits they improperly earned on those increases, are the nexus unifying the Actions and making them appropriate for centralization. Regardless of why each Retailer Defendant overcharged consumers, they all made the same public statements announcing that the IEEPA tariffs were the catalyst.

### B. The United States District Court for the Northern District of Illinois Is an Appropriate Transferee Forum

#### 1. Many Actions Are Pending in the Northern District of Illinois

The Actions are geographically dispersed across the nation, but a large number of them—four—are pending in the Northern District of Illinois. This factor weighs in favor of selecting that district as the transferee court. *See, e.g.*, *In re DirecTV, Inc., Early Cancellation Fee Mktg. & Sales Pracs. Litig.*, 655 F. Supp. 2d 1369, 1370 (J.P.M.L. 2009) (situating MDL in district court where four actions were already pending); *In re Methyl Methacrylate (MMA) Antitrust Litig.*, 435 F. Supp. 2d 1345, 1347 (J.P.M.L. 2006) (selecting the district where the "largest number of actions are already pending").[18]

---

[18] Even though the District of Oregon and Eastern District of New York (where Polistico's case is pending) have a similar number of Actions, "the Panel must weigh the interests of all the plaintiffs and all the defendants, and must consider multiple litigation as a whole in the light of the purposes of the law." *In re Libr. Editions of Children's Books*, 297 F. Supp. 385, 386 (J.P.M.L. 1968). Indeed, the Panel transferred *Library Editions* to the Northern District of Illinois notwithstanding that 11 of the 21 actions were then pending in the Northern District of California. *Id.* at 386-87; *accord In re Wireless Tel. 911 Calls Litig.*, 259 F. Supp. 2d 1372, 1374 (J.P.M.L. 2003) (selecting the Northern District of Illinois where one of ten actions was pending).

### 2. The Northern District of Illinois Will Best Serve the Convenience of the Parties, Counsel, and Witnesses

The Panel has repeatedly selected the Northern District of Illinois for nationwide dockets on precisely this ground. "[G]iven the geographic dispersal of the constituent actions, the Northern District of Illinois offers a relatively geographically central and accessible forum for this litigation." *In re McDonald's French Fries Litig.*, 444 F. Supp. 2d 1342, 1343 (J.P.M.L. 2006), *adhered to*, 545 F. Supp. 2d 1356 (J.P.M.L. 2008). So, too, in *Wireless Telephone*, where the Panel selected the district for a ten-action, ten-district docket because "no district stands out as the focal point for this nationwide docket," and "the Illinois court possesses the necessary resources." 259 F. Supp. 2d at 1373-74.

The Actions at issue here span the nation—there is no focal point:




So, too, do the Retailer Defendants' headquarters:



4921-4244-0903.v1




Finally, most of the Retailer Defendants have a significant business presence there,[19] and numerous law firms representing the Retailer Defendants—as well as counsel for many plaintiffs—have offices in Chicago.[20]

### 3. The Northern District of Illinois Is Well-Equipped to Oversee This MDL, and the Experience, Skill, and Caseloads of Available Judges Favor the Northern District of Illinois

The Northern District of Illinois is well equipped to handle complex MDLs. It has a history of efficiently managing MDLs and is staffed by experienced jurists. *See Wireless Tel.*, 259 F. Supp.

---

[19] *See, e.g.*, **Amazon**, https://amazon.jobs/content/en/locations/united-states/illinois/chicago; **Costco**, https://www.costco.com/w/-/locations?location=Chicago%2C+Illinois; **Walmart**, https://www.walmart.com/store-directory/il/chicago; **Nike**, https://www.nike.com/retail/s/nike-chicago; and **Shein** operates a massive distribution center in Indiana. *See* Wes Mills, *Fashion retailer SHEIN already expanding in Boone County*, Inside Ind. Bus. (Sept. 21, 2022), https://www.insideindianabusiness.com/articles/fashion-retailer-shein-already-expanding-boone-county-operations.

[20] *See, e.g.*, **Plaintiffs' Firms**: Robbins Geller Rudman & Dowd LLP, https://www.rgrdlaw.com/contact.html; Napoli Shkolnik PLLC, https://www.napolilaw.com/napoli-location/chicago-illinois/; Korein Tillery LLC, https://www.koreintillery.com/our-offices; Hagens Berman Sobol Shapiro LLP, https://www.hbsslaw.com/locations; McGuire Law, P.C., https://www.mcgpc.com/contact-us; **Defense Firms**: Morgan, Lewis & Bockius LLP, https://www.morganlewis.com/locations/chicago; Latham & Watkins LLP, https://www.lw.com/en/offices/chicago; Chapman & Spingola LLP, https://chapmanspingola.com/contact-us/.

2d at 1374 ("the Illinois court possesses the necessary resources to be able to devote the time and effort to pretrial matters that this docket is likely to require").

Two of the three judges currently assigned to Actions pending in the Northern District of Illinois are not currently overseeing any MDL: the Honorable Steven C. Seeger and the Honorable Joan Humphrey Lefkow. Both are exceedingly capable.[21] And District Judge Seeger has not yet presided over an MDL—a factor the Panel has previously considered favorably when selecting transferee judges. *See, e.g.*, *In re Lyft, Inc. Passenger Sexual Assault Litig.*, 819 F. Supp. 3d 1359, 1361 (J.P.M.L. 2026) (assigning MDL to Judge Rita F. Lin and noting that Judge Lin had not previously presided over an MDL); *In re Gardasil Prods. Liab. Litig.*, 619 F. Supp. 3d 1356, 1358 (J.P.M.L. 2022) (assigning MDL to Judge Robert J. Conrad, Jr. and explicitly noting that Judge Conrad had not yet had the opportunity to preside over an MDL).

Indeed, this Panel has routinely found the Northern District of Illinois to be an appropriate transferee district for MDLs. *See, e.g.*, *In re Walgreens Herbal Supplements Mktg. & Sales Pracs. Litig.*, 109 F. Supp. 3d 1373, 1376 (J.P.M.L. 2015) (centralizing actions against four competing national retailers in the district, which "provides a convenient and accessible forum for actions filed throughout the country regarding products sold nationwide"); *Hair Relaxer*, 655 F. Supp. 3d at 1377; *In re TikTok, Inc., Consumer Priv. Litig.*, 481 F. Supp. 3d 1331, 1332 (J.P.M.L. 2020).

### C. The Transferee Judge Has Discretion to Create Separate Retailer Defendant-Specific "Tracks"

This Panel has consistently recognized that a "transferee court can employ any number of pretrial techniques—such as establishing separate discovery and/or motion tracks—to efficiently

[21] Senior District Judge Lefkow previously presided over *In re Unified Messaging Sols. LLC Pat. Litig.*, 883 F. Supp. 2d 1340 (J.P.M.L. 2012) (centralizing 16 patent actions in the Northern District of Illinois and assigning them to Judge Lefkow).

manage this litigation." *In re Lehman Brothers Holdings, Inc., Sec. & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 598 F. Supp. 2d 1362, 1364 (J.P.M.L. 2009); *see also In re Janus Mut. Funds Inv. Litig.*, 310 F. Supp. 2d 1359, 1361 (J.P.M.L. 2004) (denying six motions to centralize on a defendant-by-defendant basis, creating a single omnibus MDL instead, and observing that the transferee court "can employ any number of pretrial techniques—such as establishing separate discovery and/or motion tracks for each mutual fund family and/or separate tracks for the different types of actions involved—to efficiently manage this litigation"); *Aqueous*, 357 F. Supp. 3d at 1395 (MDL created involving multiple defendants and noting, "[T]hese actions will involve significant and overlapping discovery of the AFFF manufacturers and their products. To the extent the actions entail unique factual or legal issues, the transferee court has the discretion to address those issues through the use of appropriate pretrial devices, such as separate tracks for discovery and motion practice"). The Panel has likewise confirmed that where parties raise retailer-specific factual issues and the protection of confidential proprietary information, "the degree of coordination of involved actions"—including whether to establish "separate tracks for the different retailers"—is "a matter dedicated to [the transferee judge's] discretion." *Walgreens*, 109 F. Supp. 3d at 1376.

## IV. CONCLUSION

For the foregoing reasons, Movants respectfully request that the Panel order the transfer and centralization of the Actions (and any future tag-along actions), for coordinated or consolidated pretrial proceedings to the Northern District of Illinois.

DATED: August 20, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
STUART A. DAVIDSON

*/s/ Stuart A. Davidson*
Stuart A. Davidson

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
sdavidson@rgrdlaw.com

*Attorneys for Plaintiff Don Polistico in Polistico v. Amazon.com, Inc., No. 1:26-cv-04194 (E.D.N.Y.)*

NAPOLI SHKOLNIK
HUNTER J. SHKOLNIK
1302 Avenida Ponce de León
Santurce, PR 00907
Telephone: 787/493-5088
Hunter@nsprlaw.com

NAPOLI SHKOLNIK
SALVATORE C. BADALA
400 Broadhollow Road, Suite 305
Melville, NY 11747
Telephone: 212/397-1000
SBadala@napolilaw.com

NAPOLI SHKOLNIK
SHAYNA E. SACKS
360 Lexington Avenue, 11th Floor
New York, NY 10017
Telephone: 212/397-1000
SSacks@napolilaw.com

*Attorneys for Plaintiffs Patricia Cavallaro in Cavallaro v. Target Corp., No. 7:26-cv-06165 (S.D.N.Y), Gregory Rittenhouse in Rittenhouse v. Amazon.com, Inc., No. 2:26-cv-03392 (E.D.N.Y.), and Luisa Spadafino in Spadafino v. Amazon.com, Inc., No. 2:26-cv-10023 (D.N.J.)*

FARRELL & FULLER LAW
MICHAEL J. FULLER, JR.
270 Munoz Rivera Avenue, Suite 201
San Juan, PR 00918
Telephone: 939/293-8244
mike@farrellfuller.com

*Attorneys for Plaintiffs Tonysha Emerson in Emerson v. Amazon.com, Inc., No. 2:26-cv-12614 (E.D. Mich.), Sharon Lasseter in Lasseter v. Amazon.com, Inc., No. 8:26-cv-02019 (M.D. Fla.), Zuania Martínez in Martinez v. Target Corp., No. 3:26-cv-01807 (M.D. Fla.), and Parveen Sangha in Sangha v. Amazon.com, Inc., 26-cv-01777 (N.D. Ohio)*