# EXHIBIT 2

ACO,MJI

# U.S. District Court
# Eastern District of New York (Central Islip)
# CIVIL DOCKET FOR CASE #: 2:26-cv-04939-AYS

Nolen et al v. Canon U.S.A., Inc.
Assigned to: Magistrate Judge Anne Y. Shields
Demand: $5,000,000
Cause: 28:1332 Diversity-Other Contract

Date Filed: 08/13/2026
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Michael Nolen** represented by **Jeremy R. Williams**
Lee Segui PLLC
421 N. Harrington Street, Suite 460
Raleigh, NC 27603
919-421-7784
Email: jwilliams@leesegui.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick M. Wallace**
Lee Segui, PLLC
900 W. Morgan St.
Raleigh, NC 27603
919-600-5000
Fax: 919-600-5035
Email: pwallace@leesegui.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth R. Lesser**
Klafter Lesser LLP
Two International Drive
Suite 350
Rye Brook, NY 10573
914-934-9200
Fax: 914-934-9220
Email: seth@klafterlesser.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marlon Vera**
*individually and on behalf of all others similarly situated*
represented by **Jeremy R. Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick M. Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth R. Lesser**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Canon U.S.A., Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/13/2026 | 1 | COMPLAINT against Canon U.S.A., Inc. filing fee $ 405, receipt number ANYEDC-20525374 Was the Disclosure Statement on Civil Cover Sheet completed -No,, filed by Michael Nolen, Marlon Vera. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons) (Lesser, Seth) Modified on 8/13/2026 (LJ). (Entered: 08/13/2026) |
| 08/13/2026 | 2 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made. (LJ) (Entered: 08/13/2026) |
| 08/13/2026 | | Case Assigned to Magistrate Judge Anne Y. Shields. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (LJ) (Entered: 08/13/2026) |
| 08/13/2026 | 3 | Clerks Notice Re: Consent. A magistrate judge has been assigned as the presiding judge in this case under the EDNY Direct Assignment Program, governed by EDNY Administrative Order 2025-14. In accordance with Rule 73 of the Federal Rules of Civil Procedure, Local Rule 73.1, the parties are notified that if all parties consent, the assigned Magistrate Judge is available to conduct all proceedings in this action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to this Notice is a blank copy of the consent form that should be filled out, signed and filed electronically only if all parties wish to consent. The form is also available here: https://www.nyed.uscourts.gov/sites/default/files/uploads/mjconsentform.pdf. Any party may withhold its consent without adverse substantive consequences. Do NOT return or file the consent form unless all parties have signed the consent form. Unless all parties consent to the Magistrate Judge jurisdiction by the deadline set forth in the Administrative Order 2025-14, a District Judge will be assigned to the case. The parties are directed to review the terms of Administrative Order 2025-14 and other materials related to the EDNY Direct Assignment Program on the Court's website: https://www.nyed.uscourts.gov/bulletin-direct-assignment-program. (LJ) (Entered: 08/13/2026) |
| 08/13/2026 | 4 | Summons Issued as to Canon U.S.A., Inc. (LJ) (Entered: 08/13/2026) |
| 08/31/2026 | 5 | MOTION to Appear Pro Hac Vice Filing fee $ 200, receipt number ANYEDC-20585644 by Michael Nolen, Marlon Vera. (Attachments: # 1 Pro Hac Vice Affidavit, # 2 Pro Hac Vice Certificate of Good Standing, # 3 Proposed Order) (Williams, Jeremy) (Entered: 08/31/2026) |
| 09/01/2026 | | ORDER granting 5 Motion for Leave to Appear Pro Hac Vice. The attorney shall register for ECF, registration is available online at www.pacer.gov. Once registered, the attorney shall file a notice of appearance to ensure electronic notification of activity in this case. So Ordered by Magistrate Judge Anne Y. Shields on 9/1/2026. (DM) (Entered: 09/01/2026) |

| | | |
|---|---|---|
| 09/02/2026 | 6 | MOTION to Appear Pro Hac Vice Filing fee $ 200, receipt number ANYEDC-20592723 by Michael Nolen, Marlon Vera. (Attachments: # 1 Pro Hac Vice Affidavit, # 2 Pro Hac Vice Certificate of Good Standing, # 3 Proposed Order) (Wallace, Patrick) (Entered: 09/02/2026) |
| 09/03/2026 | | ORDER granting 6 Motion for Leave to Appear Pro Hac Vice. The attorney shall register for ECF, registration is available online at www.pacer.gov. Once registered, the attorney shall file a notice of appearance to ensure electronic notification of activity in this case. So Ordered by Magistrate Judge Anne Y. Shields on 9/3/2026. (DM) (Entered: 09/03/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/03/2026 15:56:37 | | | |
| **PACER Login:** | jrwilliams4102 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:26-cv-04939-AYS |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

**MICHAEL NOLEN and MARLON VERA, individually and on behalf of all others similarly situated,**

**v.**

**CANON U.S.A., INC.**

***Defendant.***

**COMPLAINT – CLASS ACTION**

Case No.:____________________

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs Michael Nolen and Marlon Vera ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Canon U.S.A. Inc., ("Defendant" or "Canon") and allege, upon personal knowledge as to Plaintiffs' own actions and to counsels' investigation, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1. For approximately one year, the federal government charged tariffs on certain products, including consumer goods, imported into the United States under the International Emergency Economic Powers Act ("IEEPA").

2. For businesses with international supply chains, absorbing IEEPA tariffs was costly. Canon publicly disclosed the company anticipated an annual cost increase of approximately $375 million from new tariff rates.

3. Many businesses, including Canon, responded to the high cost of IEEPA tariffs by passing those tariffs through to consumers in the form of discrete, identifiable charges. In effect, this meant that it was consumers, not Canon, who paid the IEEPA tariffs.

4. On February 20, 2026, the Supreme Court of the United States held that those tariffs were not authorized by IEEPA and were thus illegal.

5. Following the Supreme Court's decision, businesses sought to recover the IEEPA tariffs they paid through initiating litigation in the International Court of Trade. In response, the U.S. Customs and Border Protection ("CBP") announced a process to streamline refunds to businesses and other entities that paid IEEPA tariffs. However, no such process has been initiated to ensure that the companies who passed on the cost of IEEPA tariffs would refund consumers who actually paid them.

6. In this case, the individuals that ultimately paid the IEEPA tariffs were undisputedly the consumers. Consequently, those consumers are entitled to a refund of the tariffs that the Supreme Court ruled were illegal when charged.

7. While Canon is able to recover refunds for the IEEPA tariffs it paid, Canon has not made any legally-binding commitment to return the same IEEPA tariffs it passed through to the consumers who bore the brunt of the illegal IEEPA tariffs.

8. Unless restrained by this Court, Canon will get paid the same tariff payments twice, once from consumers and again from the federal government through tariff refunds (including interest). Without a refund of IEEPA tariffs to consumers, Canon will be eligible for a refund of IEEPA tariff fees it never paid.

9. This action presents an actual, concrete controversy that is ripe for adjudication. Canon collected IEEPA tariffs that were never lawful from consumers like Plaintiffs, Class, and Subclass members. Canon has been and will continue to be refunded by the government for the IEEPA tariffs that Plaintiffs, Class, and Subclass members already paid. Thus, Canon has been and will continue to be enriched at the expense of Plaintiffs, Class, and Subclass Members. As

such, Plaintiffs, Class, and Subclass Members are entitled to reimbursement of all tariffs and tariff-related fees Canon unlawfully charged, plus interest.

**PARTIES, JURISDICTION & VENUE**

10. Plaintiff Michael Nolen is a resident citizen of the State of Texas. Plaintiff Nolen purchased an item from Canon that was subject to an increased price that was directly tied to IEEPA tariffs that Canon paid and passed through to him.

11. Plaintiff Marlon Vera is a resident citizen of the State of California. Plaintiff Vera purchased an item from Canon that was subject to an increased price that was directly tied to IEEPA tariffs that Canon paid and passed through to him.

12. Defendant Canon U.S.A., Inc. is a corporation with its principal place of business in New York. Canon is responsible for the pricing, marketing, distribution, and sale of its products in the United States. Canon develops, designs, manufactures, and sells photography, printing, and medical imaging equipment, among other things. A significant portion of the products Canon sells are imported goods subject to IEEPA tariffs imposed by the United States government. The decision to pass on illegal IEEPA tariffs to consumers arose out of Canon's presence in New York. Canon U.S.A., Inc., is a wholly owned subsidiary of Canon, Inc.

13. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332, because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

14. The Court has jurisdiction to enter declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties regarding Defendant's obligation to return

to the consumers who paid them the IEEPA duties and fees Defendant collected, as well as any IEEPA duty refunds Defendant recovers from the United States.

15. This Court has personal jurisdiction over Defendant, because its principal place of business is in this District. Defendant has also purposefully availed itself of the laws, rights, and benefits of the State of New York.

16. Venue is proper under 28 U.S.C. § 1391 because Defendant maintains a principal place of business in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

### A. Canon's Business Relies on International Supply Chains

17. Canon is one of the largest suppliers of photographic, printing, and medical imaging equipment in the world.

18. Canon generates roughly $9.3 billion (1.49 trillion yen) in sales in the Americas alone, accounting for approximately 32% of its worldwide sales which amount to roughly $28.7 billion (4.6 trillion yen).

19. Canon markets its cameras and lenses to a wide range of consumers, from amateur hobbyists to seasoned professionals.

20. In order to maintain a competitive edge, Canon maintains an international supply chain that includes factories in China, Thailand, Taiwan, Japan, and Malaysia.

21. Imported goods therefore account for most, if not virtually all, of Canon's retail sales in the United States. Because Canon imports most if not all of the goods it sells to the US consumers, Canon is particularly sensitive to any tariffs that could increase its cost of importing merchandise into the United States.

22. Canon sells to consumers directly and through its authorized dealer network. To be an authorized dealer, a retailer must agree to, among other things, set a minimum advertised price ("MAP") for Canon's products. Canon's authorized dealers agree not to advertise and sell a Canon product below the MAP, meaning that Canon is able to control the prices that consumers pay.

**B. IEEPA Tariffs Impacted Companies, Like Canon, with International Supply Chains**

23. Beginning in February 2025, President Donald J. Trump unilaterally issued a series of executive orders invoking the IEEPA to impose new tariffs on goods imported from numerous foreign countries. These included 25% tariffs on Canadian and Mexican imports and escalating tariffs on Chinese imports. *See* Exec. Order 14193, 90 Fed. Reg. 9113 (Feb. 1, 2025); Exec. Order 14194, 90 Fed. Reg. 9117 (Feb. 1, 2025); Exec. Order 14195, 90 Fed. Reg. 9121 (Feb. 1, 2025); Exec. Order 14228, 90 Fed. Reg. 11463 (Mar. 3, 2025).

24. The IEEPA authorizes the president to "regulate . . . importation" when faced with an "unusual and extraordinary threat" to American national security. 50 U.S.C. §§ 1702(a), 1702(a)(1)(B).

25. President Trump invoked the IEEPA on the grounds that drug trafficking and trade deficits purportedly presented unusual and extraordinary threats.

26. On April 2, 2025, the President issued an Executive Order invoking the IEEPA to impose a 10% tariff on nearly all other imports under the "reciprocal tariff" order, with rates ranging from 11% to 50% on certain countries. Exec. Order 14257, 90 Fed. Reg. 15041 (Apr. 2, 2025).

27. On April 2, 2025, President Trump signed another Executive Order eliminating the *de minimis* exemption for goods originating from China and Hong Kong, effective May 2, 2025. Beginning on that date, all imports from China and Hong Kong, regardless of value, became

subject to applicable duties, taxes, and fees–including IEEPA tariffs. Exec. Order 14256, 90 Fed. Reg. 14899 (Apr. 2, 2025).

28. As a result, every shipment, regardless of its value, country of origin, mode of transportation, or method of entry, was then subjected to duties and taxes —including the illegal IEEPA tariffs.

29. The tariffs significantly increased the cost of imported consumer goods entering the United States, particularly for retailers and other businesses that rely heavily on international supply chains to source merchandise—like Defendant Canon.

30. Under U.S. customs law, the importer of record is responsible for paying tariffs when goods enter the United States. Accordingly, importers of record—including major retailers such as Canon—were required to pay the IEEPA tariffs to U.S. CBP upon entry of covered merchandise into the country.

31. The IEEPA tariffs were never intended to serve as sources of profit for businesses.

**C. IEEPA Tariffs are Borne by Consumers**

32. As Nobel-Prize winning economist Dr. Milton Friedman famously quipped, tariffs act as a consumption tax that "protects the consumer against low prices."

33. Dr. N. Gregory Mankiw, Harvard economics professor and former Chairman of the Council of Economic Advisers under President George W. Bush stated "[t]ariffs are paid by domestic consumers, not by foreign exporters...."

34. Economic studies examining recent U.S. tariff regimes consistently find that the cost of tariffs is passed through into higher prices paid by U.S. purchasers of imported goods.[1]

[1] *See* Julian Hinz et al., *America's Own Goal: Who Pays the Tariffs?*, Kiel Inst. for the World Econ. Policy Brief (Jan. 19, 2026); see also Mary Amiti, Stephen J. Redding & David Weinstein, *The Impact of the 2018–2019 Tariffs on Prices and Welfare*, 135 J. Econ. Persp. 187 (2020)

35. The Federal Reserve has extensively studied the impact of tariffs on consumers. The Federal Reserve Board found that anticipated tariff costs would materially increase consumer prices and that "pass-through from the 2025 tariffs is effectively complete," meaning the costs of the tariffs would ultimately be borne by purchasers through higher prices.[2]

36. The Federal Reserve Bank of Dallas, reviewing the realized impacts of the 2025-2026 tariffs, concluded that increased tariffs led to increased prices.[3] This means that businesses were directly passing on the discrete cost of tariffs onto consumers in the form of increased prices of goods sold. In other words, businesses act as conduits in collecting tariffs from consumers to pay CBP.

37. The Federal Reserve Bank of Dallas' conclusion is no surprise. When tariffs increase the cost of imported goods, retailers and other downstream sellers typically raise prices to offset those additional costs.

38. Surveys of U.S. businesses conducted by the Federal Reserve Bank of New York during the recent tariff period found that a large majority of firms facing tariff-related cost increases passed at least some portion of those costs through to their customers in the form of higher prices.[4] Companies generally and necessarily consider tariffs to be costs that are to be incorporated into the pricing structure.

39. Other sources place the rate that tariffs were passed through to consumers as high as 96%, meaning that for every dollar that companies paid in tariffs, they were able to pass 96

---

[2] Robert Minto *et al*., Detecting Tariff Effects on Consumer Prices in real Time - Part II (April 8, 2026), *available at* https://www.federalreserve.gov/econres/notes/feds-notes/detecting-tariff-effects-on-consumer-prices-in-real-time-part-II-20260408.html

[3] *See* Ron Mau & Tucker Smith, Effects of Realized Tariff Changes on PCE Prices Peaked in First Quarter 2026, Fed. Rsrv. Bank of Dall. (May 5, 2026), available at: https://www.dallasfed.org/research/economics/2026/0505-mau.

[4] *See* Jaison R. Abel, Richard Deitz & Jason Bram, *Are Businesses Absorbing the Tariffs or Passing Them On to Their Customers?*, Fed. Rsrv. Bank of N.Y., Liberty Street Econ. (June 4, 2025), available at https://libertystreeteconomics.newyorkfed.org/2025/06/are-businesses-absorbing-the-tariffs-or-passing-them-on-to-their-customers/.

cents of that increased cost to consumers.[5]

40. The Tax Foundation has estimated that the tariffs imposed an average cost of $1,000 on American households in 2025.[6]

41. Indeed, as detailed below, Canon publicly acknowledged that tariffs would affect pricing decisions and the company's cost structure. In those disclosures, Canon explained that tariffs increased the company's merchandise costs and required Canon impose price adjustments and other operational responses designed to manage those additional expenses.

42. As a result, consumers who purchased goods from Canon during the tariff period paid elevated prices reflecting the tariff-related cost increases incorporated into Canon's retail pricing.

**D. Canon Admitted IEEPA Tariff-Related Price Increases**

43. Canon publicly acknowledged, early in the IEEPA tariff period, that IEEPA tariffs would increase its costs and place upward pressure on consumer prices.

44. In Canon's Q1 2025 Analyst Meeting Q&A Session Summary, Canon disclosed that the company anticipated a gross incremental cost increase of approximately $375 million per year. In this same Q&A, Canon stated that it planned to mitigate their increased costs through changes in their supply line and price increases passed to consumers.

45. In Canon's Q3 2025 Analyst Meeting Q&A Canon revised its estimation. Canon estimated an annual increase in tariff costs of around $313 million (50 billion yen), which Canon hoped to offset by 80% through price increases ($250 million).

[5] Veronique de Rugy, Drop the Tariffs, Mr. President, Cato Inst.: Commentary (May 20, 2026), https://www.cato.org/commentary/drop-tariffs-mr-president. *See also* Scott Lincicome, Alfredo Carrillo Obregon & Chad Smitson, *One Year After "Liberation Day": Here's What We Know and What We Don't*, Cato at Liberty (Apr. 2, 2026), https://www.cato.org/blog/one-year-after-liberation-day-heres-what-we-know-what-we-dont.
[6] https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/

46. In the same Q&A, Canon reported that the cost increase due to tariffs during Q3 of 2025 was approximately $87 million (14 billion yen). Canon stated that corresponding price increases had generated $93.6 million in additional revenue during Q3.

47. Canon also stated that it had raised prices by 6-8% to address IEEPA tariffs in June of 2025, and that Canon planned to increase prices by a further 3-5% in October of 2025. These were not ordinary price increases but instead directly tied to IEEPA tariffs.

48. Canon's price increases were implemented as announced. For example, effective approximately June 23, 2025, Canon raised prices on its EOS R1 (over $500 price increase over a month) and EOS R3 ($400) cameras. Canon increased its lens prices as well. Canon raised the price of the RF 70-200mm f/2.8 L IS USM by $200, the RF 100-500mm f/4.5-7.1 L IS USM by $200, and RF 100-300mm f/2.8 L IS USM by $700. In other words, Canon's price increases were discrete, identifiable, and directly traceable to the IEEPA tariffs.

49. In addition to selling brand-new merchandise, Canon also sells refurbished Canon products.

50. Because these products are refurbished and not brand-new, Canon often sells them at a marked down price from the equivalent brand-new product.

51. Canon typically prices refurbished products at 90% of the equivalent brand-new product.

52. Canon continued this practice after increasing prices to account for IEEPA tariffs for its brand new goods, meaning that when Canon increased the prices of its brand-new goods to account for the new costs imposed by the IEEPA tariffs, the prices of the corresponding refurbished goods also increased. Canon did this regardless of whether the refurbished products were actually imported as a result of the refurbishing process.

Case MDL No. 3202 Document 46-3 Filed 03/09/26 Page 10 of 25

53. On April 23, 2026, Canon announced its first quarter results. Canon identified a 19.1 billion yen cost increase directly due to tariffs, but that it "covered" this amount "through pricing measures amounting to 17.5 billion yen…" This means that Canon passed more than 90% of the cost of IEEPA tariffs on to consumers.

54. Canon's public statements and actions thus confirmed four critical points. First, IEEPA tariffs were increasing Canon's costs on imported goods. Second, Canon could not and did not absorb the IEEPA tariffs as part of a total or composite price. Third, Canon directly passed the IEEPA tariffs onto its customers. Fourth, Canon would not have raised its prices in the amount it did absent the IEEPA tariffs. This means that Canon's customers were paying for the IEEPA tariffs through their purchases of Canon's goods, and that Canon was serving as a conduit for the collection and payment of IEEPA tariffs.

55. By increasing their prices, Canon was essentially acting as a pass-through entity, forcing consumers to pay large percentages of the illegal tariffs on its behalf.

56. Plaintiffs, Class, and Subclass members paid tariff-inflated prices at Canon during the Class Period, while Canon now seeks to retain both the consumer pass-through and any government refund of the same unlawful tariff charges.

**E. IEEPA Tariffs Are Void *Ab Initio***

57. Numerous importers challenged the legality of the IEEPA tariffs, arguing that the President lacked statutory authority under IEEPA to impose tariffs of that nature.

58. The district court in *Learning Res.* granted a motion for a preliminary injunction against the enforcement of the IEEPA tariffs, a ruling that necessitated a finding of a high probability of success on the merits for the plaintiffs in that case. *Learning Res., Inc. v. Trump*, 607 U.S. 229, 239 (2026).

59. In a separate tariff case, the Court of International Trade had granted a motion for summary judgment finding the IEEPA tariffs illegal. A motion for summary judgment can only be granted where the moving party is entitled to judgment as a matter of law even if all facts are viewed in the light most favorable to the nonmoving party and there is no genuine dispute as to a material fact. *Id*.

60. The Court of International Trade ruling was later affirmed by the Federal Circuit Court of Appeals. *Id*.

61. The Supreme Court combined these cases when it ultimately heard arguments on the legality of the IEEPA tariffs. *Id*.

62. On February 20, 2026, the Supreme Court of the United States held that the challenged tariff regime was unlawful and that IEEPA does not authorize the President to impose tariffs of the type challenged in that litigation. This ruling invalidated the tariff orders issued pursuant to that statute. *Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026).

63. In holding that the IEEPA tariffs were illegal, the Supreme Court noted the following:

a. The section of IEEPA cited by the government never mentions tariffs (*Id.* at 248);

b. IEEPA had never been used by any President to impose tariffs (*Id*. at 245);

c. The Constitution reserves the powers to tax and impose duties to Congress (*Id.* at 240-1); and

d. The enormous scope of the tariffs President Trump sought to impose (*Id.* at 255).

64. For each of those reasons, the Supreme Court held that IEEPA has never granted the President unilateral authority to impose tariffs, and that the IEEPA tariffs imposed by President Trump were illegal from their conception.

65. Rather than announce any prospective limitation on the imposition of IEEPA tariffs, the Supreme Court's decision declared that there was no legal basis for imposing the IEEPA tariffs. In other words, the IEEPA tariffs were unlawful from the moment they were imposed and thus unlawful when businesses like Canon passed the tariff fees through to consumers.

**F. Canon Received Refunds For IEEPA Tariffs It Did Not Pay, Expects to Receive More**

66. On March 4, 2026, the Court of International Trade, in *Atmus Filtration, Inc. v. United States*, ordered CBP to stop liquidating IEEPA duties and to reliquidate previously liquidated IEEPA duties where possible, and indicated that the relief extended to “all importers of record” that paid IEEPA duties, including importers that had not filed their own refund suits.[7]

67. CBP developed the Consolidated Administration and Processing of Entries (CAPE) to “streamline the submission and processing of valid refund requests for duties imposed under the International Emergency Economic Powers Act (IEEPA).”[8] The CAPE process was launched on April 20, 2026, and provides a way for importers of record to recover IEEPA tariffs through the submission of a spreadsheet.

68. CBP, in ordering reliquidation, did not provide a manner for consumers like Plaintiffs, Class, and Subclass Members who ultimately paid the IEEPA tariffs to collect refunds. Instead, CBP created a refund structure that reliquidated IEEPA tariff fees to the intermediaries, like Canon.

69. Notably, Canon never claimed to the CBP, as a precursor to obtaining a refund, that it was owed a refund for IEEPA tariffs independent from the amounts paid by Plaintiffs, Class, and Subclass Members, or who bore the economic burden of the IEEPA tariffs.

70. Following the Supreme Court's decision in February 2026, importers that had paid

---

[7] *See Atmus Filtration, Inc. v. United States*, No. 26-01259, (Ct. Int’l Trade Mar. 4, 2026), ECF No. 21.
[8] https://www.cbp.gov/trade/programs-administration/trade-remedies/ieepa-duty-refunds (last visited Aug. 12, 2026).

Case MDL No. 3202 Document 46-3 Filed 08/13/26 Page 17 of 29

IEEPA tariffs—including Canon—became eligible to pursue refunds of those duties.

71. Given Canon's scale as a major importer, Canon can expect to recover significant tariff refunds corresponding to duties it paid during the Class Period. Those expected refunds are especially significant here because Canon previously passed tariff-related cost increases through to consumers in the form of higher retail prices, meaning Canon now seeks to recover from the government duties whose economic burden was borne, in whole or in part, by Plaintiffs, Class, and Subclass members.

72. On July 27, 2026, Canon announced to its investors that it had sufficient confidence in the pendency of tariff refunds that the company listed the amount as part of its anticipated profit. Canon described "the impact of U.S. tariffs, including tariff refunds, is expected to be a positive 37.5 billion yen" and that "earnings will benefit from tariff refunds of 37.5 billion yen…"[9] This figure amounts to approximately $229 million in U.S. dollars.

73. In its July 27, 2026 call with investors, Canon confirmed that "[m]ore than 90% of the tariff refunds have already been received in the first half of the year, and only a small amount is expected in the second half."[10]

74. The influx of tariff refunds allowed Canon an unmerited business benefit, as it communicated to its investors that "[h]igher memory prices and increased costs for raw materials and other inputs resulting from rising oil prices were absorbed by refunds on additional U.S. tariff…" and that the tariff refunds allowed Canon's "gross profit ratio [to] improve[] by 5.4 points…" Overall, Canon pointed to "a positive impact of 58.0 billion yen from U.S. tariff refunds." This "positive impact" amounts to approximately $354 million in U.S. dollars.

75. In practical terms, Canon has received a windfall: a double recovery for a single

[9] https://global.canon/en/ir/conference/pdf/conf2026q2e-note.pdf (last visited August 12, 2026)
[10] https://global.canon/en/ir/conference/pdf/conf2026q2e-qa.pdf at ¶ A4 (last visited August 12, 2026)

cost. Canon has already recouped tariff costs from consumers through higher prices, and it now stands in line to recover those same unlawful tariff payments from the federal government.

## PLAINTIFFS' ALLEGATIONS

**Michael Nolen**

76. In or around November 30, 2025, Plaintiff Michael Nolen purchased a lens from Canon. Specifically, he bought a RF14-35mm F4 L IS USM. This item was subject to IEEPA tariffs.

77. The price Plaintiff Nolen paid for this product included IEEPA tariff fees that were passed through to him by Canon via their pricing formula.

78. Plaintiff Nolen has not been refunded the IEEPA tariff fees that he paid to Canon. However, Canon has received a refund from the government for IEEPA tariff fees that Plaintiff Nolen, not Canon, paid.

**Marlon Vera**

79. In or around February 1, 2026, Plaintiff Marlon Vera purchased a lens from Canon. Specifically, he bought a refurbished RF70-200mm F2.8 L IS USM Z for 90% of the purchase price for a brand-new version of that lens. This item was subject to IEEPA tariffs.

80. The price Plaintiff Vera paid for this product included IEEPA tariff fees that were passed through to him by Canon via their pricing formula.

81. Plaintiff Vera has not been refunded the IEEPA tariff fees that he paid to Canon. However, Canon has received a refund from the government for IEEPA tariff fees that Plaintiff Vera, not Canon, paid.

## CLASS ACTION ALLEGATIONS

82. Plaintiffs bring this action on behalf of themselves and as a class action for all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the

class is defined as follows:

> **Nationwide Class**: All persons in the United States who purchased goods from Canon during the period from February 1, 2025 through February 24, 2026 (the "Class Period"), and were charged prices that included IEEPA tariff costs (the "Class").

83. This Nationwide Class shall be referred to herein as the "Class."

84. In addition, Plaintiff Vera brings this action on behalf of himself and as a subclass action for all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the class is defined as follows:

> **Nationwide Subclass**: All persons in the United States who purchased refurbished goods from Canon during the period from February 1, 2025 through February 24, 2026, and were charged prices that included IEEPA tariff costs (the "Subclass").

85. Plaintiffs reserve the right to amend the Class and Subclass definitions if further investigation and discovery indicate that the Class and Subclass definitions should be narrowed, expanded, or otherwise modified.

86. Excluded from the Class and Subclass are Defendant, its parents, subsidiaries, affiliates, officers and directors, and judicial officers and their immediate family members and associated court staff assigned to this case.

87. The particular members of the Class and Subclass are capable of being described without difficult managerial or administrative problems. The members of the putative classes are also readily identifiable from the information and records in the possession or control of Defendant or its affiliates and agents and from major retail sellers.

88. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

89. This action has been brought and may be properly maintained on behalf of the Class

and Subclass proposed herein under Federal Rule of Civil Procedure 23.

90. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** The Class and Subclass are so numerous that the joinder of all members is impracticable. While the exact number and identities of individual members of the Class and Subclass are unknown currently, such information is in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process.

91. **Commonality (Fed. R. Civ. P. 23(a)(2)):** There are questions of law and fact common to the Class and Subclass that are capable of generating common answers, including: whether Defendant engaged in the uniform conduct, practices, representations, omissions, or policies alleged herein; whether Defendant's conduct was unlawful, unfair, deceptive, misleading, or otherwise actionable under applicable federal and state law; whether Defendant knew or should have known of the tariffs imposed were done so unlawfully; whether Defendant's conduct caused injury to Plaintiffs and Class and Subclass Members; whether Defendant was unjustly enriched as a result of the conduct alleged herein; and whether Defendant is liable to Plaintiffs and Class and Subclass Members for damages, restitution, disgorgement, or other equitable relief.

92. **Typicality (Fed R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of the claims of the members of the Class and Subclass, because, *inter alia*, all Class and Subclass Members have been injured through the uniform misconduct described above. Moreover, Plaintiffs' claims are typical of the Class and Subclass Members' claims because Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class and Subclass. In addition, Plaintiffs are entitled to relief under the same causes of action and upon the same facts as the other members of the proposed Class and Subclass.

93. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs will fairly and adequately protect the interest of the members of the Class and Subclass. Plaintiffs and the members of the Class and

Subclass were all assessed tariffs and other collection duties as a result of the tariffs imposed by the United States pursuant to IEEPA. Plaintiffs have retained competent counsel experienced in complex litigation and class action litigation. Plaintiffs have no antagonistic interests to those of the Class and Subclass, and Defendant has no defenses unique to Plaintiffs.

94. **Injunctive and/or Declaratory Relief (Fed. R. Civ. P. 23(b)(2))**: Defendant has acted on grounds that apply generally to the proposed Class and Subclass, making declaratory and injunctive relief appropriate with respect to the proposed Class and Subclass as a whole. Defendant's uniform practice of collecting tariffs imposed by the United States pursuant to IEEPA from consumers and failing to reimburse consumers for these unlawful tariffs warrants class-wide declaratory and injunctive relief.

95. **Predominance and Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to all other available means for the fair and efficient adjudication of claims of Plaintiffs and Class and Subclass Members. There are questions of law and fact common to all Class and Subclass Members that predominate over questions affecting only individual Class and Subclass Members. The damages or other financial detriment suffered by individual Class and Subclass Members is relatively small compared to the burden and expense that would be incurred by individual litigation of their claims against Defendant. It would be virtually impossible for a member of the Class and Subclass, on an individual basis, to obtain effective redress for the wrongs committed against him or her. Further, even if the Class and Subclass Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. On the other hand, the class action device provides the benefits of

adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

96. Plaintiffs seek monetary damages, including compensatory damages on behalf of the Class and Subclass, and other equitable relief on grounds generally applicable to the entire Class and Subclass, to enjoin and prevent Defendant from engaging in the acts described. Unless a Class and Subclass are certified, Defendant will be allowed to profit from their unfair and unlawful practices, while Plaintiffs and the members of the Class and Subclass will have suffered damages. Unless a Class- and Subclass-wide injunction is issued, Defendant may continue to benefit from these alleged violations, and the members of the Class and Subclass may continue to be unfairly treated, making final injunctive relief appropriate with respect to the Class and Subclass as a whole.

97. These common questions are capable of class wide resolution because they arise from Defendant's uniform conduct and do not depend on individualized proof. The determination of these issues will resolve central aspects of Defendant's liability in a single adjudication and will materially advance the resolution of this litigation.

## CAUSES OF ACTION

### COUNT I
### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class and Subclass)

98. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

99. Plaintiffs, the Class and the Subclass have made payments to Defendant to which, as between them and Defendant, Plaintiffs and the Class have a superior legal or equitable right.

100. Plaintiffs, the Class, and the Subclass conferred a benefit upon Defendant in the form of payment of IEEPA tariffs that Canon imposed for the specific, announced purpose of

recovering its IEEPA tariff costs. Canon has now, and will continue to, recover those same costs a second time through government refunds. The benefit unjustly retained is Canon's refund of a cost already funded by Plaintiffs, the Class, and the Subclass.

101. The IEEPA tariffs constitute an imposition or assessment collected under color of public authority. That Canon served as an intermediary or conduit through which the IEEPA tariffs were collected is immaterial.

102. Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiffs, the Class, and the Subclass.

103. The benefit received by Defendant came at the Plaintiffs' and Class's and Subclass's expense, who all paid money to Defendant in the form of illegal IEEPA tariffs.

104. Defendant knowingly and voluntarily requested, received, and retained these benefits.

105. Under principles of equity and good conscience, Defendant should not be permitted to retain both the IEEPA tariffs paid by Plaintiffs, the Class, and the Subclass on the one hand, and the IEEPA tariff refunded by the government on the other. As it stands, Defendant has retained IEEPA tariff refunds (and expects to receive more) that it did not pay. Defendant's treatment of the tariff refunds concedes that it is treating the refunds as a windfall, one-time profit.

106. Plaintiffs and the Class have no adequate remedy at law.

107. Equity and good conscience require that Defendant disgorges all unlawfully obtained funds and make restitution to Plaintiffs and Class and Subclass members.

**COUNT II**
**MONEY HAD AND RECEIVED**
**(On Behalf of Plaintiffs and the Class and Subclass)**

108. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

herein.

109. The Supreme Court has determined that the IEEPA tariffs were unlawful at the time they were imposed, and not prospectively after the decision was announced.

110. Defendant received money belonging to Plaintiffs and each member of the proposed Class and Subclass in the form of IEEPA tariffs.

111. Defendant benefited from receipt of the money in the form of IEEPA tariffs from Plaintiffs.

112. In the wake of the Supreme Court's decision and the receipt of refunds for IEEPA tariffs, the money paid by Plaintiffs and the proposed Class and Subclass to Canon belongs, in equity and good conscience, to Plaintiffs and to each member of the proposed Class and Subclass.

113. Defendant has not returned the money.

114. It will give offense to equity and good conscience if Defendant is permitted to retain the IEEPA tariff fees. Plaintiffs and the putative Class and Subclass seek the return of the money in an amount to be proven at trial.

115. Plaintiffs seek all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to them.

**COUNT III**
**DECLARATORY RELIEF**
**(On Behalf of Plaintiffs and the Class and Subclass)**

116. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

117. An actual, justiciable controversy exists between Plaintiffs and Defendant regarding the rights and obligations of the parties with respect to fees collected by Defendant from

Plaintiffs, Class, and Subclass members authorized by the IEEPA. This controversy is not hypothetical or abstract.

118. Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201 that:

a. Defendant engaged in uniform conduct of charging tariffs authorized by the IEEPA to consumers such as Plaintiffs and Class and Subclass Members when those tariffs and customs duties were not lawfully authorized;

b. Defendant breached duties owed to Plaintiffs and Class and Subclass Members;

c. Defendant knew or should have known that the tariffs and customs duties were unlawfully imposed;

d. Defendant's conduct caused injury to Plaintiffs and Class and Subclass Members; and

e. Defendant is obligated to return to Plaintiffs and proposed Class and Subclass Members all IEEPA tariffs and customs duties collected from them together with interest.

119. Declaratory relief is necessary and appropriate because Defendant collected duties and fees pursuant to tariffs that the Supreme Court has declared were never lawfully authorized and Defendant has not returned those sums to consumers who paid them. Without judicial intervention, Plaintiffs and the Class and Subclass have no assurance that Defendant will return the unlawfully collected sums.

120. Class and Subclass members have no alternative remedy. Because Defendant served as the importer of record, only Defendant has standing to seek a refund from the government. Individual consumers cannot file suit in the Court of International Trade to recover

Case MDL No. 3202   Document 46-3   Filed 03/09/26   Page 26 of 29

duties they paid through Defendant. Without the declaratory relief sought in this action, Class and Subclass members will be left without any mechanism to recover the unlawful tariffs and fees they were forced to pay.

**COUNT IV**
**VIOLATION OF N.Y. GEN. BUS. LAW § 349**
**(On Behalf of Plaintiffs and the Class and Subclass)**

121. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

122. Canon is a business engaged in "trade" or "commerce" within the meaning of N.Y. Gen. Bus. Law § 349.

123. Plaintiffs and members of the putative class are persons who purchased Canon photography, printing or medical imaging equipment goods for primarily personal, family, or household purposes.

124. Canon engaged in unlawful trade practices in connection with the sale of consumer goods, including the Canon items purchased by Plaintiffs, by: representing that the tariff-related charges assessed to consumers were lawfully authorized when they were not; passing on to consumers tariffs that are unlawful; retaining the economic benefit of those unlawful tariff charges even after seeking and obtaining a refund of the same tariff payments from the federal government; and engaging in deceptive and unfair pricing practices by presenting unlawful tariff costs to consumers as legitimate, legally mandated charges with no disclosure that those tariffs were of questionable legal validity.

125. Canon's conduct constitutes unfair, deceptive, or abusive acts and practices in trade or commerce. Canon engaged in unfair and deceptive acts by: (i) charging customers with discrete, identifiable, and unlawful tariffs; and (ii) retaining tariff refunds despite having passed the costs

to its customers. Canon's conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous.

126. Canon knew or should have known at the time it imposed tariff-driven price increases on consumers that the IEEPA tariffs were of questionable legality. Numerous importers challenged the legality of the IEEPA tariffs in the United States Court of International Trade, arguing that the President lacked statutory authority under IEEPA to impose tariffs of that nature.

127. Even if Canon was justified in passing through the IEEPA tariffs to Plaintiffs and Class and Subclass members at the time, Canon now knows that the IEEPA tariffs were illegal when charged and should refund the additional monies paid by Plaintiffs and Class and Subclass members.

128. Canon's conduct also constitutes unfair business acts and practices because it caused substantial injury to consumers that was not reasonably avoidable by those consumers—who had no meaningful ability to contest or avoid unlawful tariffs at the point of purchase—and the harm to consumers is not outweighed by any countervailing benefit to consumers or competition.

129. Plaintiffs and members of the putative class suffered an ascertainable loss of money as a direct result of Canon's unlawful trade practices, having paid tariff-inflated prices for Canon products that would not have been imposed absent the unlawful IEEPA tariff regime.

130. Plaintiffs and members of the putative Class and Subclass are entitled to recover their actual damages, statutory damages, attorney fees, and costs as available under the N.Y. Gen. Bus. Law § 349.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Members of the Class and Subclass alleged herein, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A. For an order certifying the Class and Subclass and naming Plaintiffs as the representative for the Class and Subclass and Plaintiffs' attorneys as Class Counsel;

B. For an order declaring that Defendant's conduct violates the causes of action referenced herein;

C. For an order finding in favor of Plaintiffs and the Class and Subclass on all counts asserted herein;

D. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E. For prejudgment interest on all amounts awarded;

F. For an order of restitution and all other forms of equitable monetary relief;

G. For injunctive and declaratory relief as pleaded or as the Court may deem proper;

H. For an order awarding Plaintiffs and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit; and

I. For an order providing for all other such equitable relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

Dated: August 13, 2026.

Respectfully Submitted,

*/s/ Seth R. Lesser*

Seth R. Lesser
Jessica Rado
**KLAFTER LESSER LLP**
Two International Drive, Suite 350

Rye Brook, NY 10573
Telephone: (914) 934-9200
seth@klafterlesser.com

Patrick M. Wallace*
Jeremy R. Williams*
**LEE SEGUI PLLC**
421 N. Harrington Street, Suite 460
Raleigh, NC 27603
Phone: 919-421-7784
pwallace@leesegui.com
jwilliams@leesegui.com

*Attorney for Plaintiffs & Proposed Classes*
*Pro hac vice application to be filed