**BEFORE THE UNITED STATES JUDICIAL PANEL**
**ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: RETAILER TARIFF LITIGATION | MDL No. 3202 |

**DEFENDANT TARGET CORPORATION'S OPPOSITION TO MOTION FOR TRANSFER AND CENTRALIZATION PURSUANT TO 28 U.S.C. § 1407**

The Panel should reject Movants' effort to manufacture an industry-wide MDL on the basis of 25 distinct actions brought against 15 unrelated defendants. The Motion is principally founded on the uncompelling observation that all 25 cases relate to the International Emergency Economic Powers Act ("IEEPA") tariff refunds and therefore share that flimsy similarity. That grounding is simply not enough to warrant creation of an MDL: shared subject matter is not the standard for transfer under Section 1407. By that logic, any collection of cases could be consolidated so long as they involve the same statutory regime.

Here, the proposed consolidation presents none of the hallmarks that might justify centralization under Section 1407. Movants' proposal, presumably motivated by counsel's desire to lead a gargantuan MDL proceeding and pursue massive common benefit fees, would force unrelated parties and actions into a single proceeding fraught with unfairness and inefficiency. The cases involve different companies, products, pricing decisions, public statements, customer transactions, and litigation postures. There are no common operative disputed facts among these cases. Each of them will require a highly specific inquiry into whether particular tariffs applied to particular products, how those tariffs affected pricing decisions (if at all), what the individual defendant did in response, and what disclosures the defendant made to its customers (among other things). The analysis in each action will also turn on facts specific to the plaintiff in that

action, including purchase details, reliance, and the existence, scope, and enforceability of any arbitration provision. Each case focuses on a single defendant, demonstrating an implicit recognition by Movants' counsel that multi-defendant class actions are not appropriate here.

Centralization would not serve the convenience of the parties and witnesses here, nor would it promote the just and efficient conduct of the litigation. Trying to coordinate these 25 cases in one MDL would be a logistical nightmare. In the unlikely event the cases survive threshold motions and any discovery proceeds, the transferee court would be forced to manage 25 separate factual records, hundreds of distinct custodians and witnesses, defendant-specific discovery and motion practice, sensitive competitive information, and different state-law claims. Unrelated retailers from across the country will be dragged into proceedings in a foreign state that have little to do with one another. That is not efficiency; it is a pathway to needless complication, expense, and delay.

For all of these reasons, the Motion should be denied.

## BACKGROUND

### 1. The Federal Government Imposes Tariffs That Are Subsequently Held Invalid

In February 2025, the federal government implemented tariffs on virtually all goods imported into the U.S. under the IEEPA, 50 U.S.C. § 1701 et seq. The countries and "sets of goods" subject to the IEEPA tariffs varied over time, as the government regularly issued "increases, reductions, and other modifications." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 238 (2026). On February 20, 2026, the Supreme Court held that the IEEPA tariffs were unlawful and invalid. *See id.* at 255. The Supreme Court confirmed that challenges arising out of the IEEPA tariffs fall within the Court of International Trade ("CIT")'s exclusive jurisdiction. *Id.* at 240 n.1.

On April 20, 2026, Customs deployed Consolidated Administration and Processing of Entries ("CAPE") to facilitate the processing of IEEPA tariff refunds.[1] Companies have pursued refunds by filing suit in the CIT, by making CAPE submissions, or both. These processes are ongoing—the time it takes to receive refunds will vary by company.

**2. Plaintiffs File Putative Class Actions Asserting They Are Entitled To Damages From Retailers Who Receive Refunds For Tariffs That The Retailers Paid**

Beginning in February 2026, plaintiffs began filing putative class action lawsuits against various retailers on the theory that consumers are entitled to recover a portion of the prices that they paid to those retailers for certain goods while IEEPA tariffs were in place. Those plaintiffs generally contend that defendants may receive a purported double recovery by having raised prices to offset tariff costs and then recovering those same costs through the refund process.

On August 14, 2026, Movants sought to transfer to the Northern District of Illinois 25 actions listed in a Schedule of Actions attached to the Motion (the "Actions"), which involved 15 different defendants (the "Retailer Defendants"). Over the next six days, Movants twice amended their Motion, adding a case filed against Amazon.com and dropping one case that appeared to have been erroneously included.[2]

The Actions include three pending cases against Target, alleging various statutory and common law claims: *Martinez v. Target Corp.*, No. 3:26-cv-01807 (M.D. Fla. filed July 14, 2026); *Cavallaro v. Target Corp*., No. 7:26-cv-06165 (S.D.N.Y. filed July 21, 2026); and *Browne*

---

1 *See* U.S. Customs & Border Prot., CSMS No. 68340863, Update—Consolidated Administration and Processing of Entries (CAPE) for IEEPA Refunds, April 20, 2026, Deployment (Apr. 13, 2026), https://content.govdelivery.com/accounts/USDHSCBP/bulletins/412cc7f.

2 The dropped action, *Severino v. Shein US Services LLC*, No. 3:26-cv-04062 (N.D. Cal. filed May 5, 2026), involves putatively deceptive strike-through pricing practices, not IEEPA refunds.

*v. Target Corp.*, No. 1:26-cv-04959 (E.D.N.Y. filed Aug. 13, 2026) (collectively, the "Target Complaints"). The Actions do not include two other pending cases against Target asserting similar claims: *Camacho v. Target Corp.*, No. 3:26-cv-08704 (N.D. Cal. filed Aug. 20, 2026), and *Sun v. Target Corp.*, No. 2:26-cv-06391 (E.D. Pa. filed Aug. 27, 2026).

**3. The Actions Brought Against Retailers Are Vastly Different From One Another**

The Actions involve different defendant companies, a host of products described with varying levels of specificity, and a patchwork of statutory and common law claims. It is therefore not surprising that Target has no involvement in 22 of the actions Movants seek to centralize.

**(a) The Defendants Sell Vastly Different Products, Allegedly Made Different Statements, And Are At Different Stages Of The Tariff Refund Process**

While the Retailer Defendants could all be described as "large retailers" (Mot. ¶ 2), just like thousands of other companies, their similarity ends there. The Retailer Defendants range from technology retailers (Microsoft) to apparel retailers (Zara) to manufacturers of food and beverage products (The J.M. Smucker Company). They sell vastly different products: for example, one complaint alleges purchases of "decking material" (*Terrill*), another a "PlayStation Console" (*In re Sony*), and a third "a battery backup, a memory card, and a flash drive" (*In re Amazon*).[3]

The products plaintiffs allegedly purchased that they contend were price-inflated as a result of the tariffs are not even specified in many complaints. For example, the plaintiffs in the Target Complaints allege only that they purchased general categories of goods, such as "baby

---

[3] Consol. Am. Compl. ¶ 46, *Terrill v. Ikea N. Am. Servs. LLC*, No. 2:26-cv-02774 (E.D. Pa. Aug. 5, 2026); Consol. Compl. ¶ 4, *In re Sony Interactive Ent. Tariff Litig.*, No. 3:26-cv-04121 (N.D. Cal. July 15, 2026); Consol. Am. Compl. ¶ 16, *In re Amazon Tariff Litig.*, No. 2:26-cv-01670 (W.D. Wash. July 30, 2026).

and toddler food products, infant skincare and personal-care products," "collectible toys, candy," and "Target's own 'Cat & Jack' products."[4]

Importantly, none of the complaints assert that receiving a refund alone gives rise to a claim. The complaints all involve actions and products that are specific to each Retailer Defendant. The claims asserted in the Actions also rely on different statements that were allegedly made by various Retailer Defendants. For instance, the plaintiff in *Russell v. Whaleco Inc.* alleges that Whaleco told consumers that it would be charging "import charges" which "cover all customs-related processes and costs, including import fees paid to customs authorities on your behalf."[5] The plaintiffs in *Glase v. Walmart Inc.* allege that Walmart's Chief Financial Officer stated that "tariff-related costs lifted prices across many categories."[6] The plaintiffs in *Downs v. Adidas America, Inc.* allege that Adidas "confirmed that it had mitigated roughly half of the projected tariff impact . . . through a combination of 'sourcing changes, select price increases, and product mix adjustments.'"[7]

The Retailer Defendants are also in different stages of the IEEPA refund process: some are seeking refunds in actions before the CIT, others are seeking refunds through the CAPE process, and some have already received refunds. *See* Consol. Compl. ¶ 8, *In re Sony Interactive Ent. Tariff Litig.*, No. 3:26-cv-04121 (N.D. Cal. July 15, 2026) (generally alleging Sony is

---

4 Am. Compl. ¶ 12, *Martinez v. Target Corp.*, No. 3:26-cv-01807 (M.D. Fla. Aug. 3, 2026); Compl. ¶ 12, *Cavallaro v. Target Corp.*, No. 7:26-cv-06165 (S.D.N.Y. July 21, 2026); Compl. ¶ 12, *Browne v. Target Corp.*, No. 1:26-cv-04959 (E.D.N.Y. Aug. 13, 2026).

5 Compl. ¶¶ 29-30, *Russell v. Whaleco Inc.*, No. 1:26-cv-04296 (N.D. Ill. Apr. 16, 2026).

6 Third Am. Compl. ¶ 10, *Glase v. Walmart Inc.*, No. 1:26-cv-00988 (N.D. Ohio June 29, 2026).

7 Consol. Am. Compl. ¶ 63, *Downs v. Adidas Am., Inc.*, No. 3:26-cv-01008 (D. Or. July 23, 2026).

"seeking refunds"); Consol. Compl. ¶ 8, *Caldwell v. Nike, Inc.*, No. 3:26-cv-00923 (D. Or. July 17, 2026) (alleging Nike "has already received $300 million in IEEPA tariff refunds"); Compl. ¶ 4, *Stockov v. Costco Wholesale Corp.*, No. 1:26-cv-02734 (N.D. Ill. Mar. 11, 2026) (alleging Costco "filed lawsuits in the CIT, actively seeking refunds").

**(b) The Actions Assert Claims Under Many Different Legal Theories Under The Common And Statutory Law Of Many Different Jurisdictions**

The Actions assert various claims against the Retailer Defendants under several state laws. The Target Complaints allege violations of Florida, New York, and Minnesota statutes (Target is based in Minnesota). Other Actions pursue claims under the laws of several other states. *See, e.g.*, Consol. Am. Compl. ¶¶ 67-74, *Terrill v. Ikea N. Am. Servs. LLC*, No. 2:26-cv-02774 (E.D. Pa. Aug. 5, 2026) (alleging violations of Pennsylvania law); Consol. Compl. ¶¶ 101-231, *Caldwell v. Nike, Inc.*, No. 3:26-cv-00923 (D. Or. July 17, 2026) (alleging violations of Oregon, New Jersey, Pennsylvania, Illinois, Michigan, Missouri, Louisiana, California, Washington, and North Carolina law). Some Actions do not allege any statutory violations, pursuing only common law claims. *See* First Am. Compl. ¶ 21, *Lemense v. Puma United N. Am., LLC*, No. 1:26-cv-12654 (D. Mass. Aug. 11, 2026) (asserting claims for unjust enrichment and money had and received). Other Actions include requests for declaratory relief. *See* Compl. ¶ 133, *Briggs v. Costco Wholesale Corp.*, No. 2:26-cv-01064 (W.D. Wash. Mar. 27, 2026) (seeking "a declaratory judgment that retention of the tariff surcharges paid by Plaintiffs but refunded to Defendant is unlawful").

Even focusing on the claims against Target alone, the elements differ significantly. For example, the standards for what constitutes an "unfair or deceptive act or practice" differ between Minnesota and Florida law. *See Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 961 (D. Minn. 2020) ("The MCFA and Florida's FDUTPA have outcome-determinative

differences because of FDUTPA's 'hybrid standard' for determining deceptive acts or unfair practices."), *aff'd*, 9 F.4th 981 (8th Cir. 2021). The standards for causation also differ between Minnesota and New York consumer protection law. *See id.* ("The MCFA and New York's GBL have outcome-determinative differences because unlike the MCFA's causal nexus standard, the GBL requires nothing more than that a plaintiff suffer a loss because of defendants' deceptive conduct.").

In addition, the various states have different requirements for false advertising claims. To state a false advertising claim under Florida law, a plaintiff must prove that he or she "suffered injury in justifiable reliance on the representation" but does not need to prove causation. *Akai Custom Guns, LLC v. KKM Precision, Inc.*, 707 F. Supp. 3d 1273, 1286 (S.D. Fla. 2023). By contrast, justifiable reliance is not required under New York GBL section 350. *See Austin v. Albany L. Sch. of Union Univ.*, 957 N.Y.S.2d 833, 842 (Sup. Ct. 2013) ("Plaintiffs need not demonstrate reliance, reasonable or otherwise, to succeed on their GBL claims."). However, plaintiffs must prove causation. *See Denenberg v. Rosen*, 897 N.Y.S.2d 391, 395-96 (App. Div. 2010) (plaintiff must establish he or she was "injured by reason of defendant's deceptive or misleading conduct").

**(c) The Actions Are At Different Stages Of Litigation**

Other cases, including those against Target, are in such an early stage that there have been no substantive filings. *See, e.g.*, Minute Entry, *Mulconrey v. J. M. Smucker Co.*, No. 1:26-cv-08832 (N.D. Ill. July 28, 2026), Dkt. 10 (granting unopposed motion for extension of time to respond to complaint by September 14, 2026).

By contrast, in some of the other Actions, efforts are already well underway to coordinate informally on a defendant-specific basis. *See* Stipulation & Order Regarding Consolidation of Cases at 2, *In re Sony Interactive Ent. Tariff Litig.*, No. 3:26-cv-04121 (N.D. Cal. June 23, 2026),

Dkt. 25 (consolidating two pending actions "in the interest of efficiency and preserving resources"); Order, *Caldwell v. Nike, Inc.*, No. 3:26-cv-00923 (D. Or. June 17, 2026), Dkt. 9 (granting Motion to Consolidate Related Actions and for Appointment of Interim Co-Lead Class Counsel); Motion for Stay of Proceedings, *Downs v. Adidas Am., Inc.*, No. 3:26-cv-01008 (D. Or. Aug. 19, 2026), Dkt. 31 (moving to stay Oregon action under first-to-file rule given pending action in Eastern District of New York).

In still other cases, the parties have not engaged on the merits at all because the Retailer Defendants in those actions contend that the plaintiffs have agreed to arbitrate their claims. *See, e.g.*, Motion to Compel Arbitration, *Russell v. Shein Distrib. Corp.*, No. 1:26-cv-04533 (N.D. Ill. May 22, 2026), Dkt. 19; Motion to Compel Arbitration, *Russell v. Whaleco Inc*., No. 1:26-cv-04296 (N.D. Ill. May 21, 2026), Dkt. 14.

**ARGUMENT**

Section 1407 permits the Panel to transfer and centralize actions involving "one or more common questions of fact" only when transfer would serve "the convenience of parties and witnesses" and "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). The Panel has made clear that "centralization under Section 1407 should be the last solution after considered review of all other options." *In re Six Flags Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 289 F. Supp. 3d 1343, 1344-45 (J.P.M.L. 2018) (citation omitted). Movants bear the burden of showing that transfer is necessary. *See In re Best Buy Co. Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1379 (J.P.M.L. 2011) (denying transfer motion because "the proponents of centralization have not met their burden of demonstrating the need for centralization"). Movants cannot meet this burden. Because the Actions lack a common factual

core and centralization would multiply rather than reduce the burden of litigation, the Motion should be denied.

## I. CENTRALIZATION IS IMPROPER BECAUSE THE ACTIONS DO NOT SHARE COMMON QUESTIONS OF DISPUTED FACT.

### A. Here, Case-Specific Facts Overwhelm Any Purported Common Questions.

The Panel should deny the Motion because case-specific facts overwhelm common questions of fact.

Centralization is improper where "case-specific facts" and "individual inquiries" would "vastly overwhelm[]" purported common questions among multiple defendants. *In re Hotel Indus. Sex Trafficking Litig. (No. II)*, 730 F. Supp. 3d 1360, 1363 (J.P.M.L. 2024). The Panel regularly finds that the presence of highly individualized factual inquiries weighs against centralization. *See, e.g.*, *In re CP4 Fuel Pump Mktg., Sales Pracs., & Prods. Liab. Litig.*, 412 F. Supp. 3d 1365, 1366-67 (J.P.M.L. 2019) (denying centralization of cases involving "numerous [defendant]-specific and plaintiff-specific issues" related to each manufacturer's design, knowledge of the alleged defect, and marketing and communications with consumers); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 959 F. Supp. 2d 1375, 1376 (J.P.M.L. 2013) (denying centralization of cases that would require "a highly individualized inquiry" to determine whether the alleged product caused a particular plaintiff's injuries).

Here, the proposed MDL would sweep together 25 cases against 15 unrelated defendants. No Action names multiple retailers as co-defendants. Each case requires highly individualized factual inquiries into such matters as (1) the products at issue, which vary widely among the co-defendants; (2) whether the tariffs affected consumer pricing for the products at issue, which will involve individual inquiries into complex and commercially sensitive pricing practices; (3) the statements each defendant allegedly made (or did not make) to consumers about the tariffs and

any product price increases; and (4) whether each defendant will receive a refund for some or all of the tariffs it paid.

The Actions also turn on numerous disputed and plaintiff-specific questions, including which specific product(s) each plaintiff purchased, the details of that plaintiff's purchases, whether the plaintiff relied on a defendant's statements when making those purchases, and whether that plaintiff agreed to arbitrate. Those facts will vary from plaintiff to plaintiff. As a result, any discovery in each action would be specific to each defendant-plaintiff pairing, making common discovery tracks across the Actions impracticable. Movants try to avoid these differences by asserting that "the central factual allegation in every case is that the Retailer Defendants improperly shifted the economic burden of illegal tariffs onto customers, and refuse to refund consumers the amount the Retailer Defendants unlawfully retained." (Mot. ¶ 4.) But that sweeping assertion establishes, at most, "superficial commonality": it is a manufactured "common factual question" that "will have defendant-specific answers." *In re Cash Sweep Programs Cont. Litig.*, 766 F. Supp. 3d 1346, 1349 (J.P.M.L. 2025). Movants' claim of commonality is "vastly overwhelmed" by the individualized issues associated with each defendant's experience with the IEEPA tariffs and each plaintiff's unique purchase experience. *In re Hotel Indus. Sex Trafficking Litig. (No. II)*, 730 F. Supp. 3d at 1363; *see also In re Baby Food Mktg., Sales Pracs. & Prods. Liab. Litig.*, 544 F. Supp. 3d 1375, 1376 (J.P.M.L. 2021) (denying centralization where "[t]he claims against each defendant . . . are likely to rise or fall on facts specific to that defendant").

**B. Industry-Wide MDLs Of Actions With Different Defendants Are Disfavored.**

As Movants themselves recognize, the Panel disfavors industry-wide MDLs requiring coordination among businesses that are not co-defendants in the underlying cases. (Mem. at 12.) *See also In re Benzoyl Peroxide Mktg., Sales Pracs. & Prods. Liab. Litig.*, 743 F. Supp. 3d 1373,

1375 (J.P.M.L. 2024) (denying centralization of an industry-wide MDL where "widely varying product formulations" would create "an unwieldy MDL and require separate discovery tracks to safeguard the confidentiality of defendants' unique formulations"); *In re COVID-19 Bus. Interruption Prot. Ins. Litig.*, 482 F. Supp. 3d 1360, 1362 (J.P.M.L. 2020) (declining to centralize cases involving several different insurers, noting that "there are no true multi-defendant cases"); *In re Secondary Ticket Mkt. Refund Litig.*, 481 F. Supp. 3d 1345, 1346 (J.P.M.L. 2020) (declining to create an industry-wide MDL and noting that "[a]ny general factual commonality across the actions appears to be superficial at best"). The Actions themselves underscore why that principle applies here. Not a single one of the 25 Actions names more than one retailer as a defendant; each is a single-defendant class action. That pleading choice is an implicit concession by Movants' counsel that these retailers' conduct is not sufficiently related to warrant joinder in a single action. The *In re COVID-19 Business Interruption Protection Insurance Litigation* decision's observation that "there are no true multi-defendant cases" is therefore especially apt. If multi-defendant class actions do not make sense here, coordinated MDL treatment—which would accomplish the same forced grouping of the retailers' separate cases—is no more appropriate. In other words, where each defendant's liability rises or falls on its own facts, an industry-wide MDL creates the appearance of commonality without the benefit of a workable common record.

Movants' attempt to distinguish these authorities is unsuccessful. In *In re COVID-19 Business Interruption Protection Insurance Litigation* (cited in Mem. at 12), the Panel declined to centralize cases involving several different insurers because "these cases involve different insurance policies . . . purchased by different businesses in different industries located in different states." 482 F. Supp. 3d at 1362. The Panel concluded that "[t]hese differences will

overwhelm any common factual questions." *Id.* Movants argue this case is different than *In re COVID-19* because here, the IEEPA tariffs putatively created a "common factual core—one set of unlawful tariffs, one federal refund process, and one industry-wide pricing response." (Mem. at 12.) That characterization confuses a common legal backdrop with common operative facts. The tariffs affected different businesses and products differently, in part based on each imported product's country of origin. Nor was there a single "industry-wide pricing response." (*Id.*) Some companies made pricing changes. Others made no tariff-related changes at all. Plaintiffs' claims turn not on the fact of the tariffs, but on each defendant's response. Discovery will therefore focus overwhelmingly on the individual conduct of each defendant, leaving "little potential for common discovery across the litigation." *In re COVID-19 Bus. Interruption Prot. Ins. Litig.*, 482 F. Supp. 3d at 1362.

Movants' authorities are plainly distinguishable. *In re 100% Grated Parmesan Cheese Marketing & Sales Practices Litigation*, 201 F. Supp. 3d 1375 (J.P.M.L. 2016), and *In re Hair Relaxer Marketing, Sales Practices, & Products Liability Litigation*, 655 F. Supp. 3d 1374 (J.P.M.L. 2023) (both cited in Mem. at 10-11), both involved product defects that were uniform across producers. In *In re 100% Grated Parmesan* (cited in Mem. at 10), all defendants labeled their products "100% grated parmesan cheese," and the litigation largely stemmed from a single news article "allegedly reporting that independent laboratory testing" revealed "significant amounts of cellulose" across various brands. 201 F. Supp. 3d at 1376. In *In re Hair Relaxer* (cited in Mem. at 11 n.17), there were "allegations that defendants' hair relaxer products" contained certain common chemicals which "caused or increased the risk of developing" various cancers and other diseases. 655 F. Supp. 3d at 1376. In both cases, the alleged defect was

consistent across all products, regardless of the defendant company that manufactured the product. Here, by contrast, there is no comparable common defect.

## II. TRANSFER AND PRETRIAL COORDINATION WILL NOT PROMOTE THE GOALS OF 28 U.S.C. § 1407, JUSTICE AND JUDICIAL EFFICIENCY.

The Panel should also deny the Motion because centralization is "not necessary for the convenience of the parties and witnesses or to further the just and efficient conduct of this litigation." *In re CP4 Fuel Pump Mktg., Sales Pracs., & Prods. Liab. Litig.*, 412 F. Supp. 3d at 1366. The purpose of centralization is to eliminate "duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." *Manual for Complex Litigation* § 20.131 (4th ed. 2004). Centralization here would do the opposite: it would make these cases unwieldy, unmanageable, and extraordinarily burdensome for parties, witnesses, and the court.

### A. Centralization Would Not Make Discovery More Efficient Because Discovery Will Be Specific To Each Defendant.

Even if the Actions shared some common factual questions, centralization would not advance Section 1407's goals because any discovery will be specific to each of the 15 defendants. *See In re Fam. Dollar Stores, Inc., Access for Individuals With Disabilities Litig.*, 466 F. Supp. 3d 1383, 1384 (J.P.M.L. 2020) (denying centralization, in part, because of "the likelihood of substantial case-specific discovery"). Movants assert that consolidation would be convenient because Plaintiffs will seek the same discovery from the Retailer Defendants, including discovery regarding the Retailer Defendants' pricing, status as importers of record, entitlement to refunds, and amount of overcharges. (Mem. at 14.) But that mistakes common requests for common discovery. The responsive information will be unique to each defendant's pricing decisions, import records, refund status, and customer communications (among other things). Centralization would therefore multiply discovery rather than streamline it.

For example, in *In re Gateway Video Game Addiction Products Liability Litigation*, 812 F. Supp. 3d 1350, 1351 (J.P.M.L. 2025), the Panel denied centralization of 39 cases against three video game developers, finding that centralization would "not serve the convenience of the parties and witnesses or further the just and efficient conduct of the litigation." *Id.* The Panel explained that, although the cases all made similar allegations related to the design and marketing of addictive video games, "this slim reed of commonality" could not prevent the addition of other video game manufacturers and the "host of individualized issues" that would result. *Id.* at 1352. It concluded that the plaintiffs' threadbare allegations of similar conduct failed to satisfy the "heavier burden of persuading us that common allegations and discovery will outweigh the attendant case management complications of a multi-product, multi-defendant MDL." *Id.*

The same is true here—and more so. These cases do not share common factual issues, and if they proceed past initial motions, discovery will not meaningfully overlap. Each defendant will require its own discovery track covering its pricing decisions, internal communications, product-specific tariff impacts, and customer-facing representations. There will therefore be virtually no overlap in the factual record across defendants. Centralization would therefore force each Retailer Defendant to spend resources litigating cases in which it has no involvement and no connection. For Target alone, the scope and cost of discovery would balloon if Target were forced to participate in 25 cases involving entirely unrelated defendants, products, arbitration clauses, legal issues, and witnesses. A single-district proceeding would not promote justice or efficiency; it would complicate case management and impose unnecessary burdens on parties and witnesses who have no connection to one another.

### B. Joining Defendants Who Are Competitors In The Same MDL Will Create Unnecessary Complexity.

Some of the Retailer Defendants here compete with certain other Retailer Defendants. Centralizing competitor defendants in the same MDL, as Movants propose, will "complicate case management due to the need to protect trade secret and confidential information." *In re CP4 Fuel Pump Mktg., Sales Pracs., & Prods. Liab. Litig.*, 412 F. Supp. 3d at 1367. The Panel, recognizing this concern, has repeatedly declined to centralize proceedings involving multiple competitor defendants. *See, e.g.*, *In re Dish Wireless L.L.C. Commc'n Towers Cont. Litig.*, MDL No. 3182, 2026 WL 1659414, at *2 (J.P.M.L. June 4, 2026) ("Any centralized proceeding also would be complicated by numerous confidentiality issues. Several of the complaints in this litigation are subject to protective orders restricting access to alleged competitively sensitive information contained in the contracts and case documents that cite those contracts. Centralization of these actions involving competitors likely will result in unnecessary complexity and delay."); *In re Salesforce, Inc., Customer Data Sec. Breach Litig.*, MDL No. 3164, 2026 WL 194638, at *3 (J.P.M.L. Jan. 26, 2026) ("Because some of the defendants are competitors . . . , there also may be privacy and trade secret concerns that would unnecessarily complicate discovery if centralized."); *In re Watson Fentanyl Patch Prods. Liab. Litig.*, 883 F. Supp. 2d 1350, 1351 (J.P.M.L. 2012) (same).

The Panel should reach the same result here. Plaintiffs intend to seek discovery into each Retailer Defendant's underlying pricing and pricing strategies. (Mem. at 14.) That discovery will demand highly sensitive competitive information from each Retailer Defendant. Pricing and strategic information is widely recognized as among the most sensitive categories of business information, and the Panel has recognized that centralizing competing defendants creates precisely these trade-secret and confidentiality concerns. *See In re Dish Wireless L.L.C.*

*Commc'n Towers Cont. Litig.*, 2026 WL 1659414, at *2. For this reason, too, centralization would create unnecessary complexity and delay that would hinder, not further, the just and efficient resolution of these actions.

### C. Centralization Will Not Simplify Pretrial Proceedings, Because The Actions Involve Different Facts And Different Legal Theories.

Movants suggest that centralization would "streamline discovery [and] pretrial motions (including class certification)." (Mem. at 2; *see also id.* at 14 (citing *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 363 F. Supp. 3d 1372, 1374 (J.P.M.L. 2019)).) They are wrong, because each putative class in the Actions is defendant-specific: the cases against Target involve putative classes of ***Target*** customers, while the cases against other retailers involve putative classes of those retailers' customers. Class certification therefore cannot be resolved through a single motion or ruling. *See In re Cash Sweep Programs Cont. Litig.*, 766 F. Supp. 3d at 1349-50 (denying motion for centralization where "the putative classes asserted by plaintiffs are defendant-specific, such that any certification ruling as to one defendant is unlikely to impact certification as to a different defendant class").

Nor is there a meaningful risk of "inconsistent pretrial rulings" (Mem. at 14) because the motions and issues will differ by defendant:

(i) Certain defendants have already filed motions to compel arbitration. Target anticipates that additional defendants will file motions to compel arbitration, and arbitrability will turn on each defendant's arbitration provision, applicable law, and any class-action waiver.

(ii) Motions to dismiss and motions for summary judgment likewise will be defendant-specific. For example, the motions to dismiss in the Adidas and Costco cases address entirely different statutes and legal theories: Adidas challenges claims under the

Oregon Unlawful Trade Practices Act and New York General Business Law, while Costco argues that the plaintiff fails to state a claim under the Washington Consumer Protection Act, California Unfair Competition Law, and Ohio Consumer Sales Practices Act.

(iii) Defendants' legal arguments are already specific to the distinct factual circumstances surrounding the purchases in question. For instance, Adidas argues that plaintiffs' unjust enrichment claims fail because there is no "specific and direct benefit" to Adidas as plaintiffs "did not actually transact" with Adidas and instead "purchased the shoes from third-party retailers." *See* Motion to Dismiss at 12, 14, *Hernandez v. Adidas Am., Inc.*, No. 1:26-cv-02848 (E.D.N.Y. July 22, 2026), Dkt. 19-1. Costco raises that plaintiffs lack standing as they cannot "plausibly link their specific purchases to prices affected by tariffs" because the company made "selective pricing changes" and "did not raise prices on all products that were subject to the tariffs." *See* Motion to Dismiss at 7, *Briggs v. Costco Wholesale Corp.*, No. 2:26-cv-01064 (W.D. Wash. July 10, 2026), Dkt. 24. Those differences underscore that pretrial motions cannot be efficiently or coherently managed as if they presented common issues.

These disparities are compounded by the numerous different state-law claims and defenses at issue. *See In re Skinnygirl Margarita Beverage Mktg. & Sales Pracs. Litig.*, 829 F. Supp. 2d 1380, 1381 (J.P.M.L. 2011) (finding centralization "may not prevent either conflicting or multiple rulings, because plaintiffs bring their claims under the laws of different states"). Most cases in the proposed MDL assert state consumer-protection claims not alleged in the Target Complaints. *See supra* Section I.B. Those differences underscore the defendant-specific nature of

the proceedings. The transferee court would have to examine each defendant's conduct and apply different standards to determine whether that conduct violates the particular state consumer-protection statutes asserted against that defendant. *Cf. In re Skinnygirl Margarita Beverage Mktg. & Sales Pracs. Litig.*, 829 F. Supp. 2d at 1381 ("Under some state laws, the state of mind or reliance by individual purchasers may be a critical factor; in others it may not. These issues would not involve common discovery."). While denial of the Motion could leave certain overlapping legal issues to different courts, avoiding that possibility, standing alone, cannot justify centralization absent compelling countervailing factors. *See In re Medi-Cal Reimbursement Rate Reduction Litig.*, 652 F. Supp. 2d 1378, 1378 (J.P.M.L. 2009) ("Merely to avoid [different] federal courts having to decide the same issue is, by itself, usually not sufficient to justify Section 1407 centralization."). No such compelling factor exists here.

**D. Defendants' Opposition Militates Against Centralization.**

Centralization is disfavored where the motion lacks support from the responding parties. *See, e.g.*, *In re Boehringer Ingelheim Pharms., Inc. Fair Labor Standards Act (FLSA) Litig.*, 763 F. Supp. 2d 1377, 1378 (J.P.M.L. 2011) (centralization is "less compelling" when "defendants and/or some of the plaintiffs oppose centralization"). Here, other parties—including, to Target's knowledge, all Retailer Defendants and certain plaintiffs—oppose centralization.[8] That overwhelming opposition confirms that a single MDL would not serve the parties' collective convenience and weighs strongly against transfer.

[8] *See* Motion for Permission to File Joint Opposition, *In re Retailer Tariff Litigation*, MDL No. 3202 (J.P.M.L. Sep. 4, 2026), Dkt. 78; Interested Party Response of *Terrill* Plaintiffs in Opposition to Amended Motion for Transfer and Centralization, *id.*, Dkt. 84.

**E. Defendant-By-Defendant Coordination Can Better Provide Efficiencies.**

Rather than be part of a sprawling MDL proceeding that is largely irrelevant to the lawsuits it faces, Target can coordinate the five cases filed against it far more efficiently through informal coordination or targeted pretrial motions to transfer—an approach that this Panel has preferred to centralization where possible. *In re Best Buy Co. Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d at 1378 ("Seeking transfer under Section 1404(a) or seeking to dismiss or stay duplicative actions under the first-to-file doctrine are among the variety of options available to avoid duplication of efforts."); *In re Baby Food Mktg., Sales Pracs. & Prods. Liab. Litig.*, 544 F. Supp. 3d at 1377-78 ("We have repeatedly observed that transfer under Section 1404 or the first-to-file doctrine is preferable to Section 1407 centralization."). Given that Target is named in only a handful of Actions and the relevant proceedings are "in their infancy" (Mem. at 8, 13), Target has several less disruptive options, including a motion under Section 1404, that would permit any necessary coordination without forcing unrelated defendants and cases into an MDL. In addition, Target reserves the right to seek a Target-only MDL if current efforts to consolidate the pending actions are unsuccessful, which would allow for more focused and efficient coordination of the claims brought specifically against Target without the burdens of an industry-wide proceeding. Centralization of these 25 disparate actions is therefore not the necessary or efficient solution.

**F. There Is No Natural Geographic Center For The Actions.**

The litigation also has no geographic focus, and no single location would be convenient for even a majority of the participants. As the Motion's maps demonstrate, both the Retailer Defendants and the Actions are dispersed throughout the country. (Mem. at 17-18.) In addition, many Retailer Defendants, including Target, have no connection to the Northern District of

Illinois and no cases pending there. This further underscores the inconvenience to the parties that would be created by the proposed MDL.

### G. Movants' Speculation That Additional Actions Might Be Filed Cannot Support Centralization.

While Movants' counsel "anticipates that additional class actions will be filed in other federal courts alleging similar claims against one or more of the Retailer Defendants" (Mem. at 7), such speculation is insufficient to support centralization. *See In re Dish Wireless L.L.C. Commc'n Towers Cont. Litig.*, 2026 WL 1659414, at *2 ("[A]lthough DISH argues that additional actions are likely, the Panel generally is 'disinclined to take into account the mere possibility of future filings in our centralization calculus.'") (citation omitted); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 959 F. Supp. 2d at 1376 (same).

## CONCLUSION

The Motion rests on purported superficial similarities among the many tariff refund cases, while ignoring the facts that make these cases distinct: 25 cases, 15 unrelated defendants, different products and pricing decisions, different legal theories, and different customer-specific issues. An MDL in the Northern District of Illinois would burden nearly every party without creating meaningful efficiencies. Accordingly, the Panel should deny the Motion.

Dated: September 10, 2026

Respectfully submitted,

/s/ John H. Beisner
John H. Beisner
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 371-7410
Fax: (202) 661-8301
Email: john.beisner@skadden.com

Michael W. McTigue Jr.
Meredith C. Slawe
Shaud G. Tavakoli
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
Email: michael.mctigue@skadden.com
Email: meredith.slawe@skadden.com
Email: shaud.tavakoli@skadden.com

*Attorneys for Defendant Target Corporation in Martinez v. Target Corp., No. 3:26-cv-01807 (M.D. Fla.); Cavallaro v. Target Corp., No. 7:26-cv-06165 (S.D.N.Y.); and Browne v. Target Corp., No. 1:26-cv-04959 (E.D.N.Y.)*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Defendant Target Corporation's Opposition to Motion for Transfer and Centralization Pursuant to 28 U.S.C. § 1407 was e-filed via the Court's CM/ECF system on September 10, 2026, which provides electronic service copies of filed documents upon all parties registered in this action.

Dated: September 10, 2026

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

/s/ John H. Beisner
John H. Beisner

*Attorney for Defendant Target Corporation in Martinez v. Target Corp., No. 3:26-cv-01807 (M.D. Fla.); Cavallaro v. Target Corp., No. 7:26-cv-06165 (S.D.N.Y.); and Browne v. Target Corp., No. 1:26-cv-04959 (E.D.N.Y.)*