# EXHIBIT A

ADRMOP

# U.S. District Court
# California Northern District (San Francisco)
# CIVIL DOCKET FOR CASE #: 3:26-cv-08704-AGT

Camacho et al v. Target Corp.
Assigned to: Magistrate Judge Alex G. Tse
Cause: 28:1332 Diversity-Other Contract

Date Filed: 08/20/2026
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Diversity

**Plaintiff**

**Eric Camacho** represented by

**Noah A. Messing**
Messing & Spector LLP
230 Park Avenue
Ste 3rd Floor
New York, NY 10169
212-960-3720
Email: nm@messingspector.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Phillip Michael Spector**
Messing & Spector LLP
145 West Ostend Street
Ste 600
Baltimore, MD 21230
202-277-8173
Fax: 202-277-8173
Email: ps@messingspector.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Raymond S. Levine**
Schneider Wallace Cottrell Kim LLP
2000 Powell Street
Suite 1400
Emeryville, CA 94608
415-421-7100
Fax: 415-421-7105
Email: rlevine@schneiderwallace.com
*ATTORNEY TO BE NOTICED*

**Jason H. Kim**
Schneider Wallace Cottrell Kim LLP
300 S Grand Avenue
Suite 2700
Los Angeles, CA 90071
415-421-7100
Email: jkim@schneiderwallace.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sharon Manier** represented by **Noah A. Messing**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Phillip Michael Spector**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Raymond S. Levine**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason H. Kim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dilip Somavarapu** represented by **Noah A. Messing**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Phillip Michael Spector**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Raymond S. Levine**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason H. Kim**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Target Corp.**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/20/2026 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405, receipt number ACANDC-22362492.). Filed by Dilip Somavarapu, Sharon Manier, Eric Camacho. (Attachments: # 1 Civil Cover Sheet)(Kim, Jason) (Filed on 8/20/2026) (Entered: 08/20/2026) |

| | | |
|---|---|---|
| 08/20/2026 | 2 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-22363718.) filed by Eric Camacho, Sharon Manier, Dilip Somavarapu. (Attachments: # 1 Exhibit Certificate of Good Standing)(Spector, Phillip) (Filed on 8/20/2026) (Entered: 08/20/2026) |
| 08/21/2026 | 3 | Case assigned to Magistrate Judge Alex G. Tse.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 9/4/2026. (mxg, COURT STAFF) (Filed on 8/21/2026) (Entered: 08/21/2026) |
| 08/21/2026 | 4 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-22366831.) filed by Eric Camacho, Sharon Manier, Dilip Somavarapu. (Attachments: # 1 Certificate of Good Standing)(Messing, Noah) (Filed on 8/21/2026) (Entered: 08/21/2026) |
| 08/21/2026 | 5 | **ORDER Granting Application for Admission of Attorney Pro Hac Vice signed by Magistrate Judge Alex G. Tse: granting 2 Application. (shy, COURT STAFF) (Filed on 8/21/2026) (Entered: 08/21/2026)** |
| 08/21/2026 | 6 | **ORDER Granting Application for Admission of Attorney Pro Hac Vice signed by Magistrate Judge Alex G. Tse: granting 4 Application. (shy, COURT STAFF) (Filed on 8/21/2026) (Entered: 08/21/2026)** |
| 08/26/2026 | 7 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 11/13/2026. Initial Case Management Conference set for 11/20/2026 02:00 PM in San Francisco, - Videoconference Only. (far, COURT STAFF) (Filed on 8/26/2026) (Entered: 08/26/2026)** |
| 09/03/2026 | 8 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Eric Camacho, Sharon Manier, Dilip Somavarapu.. (Levine, Raymond) (Filed on 9/3/2026) (Entered: 09/03/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 09/10/2026 14:23:07 | | | |
| **PACER Login:** | jasonkim | **Client Code:** | 107361 |
| **Description:** | Docket Report | **Search Criteria:** | 3:26-cv-08704-AGT |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

Case 3:26-cv-08704-AG Document 21-1 Filed 09/10/26 Page 1 of 28

Jason H. Kim (SBN 220279)
**SCHNEIDER WALLACE**
**COTTRELL KIM LLP**
515 S. Figueroa Street, Suite 1060
Los Angeles, CA 90071
Tel: (415) 421-7100
jkim@schneiderwallace.com

Todd M. Schneider (SBN 158253)
Raymond S. Levine (SBN 348030)
**SCHNEIDER WALLACE**
**COTTRELL KIM LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel: (415) 421-7100
tschneier@scheniderwallace.com
relevine@schneiderwallace.com

Noah A. Messing (*pro hac vice forthcoming*)
**MESSING & SPECTOR LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel: (212) 960-3720
nm@messingspector.com

Phillip M. Spector (*pro hac vice forthcoming*)
**MESSING & SPECTOR LLP**
145 West Ostend Street, Suite 600
Baltimore, MD 21230
Tel: (212) 960-3720
ps@messingspector.com

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

ERIC CAMACHO, SHARON MANIER, AND DILIP SOMAVARAPU, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

TARGET CORP.,

*Defendant*.

Case No. ________

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Case MDL No. 3204 Document 121-3 Filed 03/20/26 Page 6 of 32

**TABLE OF CONTENTS**


I. INTRODUCTION ........ 2

II. PARTIES ........ 4

III. JURISDICTION AND VENUE ........ 4

IV. DIVISIONAL ASSIGNMENT ........ 5

V. FACTUAL BACKGROUND ........ 5

- A. The IEEPA Tariffs ........ 5
- B. Target Passes the IEEPA Tariffs Through to Consumers ........ 7
- C. The Supreme Court Invalidates the IEEPA Tariffs ........ 12
- D. Target Pursues and Receives Refunds for the Unlawful Tariffs—But Refuses to Commit to Returning the Money to Consumers ........ 13
- E. The Plaintiffs ........ 14

VI. CLASS ACTION ALLEGATIONS ........ 15

VII. CAUSES OF ACTION ........ 18

VIII. PRAYER FOR RELIEF ........ 26

IX. DEMAND FOR JURY TRIAL ........ 27

Plaintiffs Eric Camacho, Sharon Manier, and Dilip Somavarapu (collectively, the "Plaintiffs"), individually and on behalf of the Class defined herein of similarly situated consumers, bring this class action against Defendant Target Corp. ("Defendant" or "Target"), and allege the following:

## I. INTRODUCTION

1. This is a case about fairness. In 2025, President Trump imposed illegal tariffs. Defendant Target passed through the cost of those tariffs to its customers, in whole or in part, on thousands of products. Thus, *Plaintiffs* and other customers covered tariff costs that Target incurred. Yet after the tariffs were struck down by the Supreme Court, *Target* began receiving a refund of the tariffs it paid—even though it had already recouped those sums. As a result, Target is receiving a double recovery: It paid tariffs, recovered those costs from its customers,and yet is recovering those costs again from the federal government. Plaintiffs and the Class they seek to represent, however, paid inflated prices because of illegal tariffs. Target has not agreed to refund the overpayments to Plaintiffs and other customers. This case seeks to prevent Target from retaining a windfall at the expense of Plaintiffs and the Class.

2. Starting in February 2025, President Trump invoked the International Emergency Economic Powers Act ("IEEPA") to issue a series of executive orders that imposed sweeping new tariffs on imports from virtually every U.S. trading partner.

3. Companies proceeded to pass through all or some of these IEEPA tariffs to consumers across the United States. The companies frequently were explicit that they were raising prices due to the IEEPA tariffs—telling their customers, investors, and the media that the IEEPA tariffs were the reason they chose to increase prices, at a time when many of their customers already were struggling financially and reeling from the inflation of the previous several years.

4. In February 2026, the Supreme Court found the IEEPA tariffs unlawful.

5. Thousands of companies that paid IEEPA tariffs have filed claims for reimbursement. The total amount of refunds is estimated at $166 billion plus interest. The U.S. government has already repaid many billions.

6. But most consumers have received nothing.

7. That is because the vast majority of those companies have tried to avoid returning to their customers the additional amounts those customers paid due to the illegal tariffs, despite receiving refunds from the U.S. government for those same amounts.

8. Target is one of those companies. Target ranks among the nation's largest retailers, with approximately $105 billion in net sales each year. Target raised its prices on thousands of products in response to the IEEPA tariffs, and collected hundreds of millions—or even billions of dollars—from its customers to offset those tariffs. Target then pursued and is now receiving a refund of those sums (and any other IEEPA tariffs it paid) from the U.S. government. Target received just shy of $1 billion in IEEPA tariff refunds from the U.S. government *in the second quarter of 2026 alone*. And yet Target has declined to answer whether it will return any of that money to its customers who paid tariff surcharges on its goods.

9. By retaining both the amounts paid by customers to absorb the tariffs and the refunds it received from the U.S. government for those same tariffs, Target is trying to enjoy a double recovery—at its customers' expense.

10. The law of unjust enrichment exists to prevent precisely this kind of windfall: the retention of two recoveries for a single expense. Target's retention of both the tariff-related amounts collected from its customers and the corresponding tariff refunds gives rise to claims for unjust enrichment (and, in the alternative, money had and received and breach of contract), as well as violations of California's Unfair Competition Law.

11. Plaintiffs and the Members of the Class seek restitution of the tariff overcharges they paid, along with all other damages, fees, and costs to which they are entitled under the law.

12. Target had every right to seek a refund from the government for the unlawful tariffs. It has no right, however, to obtain that refund and retain the amounts it already has recovered from consumers for those same unlawful tariffs. What might have been compensation for a legitimate business expense has become a windfall. The Court should require Target to disgorge those twice-recovered funds and return them to the customers who actually bore the cost.

## II. PARTIES

13. Plaintiff Eric Camacho is a resident of Hercules, California and a citizen of the State of California.

14. Plaintiff Sharon Manier is a resident of Riverside, California and a citizen of the State of California.

15. Plaintiff Dilip Somavarapu is a resident of Folsom, California, a permanent resident of the United States, and a citizen of India.

16. Defendant Target Corp. is a publicly traded Minnesota corporation with the principal place of business at 1000 Nicollet Mall, Minneapolis, Minnesota 55403. Target operates approximately 2,000 retail facilities throughout the United States, including more than 320 in the State of California. Target operates stores in this District and in each of the other Districts in which the Plaintiffs reside.

## III. JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Target. Plaintiffs Camacho and Manier establish jurisdiction under 28 U.S.C. § 1332(d)(2)(A), and Plaintiff Somavarapu establishes jurisdiction in the alternative under 28 U.S.C. § 1332(d)(2)(B).

18. The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

19. The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 because an actual controversy exists between the parties regarding Target's obligation to return to its customers sums those customers paid in IEEPA tariff surcharges.

20. This Court has personal jurisdiction over Target because Target has purposefully established substantial contacts with California by operating stores in California, advertising and selling the relevant products in California, maintaining distribution channels serving California, and

selling the tariff-inflated goods to Plaintiffs and the Class Members in California. Plaintiffs' claims arise out of or relate to those contacts through their purchases at Target's retail stores in California.

21. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (c)(2), and (d), because Target resides in this district for purposes of the statute: Target maintains contacts within this District (including operating retail stores in this District) that would be sufficient to subject it to personal jurisdiction if this District were a separate state. Plaintiff Eric Camacho also resides in this District and purchased goods at a Target retail store in this District.

## IV. DIVISIONAL ASSIGNMENT

22. This action is properly assigned to the San Francisco Division or the Oakland Divisions pursuant to Civil Local Rule 3-2(c)-(d). A substantial part of the events giving rise to the claims alleged herein occurred in Hercules, California (where Plaintiff Camacho resides) and in Albany, California (where Plaintiff Camacho most frequently shopped at Target during the Class Period). The former is in Contra Costa County, the latter is in Alameda County.

## V. FACTUAL BACKGROUND

### A. The IEEPA Tariffs

23. The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 et seq., is a federal statute that authorizes the President to regulate certain economic transactions during a declared national emergency.

24. On February 1, 2025, President Trump invoked IEEPA through executive orders to impose additional tariffs on goods imported from Canada, Mexico and China. Those executive orders went into effect for China on February 4, 2025, and for Mexico and Canada on March 4, 2025.

25. In the ensuing weeks, President Trump expanded the IEEPA tariffs through a series of other executive orders.

26. In particular, on April 2, 2025, President Trump—calling the date "Liberation Day"—signed an executive order that expanded IEEPA tariffs substantially, resulting in the imposition of tariffs on the vast majority of consumer goods imported into the United States from nearly every country in the world.

27. One economic analysis calculated that the country-specific reciprocal tariffs announced on April 2 covered 86% of U.S. imports.[1]

28. The tariffs varied by country of origin and product type.

29. For many imported goods, the baseline tariffs were set at 10%.

30. Imports from dozens of other countries were subject to substantially higher cumulative tariffs that, in the case of China, reached as high as 145%.

31. Under U.S. customs law, the importer of record is the party legally responsible for entering imported goods into the United States and paying any applicable IEEPA tariffs. The importer of record, either directly or through a licensed customs broker acting as its agent, was required to pay the IEEPA tariffs to U.S. Customs and Border Protection ("CBP") when the merchandise entered the United States or shortly thereafter.

32. The vast majority of importers of record passed all or some of the tariff costs on to consumers.

33. A June 2025 analysis by the Federal Reserve Bank of New York found that approximately 75% of the surveyed manufacturers and service firms facing tariff-related cost increases chose to pass at least some of those costs along to their customers through higher prices.[2]

34. Likewise, a November 2025 working paper by researchers at the Harvard Business School Pricing Lab found that prices "began rising immediately after the broader tariff measures announced in early March and continued to increase gradually over subsequent months, with imported goods rising roughly twice as much as domestic ones."[3]

35. An April 2026 analysis by The Budget Lab at Yale University estimated, using its preferred methodology, that importers in the aggregate had passed through 86% of the new 2025 tariff costs to consumers on core consumer goods—such as household goods, toys, appliances, and other everyday merchandise—by January 2026.[4]

---

[1] McKibbin, Noland & Shuetrim, *The Global Economic Effects of Trump's 2025 Tariffs*, PIIE Working Paper 25-13, at 2 (June 2025).

[2] *See* Jaison R. Abel et al., *Are Businesses Absorbing the Tariffs or Passing Them On to Their Customers?*, Liberty St. Econ. (Fed. Rsrv. Bank of N.Y. June 4, 2025).

[3] Alberto Cavallo, Paola Llamas & Franco M. Vazquez, *Tracking the Short-Run Price Impact of U.S. Tariffs*, NBER Working Paper No. 34496 (Nov. 2025).

[4] The Budget Lab at Yale, *Tracking the Economic Effects of Tariffs* (Apr. 1, 2026).

36. In other words, companies that sold the sort of consumer goods that Target sells generally recovered the supermajority of their tariff costs by raising prices on consumers. They were largely made whole even without receiving refunds from the United States of tariffs that were eventually held to be illegal.

**B. Target Passes the IEEPA Tariffs Through to Consumers**

37. Target is one of the largest retailers in the United States, generating approximately $105 billion in net sales each year. Target sells apparel, home goods, food, electronics, and other consumer products directly to consumers through about 2,000 retail stores and its online channels.

38. Nearly all of Target's revenue is generated in the United States.

39. California is Target's largest state-level retail market by a substantial margin: Target operates more than 320 stores in California—approximately twice as many as the next-largest state market—and maintains more than 38 million square feet of retail space in the State. Target also employs more than 68,000 people in California and maintains substantial distribution and fulfillment infrastructure in the State, through which it sells billions of dollars of merchandise annually to California consumers.

40. Target sells products to tens of millions of customers in the United States, and completes hundreds of millions of transactions in its retail stores each year.

41. Target is an importer of record, including for most of its exclusive brands.

42. In fact, Target is one of the largest importers of consumer goods into the United States.

43. The Journal of Commerce ranked Target as the third-largest U.S. importer by volume in 2024.[5]

44. Approximately one-half of the merchandise Target offers is sourced from outside the United States.

45. China represents the largest country of origin for Target's imported goods. This was true when the IEEPA tariffs went into effect. It was true throughout the Class Period.

46. Target paid IEEPA tariffs to CBP throughout the Class Period.

---

[5] JOC Staff, *Top 100 Importer/Exporter Rankings: Largest US Shippers Outpace Hot Market*, J. Com. (May 7, 2025).

47. Soon after the IEEPA tariffs went into effect, Target announced that it would begin raising prices in response.

48. In a March 4, 2025, interview—the same day that 25% IEEPA tariffs on Mexico were set to commence—Target CEO Brian Cornell warned that consumers "will likely see prices increase over the next couple of days" for fruits and vegetables, and that if "there's a 25% tariff, those prices will go up . . . certainly over the next week."[6]

49. In April 2025, following the imposition of the Liberation Day tariffs, the CEOs of Target, Walmart and Home Depot visited the White House and warned President Trump that prices "will go up" as a result of the tariffs.[7]

50. On a May 21, 2025, earnings call, Target's Executive Vice President and Chief Commercial Officer Rick Gomez acknowledged that Target had been "adjusting prices" where needed in response to the tariffs.[8]

51. On that same call, Target CEO Brian Cornell claimed that price increases would be "the very last resort."[9]

52. In reality, the company was already driving a series of dramatic price increases across thousands of products in response to the IEEPA tariffs.

53. Target's own employees and customers took to online platforms to voice their frustration over the sheer number and magnitude of the tariff-related price hikes that were being imposed at their retail stores.

54. One self-identified Target employee posted on the subreddit r/Target in May 2025: "Been doing price change[s] everyday for the past 4 months or so. . . . I just feel terrible putting all

[6] Gabrielle Fonrouge & Jacob Pramuk, *Trump's Mexico Tariffs Could Raise Produce Prices in the Next Few Days, Target CEO Says*, CNBC (Mar. 4, 2025); Siddharth Cavale & Juveria Tabassum, *Target Braces for First-Quarter Profit Pressure Due to Tariffs, Low Demand*, Reuters (Mar. 4, 2025).
[7] Marc Caputo & Ben Berkowitz, *Trump Softens Tariff Tone Amid Empty Shelves Warning, Market Slump*, Axios (Apr. 23, 2025).
[8] Target Corp., *Q1 2025 Earnings Call Transcript* at 5 (May 21, 2025).
[9] *Id.* at 3.

these ridiculously high prices up."[10] Another self-identified Target employee posted: "It's ridiculous — the amount of time spent changing 3,000+ labels . . . ."[11]

55. Other self-identified Target employees described their stores as removing price tags on thousands of items "since the whole tariff thing started."[12] A number of media outlets corroborated the allegations of removed tags (as well as tags where the barcode price was higher than the printed price).[13] Axios reported that Target itself confirmed that it had changed its labeling or re-ticketing practices "to increase flexibility and stay competitive" in this period.[14]

56. A viral post on r/Target featured a side-by-side photo of a *Paw Patrol* toy tagged at $51.99 on May 29, 2025, and then updated to $101.99 by June 7, 2025 (a 96% price increase in fewer than ten days).[15] Another self-identified Target worker uploaded a photo to Reddit in which they were replacing the $9.99 tag on a six-foot phone charging cable with a new tag for $17.99 (an 80% price increase).[16]

57. Reports of tariff-related price hikes continued through the summer and fall. An August 8, 2025, TikTok by a self-identified Target worker showed them tearing price tags off jeans and saying the store couldn't "keep up with constant price changes."[17] A Nebraska-based Target employee named Kaitlin Sonday regularly shared TikToks describing the changes she saw unfolding in stores, including one post where she said, "The price changes I have been seeing have been insane. . . . Quite literally

[10] TheCeleryCrunch234, Comment to *Brilliant_Safe_5505, I Feel Bad Doing All These Price Changes When Everything Goes Up*, Reddit (May 19, 2025), https://www.reddit.com/r/Target/comments/1kqdbd4/comment/mt4p1rh/.

[11] Teddy Cambosa, *Target Workers Expose Shocking Price Hikes of Up to 96% Allegedly Tied to Trump's Tariffs*, Int'l Bus. Times (June 21, 2025).

[12] Cambosa, *supra* note 11; Oracle90000, Comment to *Hearth and Hand Hidden Prices and Being Raised*, Reddit, r/Target (2025), https://www.reddit.com/r/Target/comments/1mg4dnv/hearth_and_hand_hidden_prices_and_being_raised/.

[13] Kelly Tyko, *Where Tariffs Are Hiding, and How to Tell If You're Paying One*, Axios (Sept. 28, 2025); Desk Report, *Walmart and Target Face Backlash over Removal of Apparel Price Tags*, Textile Today (Sept. 7, 2025); Erin Cabrey, *Are Walmart and Target Asking Employees to Tear the Prices Off Clothing Tags?*, Retail Brew (Aug. 28, 2025).

[14] Tyko, *supra* note 13.

[15] Cambosa, *supra* note 11.

[16] Io Dodds, *Walmart and Target Workers Are Sharing Pics of Price Increases Amid Trump's Trade War*, The Independent (June 2, 2025).

[17] Cabrey, *supra* note 13.

everything has been going up, and I'm honestly very scared."[18] Another Reddit post in December 2025 read: "I work at target and it [i.e., the set of price changes] actually is because of tariffs. Our price changes skyrocketed from about 200 per week to 3-5000 per week to keep up with the constant changing. It drowns our style teams and makes pricing ridiculous for us to keep up with."[19]

58. Collectively, the above statements describe Target raising prices on many thousands of items to pass through tariffs to its customers.

59. Such tariff-related price increases are confirmed by independent analyses. For example, Consumer Edge, a company that tracks consumer spending through shopper-purchase data, showed that prices on certain consumer goods at Target and Walmart became "notably higher" after the IEEPA tariffs went into effect. For example, a Consumer Edge analysis of Target and Walmart prices found that during just the two weeks from May 11 through May 25, dry cat food had increased 13%, wet cat food had increased 8%, liquid laundry detergent had increased 8%, and crackers had increased 3% across the two retailers.[20] Those price changes, even on a non-compounded basis, equate to an annualized inflation rate of 78% to 338%.

60. On March 11, 2026, Target admitted in its 2025 Form 10-K that "U.S. tariffs imposed or threatened to be imposed on several countries in 2025, including China, India, Vietnam and Bangladesh" had "resulted, and could continue to result" in the company "raising prices on certain products."[21]

61. National media outlets reported throughout the Class Period that Target was raising prices in response to tariffs—often prompted by statements from the company's own executives. Examples include:

---

[18] Averee Nelson, *Target Employee Shares Inside Knowledge on Pricing Strategy Amid Tariffs*, Daily Express U.S. (Sept. 12, 2025).

[19] Partypoisonstrikes, Comment to Target No Longer Prices Their Clothes, Reddit, r/mildlyinfuriating (Dec. 31, 2025), https://www.reddit.com/r/mildlyinfuriating/comments/1q064kp/comment/nwydzhz.

[20] Michael Gunther, *From Tariffs to Totes: Trouble in the Aisle at Walmart and Target*, Consumer Edge (June 2, 2025); Parija Kavilanz, *Here's Where Consumer Purchase Data Shows Walmart Prices Rising*, Investopedia (June 10, 2025).

[21] Target Corp., Annual Report (Form 10-K), at 15 (Mar. 11, 2026).

a. Daily Beast: “Target CEO: You’ll Pay More Because of Trump’s Tariffs Within Days.”[22]

b. Fox Business: “Target, Best Buy CEOs warn of price increases as tariffs take effect.”[23]

c. Washington Post: “Two of the nation’s largest retailers, Best Buy and Target, warned that the new taxes on imports will mean higher prices for American consumers.”[24]

d. CNN: “Expect Price Increases in the Next Couple Days Because of Tariffs, Says CEO of Target.”[25]

e. New York Post: “Walmart and Target accused of sneakily removing price tags amid tariff-driven price hikes.”[26]

f. Daily Express US: “Tariff policies are making their impact felt as Americans witness escalating prices at neighborhood retailers like Target.”[27]

g. Fortune: “Retailers like Walmart and Target ‘can't keep up with constant price changes’ from tariffs . . . .”[28]

h. CNBC: “Prices on Amazon, Walmart and Target have all increased this year as retailers grapple with higher costs due to tariffs.”[29]

62. Target substantially raised prices, on many thousands of items, as a direct and proximate result of the unlawful tariffs.

---

[22] Janna Brancolini, *Target CEO: You’ll Pay More Because of Trump’s Tariffs Within Days*, Daily Beast (Mar. 4, 2025).

[23] Daniella Genovese, *Target, Best Buy CEOs Warn of Price Increases as Tariffs Take Effect*, Fox Business (Mar. 4, 2025).

[24] David J. Lynch, Jeff Stein & Evan Halper, *Wall Street Worries Trump Tariffs Could Wreck the Souring Economy*, Wash. Post (Mar. 4, 2025).

[25] Nathaniel Meyersohn, *Target CEO: Expect Price Increases in the Next Couple Days Because of Tariffs*, CNN (Mar. 4, 2025).

[26] Adriana Diaz, *Walmart and Target Accused of Sneakily Removing Price Tags Amid Tariff-Driven Price Hikes—Leaving Customers Furious*, N.Y. Post (Sept. 2, 2025).

[27] Averee Nelson, *Target Employee Shares Inside Knowledge on Pricing Strategy Amid Tariffs*, Daily Express U.S. (Sept. 12, 2025).

[28] Erin Cabrey & Retail Brew, *Retailers Like Walmart and Target ‘Can’t Keep Up with Constant Price Changes’ from Tariffs, So Many Are Snipping Price Tags and Ditching Discounts*, Fortune (Sept. 22, 2025).

[29] Courtney Reagan, *Retailers Are Raising Prices to Meet Tariffs. Amazon Is Hiking More than Others*, CNBC (Nov. 5, 2025).

63. The higher prices that consumers paid were largely or wholly a consequence of Target's increased cost of importation.

64. Target's tariff-related price increases resulted from companywide sourcing and pricing decisions and were implemented across Target's nationwide retail network, raising prices for consumers throughout the United States, including in California and in this District.

65. On information and belief, Target derives more of its revenue from California than from any other state, and the tariff surcharges that Target added to its products imposed a substantially greater cumulative cost on customers in California than on customers in any other state.

66. Target possesses records that would identify its products that were subject to IEEPA tariffs, the amount that it raised prices on those goods due to the tariffs, and (in most instances) the customers who purchased those goods.

67. The portion of the purchase price of Target's goods that is attributable to the IEEPA tariffs was not part of its ordinary markup, but an identifiable price increment imposed for the purpose of recovering a specific governmental charge that Target has since recovered, or will recover, from the government.

68. Absent the imposition of the unlawful IEEPA tariffs, Target would not have imposed the tariff-related price increases, and could not have done so in a competitive marketplace.

**C. The Supreme Court Invalidates the IEEPA Tariffs**

69. Starting in April 2025, private importers began filing suit in the U.S. Court of International Trade ("CIT") arguing that Congress had not authorized the President to impose tariffs through IEEPA, and seeking refunds of the IEEPA tariffs they had paid.

70. Other lawsuits filed by states and private actors in federal district courts likewise challenged the President's authority to issue the tariffs.

71. On information and belief, Target was aware that these lawsuits had been filed, that the plaintiffs had begun prevailing on the merits as early as May 2025, and that the lawsuits could have enormous financial consequences for the company on the order of billions of dollars—because Target had already paid substantial sums in IEEPA tariffs as an importer of record and would continue to incur substantial additional tariff costs if the tariffs remained in effect.

72. These lawsuits culminated in the Supreme Court's February 20, 2026, decision in *Learning Resources, Inc. v. Trump* (No. 24-1287), in which the Supreme Court invalidated all IEEPA-based tariffs in a 6-3 decision. The Court stated: "We hold that IEEPA does not authorize the President to impose tariffs." *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 255 (2026). The Court declined to specify whether and how previously collected tariffs must be refunded, leaving that issue to lower courts and administrative processes. Justice Kavanaugh's dissent specifically recognized the problem that is now presented here: "The United States may be required to refund billions of dollars to importers who paid the IEEPA tariffs, even though some importers may have already passed on costs to consumers or others." *Id.* at 334–35 (Kavanaugh, J., dissenting).

73. On February 22, 2026, U.S. Customs and Border Protection ("CBP") announced that IEEPA tariff collection would cease as of February 24, 2026.

**D. Target Pursues and Receives Refunds for the Unlawful Tariffs—But Refuses to Commit to Returning the Money to Consumers**

74. According to Brandon Lord, the Executive Director of CBP's Trade Programs Directorate, as of March 4, 2026, the total amount of IEEPA tariffs and estimated tariff deposits collected pursuant to IEEPA is approximately $166 billion.[30]

75. Importers ordinarily deposit estimated duties when merchandise enters the United States. CBP subsequently "liquidates" each entry by determining the final amount of duties legally owed.

76. On March 4, 2026, the CIT issued an order directing CBP to liquidate all unliquidated entries without IEEPA duties, and to reliquidate any entries not "finally liquidated" without IEEPA duties.[31]

77. When liquidation or reliquidation establishes that an importer deposited more than it owed, CBP must refund the excess, together with applicable interest. 19 U.S.C. § 1505(b)-(c).

78. On April 20, 2026, CBP launched the Consolidated Administration and Processing of Entries (CAPE) system to process tariff refunds.

[30] *Atmus Filtration, Inc. v.* United States, Ct. No. 26-01259, ECF No. 31, at 6 (Ct. Int'l Trade Mar. 6, 2026).
[31] *Atmus*, ECF No. 21, at 2-3.

79. Only importers of record or the customs broker that filed the entry summaries are permitted to seek tariff refunds through CAPE.

80. CBP has not provided an avenue for consumers to seek a refund from the U.S. government.

81. On May 22, 2026, Target Chief Financial Officer Jim Lee told CNBC that Target was "working through the process" of receiving a refund.[32]

82. On May 29, 2026, Target filed a quarterly report with the SEC confirming that Target was following the established refund filing and validation process through the CAPE system, and that it "began receiving refunds" from CBP for the unlawful tariffs in May 2026.[33]

83. On August 19, 2026, Target filed a report with the Securities and Exchange Commission acknowledging that it had received $994,000,000 in tariff refunds from the U.S. government during the second fiscal quarter of 2026.[34]

84. An April 2026 Citi analysis estimated that Target was due about $2.2 billion in refunds for the invalidated tariffs.[35]

85. Some companies, including UPS and FedEx, have committed to use their tariff refunds to reimburse customers for the tariff pass-throughs that those customers paid.

86. Target has not done so. When asked by media outlets, Target has declined to commit to refunding sums to consumers who paid tariff-driven price increases.

**E. The Plaintiffs**

87. Within the Class Period, Plaintiffs each made in-store purchases from Target within California of products subject to IEEPA tariffs and whose prices, on information and belief, Target increased to pass through some or all of the cost of the tariffs to consumers.

88. Plaintiff Eric Camacho resides in Hercules, California. He and his partner have a three-year-old daughter. He currently is not working due to a disability. He shopped at one or more Target stores in California and in this District multiple times during the Class Period, typically going several

---

[32] *Trump Tariff Refunds: Walmart, Home Depot and Target Apply*, CNBC (May 22, 2026).
[33] Target Corp., *Q1 2026 Form 10-Q*, at 14 (May 29, 2026).
[34] Target Corp., Current Report (Form 8-K), Ex. 99, at 1–2 (Aug. 19, 2026).
[35] Tobias Burns, *Tariff Refunds Begin on Monday. These Retailers Are Due Big Paydays*, CNBC (Apr. 20, 2026).

times a month. The items he purchased on his visits to Target include furniture, baby wipes, diapers, food, cases of water, beauty products, toys, and personal care items. He purchased items from Target in-house brands. When the tariffs went into effect, he noticed that prices went up – the total price of goods was, in his view, "starting to get a little out of hand."

89. Plaintiff Sharon Manier resides in Riverside, California. She shopped routinely at a Target store in California during the Class Period, and she purchased an array of goods that, on information and belief, experienced tariff-related price increases.

90. Plaintiff Dilip Somavarapu resides in Folsom, California. He shopped at a Target store in California about once per week during the Class Period. He was aware of the tariffs at the time he made his purchases and understood that Target had likely raised prices as a result of the tariffs. He purchased various items, including groceries, baby items, toys and an array of household products. He purchased items from Target in-house brands.

## VI. CLASS ACTION ALLEGATIONS

91. Plaintiffs bring this action on behalf of themselves, individually, and on behalf of all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3), and (c)(4), on behalf of the following Class:

> All persons who made in-store purchases in California from any Target retail store of any consumer good or other item subject to the tariffs imposed under IEEPA, during the period from February 1, 2025, through February 24, 2026, at a price that Target increased to pass through some or all of the IEEPA tariffs imposed on that consumer good or other item.

92. Plaintiffs respectfully ask the Court to construe the above request broadly and flexibly to achieve a just result. Plaintiffs reserve the right to amend or modify the class definition(s), to ask the court to create subclasses, and to limit the classes or subclasses as needed.

93. Additional customers of Target might file subsequently, and Plaintiffs ask the Court to liberally allow additional plaintiffs to join this suit in order to produce a just and full remedy.

94. The period from February 1, 2025, through February 24, 2026, is referred to throughout this Complaint as the "Class Period."

95. Excluded from the Class are Target, its parents, subsidiaries, affiliates, officers, directors, and employees; the judicial officers assigned to this case and their immediate family members and court staff; and governmental entities.

96. This action satisfies all of the explicit and implied requirements of Fed. R. Civ. P. 23(a) and Rule 23(b), as discussed below.

97. **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. Target operates approximately 2,000 total retail stores nationally and more than 320 in California. Each week, more than 30 million customers shop at Target's stores, including millions in California. Thus, there will be millions of members of the Class. The Class far exceeds the number necessary to satisfy Rule 23(a)(1).

98. **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs – like every other class member – purchased products in-store in California from Target that were subject to price increases attributable to tariffs, and were injured as a result of paying that unfairly elevated price without later receiving reimbursement of the portion of that price attributable to tariffs. Moreover, Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class. Each Plaintiff seeks to represent only consumers whose injuries and rights resemble those of that Plaintiff.

99. **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are each committed to the vigorous prosecution of this action and have no interests that are adverse or antagonistic to the Class or potential subclasses described above. Plaintiffs have retained counsel who are competent and experienced in class action litigation, and counsel has been certified as lead counsel in prior cases.

100. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of the Class's claims. The damages suffered by certain individual members of the Class are relatively small compared to the burden and expense of individual prosecution of the complex litigation required to recover from Target. It would therefore be impractical for most, if not all, members of the Class to seek relief on an individual basis. Individual litigation could result in thousands or even hundreds of thousands of individual lawsuits, introducing a serious risk of

inconsistent or contradictory judgments arising from the same set of facts, and increasing the delay and expense to all parties. As a practical matter, millions of potential claimants in California would not file and would be deprived of a fair remedy. In contrast, a class action would present few administrative difficulties and a strong process to provide broad relief. A class action provides the benefits of adjudication of these issues in a single proceeding, economics of scale, and comprehensive supervision by a single court. It presents no material management difficulties under the circumstances here.

101. **Predominance of Common Questions of Law and Fact**. Numerous questions of law and fact are common to Plaintiffs and all members of the Class. These common questions will result in common answers for all members of the Class that will impact the resolution of the claims on grounds equally applicable to all members of the Class. These common questions, which predominate over any questions affecting only individual members of the Class, include, but are not limited to:

a. Whether Target engaged in the policies and practices alleged herein;

b. Whether the higher prices that customers paid at Target are attributable to IEEPA tariffs;

c. Whether Target passed through some or all of the tariffs to consumers in the form of higher prices;

d. Whether Target is obligated to return to customers in California a sum equal to the amount by which Target raised prices on goods as a result of and response to IEEPA tariffs;

e. Whether Target privately knew and/or had reason to believe that the IEEPA tariffs would ultimately be determined to be illegal, but nonetheless instituted the policy, practice and pattern of passing the elevated tariff costs of goods sold to its customers, including Plaintiffs and the Class and the associated practice and pattern of giving none of the tariff refunds to those same customers;

f. Whether Target's retention of price increases attributable to tariffs constitutes unjust enrichment, "money had and received", or a breach of contract under Target's own uniform terms and conditions and background sources of California contract law;

g. Whether Target acted unfairly, unlawfully, deceptively, or unconscionably by up-charging consumers in response to tariff-related costs under California law while failing to reimburse consumers upon learning the tariffs were illegal, or otherwise violating applicable California consumer protection laws;

h. The measure of damages available to Plaintiffs and the Class due to increased prices caused by Target's tariff pass-through; and

i. The appropriate measure of restitution, actual damages, consequential damages, statutory damages, punitive damages, or other forms of relief due to Target's conduct.

102. **Ascertainability**. The members of the Class are ascertainable through objective criteria typical of class action practice and procedure, including through Target's own transaction, pricing and customer records, along with receipts, credit card records (and similar purchase records), account histories, or other ordinary proof of purchase. Determining whether a consumer is a member of the Class does not require an individualized inquiry into subjective intent, knowledge, or reliance, but only a straightforward review of objective purchase and pricing information.

## VII. CAUSES OF ACTION

### COUNT ONE
### Unjust Enrichment
### (On behalf of Plaintiffs and the Class)

103. Plaintiffs here by reallege and incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

104. An equitable claim for unjust enrichment lies where no valid and enforceable contract governs the claim, the plaintiff has conferred a benefit on the defendant, the defendant has knowledge of the benefit and has accepted or retained the benefit conferred, and the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.

105. Neither Plaintiffs nor any member of the Class entered into any valid and enforceable agreement that addresses Target's decision to pass through the cost of a tariff and then refuse to return that money even after the tariff was declared unlawful and Target recovered those same amounts from the U.S. government.

106. Courts routinely award relief in equity rather than breach of contract where, as here, a retailer refuses to refund consumer payments attributable to the pass-through of government fees or taxes that were later deemed to be unlawful.

107. Plaintiffs and the members of the Class conferred a direct and ascertainable benefit on Target in the form of additional money paid through tariff-inflated prices on goods subject to the IEEPA tariffs.

108. Target has knowledge of and has accepted or retained those benefits to the detriment of Plaintiffs and members of the Class and at their expense.

109. Target has not returned, offered to return, or indicated any intention to return these amounts to the customers who paid them, even after receiving refunds from the U.S. government or receiving reasonable assurances that Target would be fully reimbursed for the same tariff costs that Target passed through to Plaintiffs and Members of the Class. Target is thereby obtaining a double recovery for sums it already passed through to Plaintiffs and Members of the Class.

110. Target is willfully, knowingly and intentionally choosing not to return those amounts to Plaintiffs.

111. But for the imposition of the IEEPA tariffs, Target would not have incurred the tariff costs at issue and would not have imposed the corresponding tariff-related price increases on Plaintiffs and Members of the Class.

112. Plaintiffs and Members of the Class have no mechanism through the customs-refund process to recover the tariff costs that Target passed through to them.

113. Target knew of and voluntarily accepted the benefits conferred by Plaintiffs and the Class. Target's own public statements and earnings disclosures make clear that Target made willful, knowing and intentional decisions to raise prices on goods due to the illegal tariffs.

114. Plaintiffs and the Class paid the tariff-inflated prices directly to Target, and Target directly received and retained those payments. No third party stands between Plaintiffs' payment of the tariff-inflated price and Target's receipt of the benefit for which Plaintiffs and the Class seek restitution or other remedies.

115. Target is continuing to retain those payments, even though it has now received nearly $1 billion in refunds from the U.S. government for the unlawful IEEPA tariffs.

116. It would be unjust and inequitable for Target to retain both (1) the increased charges attributable to tariffs that Target collected from Plaintiffs and the Class through inflated retail prices and (2) government refunds corresponding to those same unlawful tariffs.

117. This double recovery—from consumers and from the government for the identical cost that Target incurred—offends the principles of equity and good conscience that are the basis for the unjust enrichment cause of action.

118. Plaintiffs do not seek restitution of the full purchase price of the affected goods under this Count, nor do they contend that Target was unjustly enriched merely because it earned revenue or profit from those transactions. Plaintiffs seek only the portion of the purchase price attributable to tariff costs that Target passed through to consumers and that Target subsequently recovered from or will recover from the United States (or a U.S. agency or government-controlled process). Even if Target has not received a complete recovery from the federal government thus far, it must return to Plaintiffs and the Class what it has already received.

119. This information (the amount of the price increase passed through to Plaintiffs and members of the Class) is ascertainable through Target's records, through discovery, and through fact-finding by a jury.

120. Plaintiffs and the Class are entitled to restitution, disgorgement, and such other equitable relief as the Court deems appropriate.

121. The foregoing allegations state a claim for unjust enrichment against Target under the law of California.

122. This claim is pleaded in the alternative to Plaintiffs' breach of contract count (Count Three).

**COUNT TWO**
**Money Had and Received**
**(On behalf of Plaintiffs and the Class)**

123. Plaintiffs hereby reallege and incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

124. Money had and received is an equitable cause of action that lies where the defendant received money that in equity and good conscience should be returned to a plaintiff.

125. Target received money from Plaintiffs and from each member of the Class in the form of higher prices due to the pass-through of IEEPA tariff costs.

126. Target benefited from its receipt of these amounts because the tariff-related portion of the prices paid by Plaintiffs and the members of the Class reimbursed or offset costs Target had incurred in paying the IEEPA tariffs.

127. Target imposed the tariff-related price increases in order to offset, recover, or defray the additional costs it incurred as a result of paying the IEEPA tariffs on imported merchandise.

128. Plaintiffs and the members of the Class paid the tariff-inflated prices directly to Target, and Target directly received and retained those payments. No third party stands between Plaintiffs' and the members of the Class's payments of the tariff-inflated prices and Target's receipt of the benefit for which restitution and other applicable remedies are sought.

129. But for the imposition of the IEEPA tariffs, Target would not have incurred the tariff costs at issue and would not have imposed the corresponding tariff-related price increases on Plaintiffs and the Class.

130. Target has received nearly $1 billion in refunds for the invalidated IEEPA tariffs from the U.S. government.

131. Even if Target has not received a complete recovery from the federal government thus far, it must return to Plaintiffs and the Class the sums it has already received.

132. Target knows that the governmental refunds correspond to tariff costs that it previously passed through, in whole or in part, to consumers, yet has retained the resulting duplicate recovery and has neither returned the money nor offered to return the corresponding amounts to Plaintiffs and the Class.

133. Target is now retaining both the amounts collected from its customers that it charged them to offset those unlawful tariff costs and the governmental refunds of those same costs. The retention of the amounts from its customers is money that, in equity and good conscience, belonged to and ought to be returned to Plaintiffs and the members of the Class.

134. Target owes Plaintiffs and the members of the Class an ascertainable amount equal to the tariff-related price increases paid by them for which Target has received or will receive corresponding reimbursement from the United States.

135. Plaintiffs do not seek restitution of the full purchase price of the affected goods; Plaintiffs seek only the portion of the purchase price attributable to tariff costs that Target passed through to consumers and that Target subsequently recovered from or will recover from the government.

136. Plaintiffs and the Class are entitled to recover from Target such sums, together with prejudgment interest.

137. The foregoing allegations state a claim for money had and received under the law of California.

138. This claim is pleaded in the alternative to Plaintiffs' breach of contract count (Count Three).

## COUNT THREE
**Breach of Contract**
**(On behalf of Plaintiffs and the Class)**

139. Plaintiffs hereby incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

140. This Count is pleaded in the alternative pursuant to Rule 8(d). If the Court determines that an enforceable contract governed the parties' rights and obligations with respect to the allegations in this Complaint, then Target has breached that contract as set forth below.

141. Any contract entered into by each of the Plaintiffs and Target only allowed Target to charge, collect, or retain lawful, valid, or authorized duties, tariffs, or related surcharges.

142. Neither Target's Terms and Conditions nor any other written or verbal proposal or offer by either Plaintiffs or Target authorized Target to charge, collect, or retain unlawful, invalid, or unauthorized duties, tariffs, or fees.

143. Nothing in the parties' contract or applicable law permits a company to charge, collect, or retain unlawful, invalid, or unauthorized duties, tariffs, or fees.

144. Target's conduct breached the implied covenant of good faith and fair dealing inherent in a contract by failing to pass along to the consumers the refunds of tariffs that Target received or will receive for sums that Target already passed through to consumers. In other words, if there is a contract, that contract should be construed as requiring Target to refund passed through price increases attributable to illegal tariffs.

145. Target acted in bad faith and in a manner that is unconscionable by imposing tariff-inflated price increases across thousands of goods and then retaining the resulting amounts even after the tariffs were declared unlawful and the U.S. government refunded the corresponding tariff amounts to Target.

146. Target's conduct deprived Plaintiffs and the members of the Class of the benefits of the bargain, which was to pay only lawful and authorized charges and not to be charged sums that were later adjudicated to be based on illegal tariffs for which Target was or would be reimbursed.

147. The foregoing allegations state a claim for breach of contract (as an alternative claim) under the law of California.

148. Plaintiffs and the Class suffered ascertainable losses as a direct and proximate result of Target's unlawful conduct, including but not limited to the amounts they paid in tariff-related surcharges and/or inflated prices.

**COUNT FOUR**
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200 et seq.**
**(On Behalf of Plaintiffs and the Class)**

149. Plaintiffs hereby reallege and incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows:

150. Target engaged in unlawful and/or unfair and/or deceptive and/or unconscionable business acts or practices under California law by:

a. Obtaining a double recovery by collecting the same sum of money twice: first from consumers through higher prices, then from the government through refunds.

b. Forcing consumers to bear the economic burden of tariffs through higher prices, but keeping the corresponding refund, leaving consumers injured and the company overcompensated.

c. Effecting a windfall recovery by refusing to return tariff surcharges that it had shifted onto consumers (in the form of higher prices) even after the Supreme Court had declared the tariffs unlawful and Target had received refunds of those sums;

d. Undertaking a scheme where it raised prices across thousands of goods due to tariffs with the aim of simultaneously obtaining inflated payments from consumers based on unlawful tariffs while also obtaining a full refund of tariffs from the U.S. government (should the tariffs be invalidated).

151. There is no consumer or competitive benefit to allowing a company simultaneously to keep both the elevated consumer price charged to consumers and the government refund.

152. Target's conduct occurred in the course of trade or commerce.

153. Target's conduct affects the public interest, given that vast numbers of consumers in California are affected by the company's unfair practices.

154. Target's unfair practices were willful, knowing and intentional, as Target purposefully raised consumer prices in response to tariff costs while simultaneously positioning itself to obtain government refunds for those same costs; and Target is now choosing not to return the ill-gotten gains to consumers (i.e., the price increases derived from passing through illegal tariffs) with full knowledge that it has pursued and obtained a double recovery.

155. Target has received nearly $1 billion in refunds for the invalidated IEEPA tariffs from the U.S. government.

156. Plaintiffs and the members of the Class suffered ascertainable losses as a direct and proximate result of Target's unlawful conduct, including the amounts they paid in tariff-related surcharges and/or inflated prices.

157. Plaintiffs and the members of the Class suffered damages, including injury in fact and loss of money, which occurred as a result of the unlawful, unfair or deceptive acts or practices.

158. The above-mentioned conduct offends established public policy, is immoral, oppressive, or unscrupulous, is unconscionable, and is substantially injurious to consumers who have no avenue to seek a refund from the government directly.

159. By prosecuting this action, Plaintiffs seek to enforce important California consumer-protection rights and to halt and remedy a uniform practice affecting a large class of California consumers. The relief sought in this action will confer substantial pecuniary benefits upon the Class and the consuming public, including by restoring money obtained through the challenged practice and preventing its continuation, and by deterring the retention of funds stemming from unlawful tariffs by thousands of other companies across California. The affected consumers' individual losses are too small to support separate litigation, while the cost and complexity of establishing Target's uniform conduct substantially exceed any individual Plaintiff's financial stake. Plaintiffs therefore seek reasonable attorneys' fees under Code of Civil Procedure § 1021.5 and all other applicable laws.

160. Plaintiffs and the Class are entitled to the restitution of all monies from the collection of tariff charges, which were unjustly acquired through acts of unfair competition, and such other relief as is available under the law.

## <u>COUNT FIVE</u>
## Declaratory Relief, 28 U.S.C. § 2201
## (On behalf of Plaintiffs and the Class)

161. Plaintiffs hereby reallege and incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

162. Plaintiffs allege this claim individually and on behalf of the proposed Class.

163. Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

164. Plaintiffs' claims present an actual controversy as to the rightful ownership of the tariff surcharges paid to Target.

165. Plaintiffs have suffered an injury by having been required to pay Target a tariff surcharge because of the subject tariffs on Target's products. And Plaintiffs will imminently suffer injuries by Target's unlawful retention of the tariff refund.

166. Plaintiffs and the Class request that this Court exercise its equitable power to enter a declaratory judgment that retention of the tariff surcharges paid by Plaintiffs but refunded to Target is unlawful for the above-stated reasons, and that Target is obligated to return to Plaintiffs and the Class all IEEPA tariffs passed on to consumers through higher prices with interest or the refund Target receives from the federal government (or a portion of it sufficient to make Plaintiffs and the Class whole). This declaratory judgment should apply to any refunds of IEEPA tariffs that Target has received and to any refunds of such tariffs that Target receives in the future.

## VIII. PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of the proposed Class, respectfully request that this Court enter judgment in their favor and against Target and grant the following relief:

- An order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23; appointing Plaintiffs as Class Representatives and the undersigned counsel as Class Counsel; and directing that notice of this action be given to members of the Class;
- An order that Target's actions violate the state consumer protection laws and common law principles pled in this Complaint, and that Target is obligated to return to Plaintiffs and the Members of the Class all IEEPA tariffs passed through to customers in the form of higher prices, with interest or sums Target receives or has received from the federal government to reimburse Target for unlawful IEEPA tariffs;
- An award to Plaintiffs and the Class of (a) restitution and disgorgement, (b) actual damages, (c) consequential damages, including trble damages, (d) statutory damages, (e) punitive damages, and/or (f) any other damages authorized under law, in the amount to be determined at trial;
- An award of pre-judgment and post-judgment interest;
- An award to Plaintiffs and the Class of reasonable attorneys' fees and costs;
- An order of an accounting of all IEEPA tariff surcharges collected from consumers and all IEEPA tariff refunds received or anticipated to be received from the U.S. government;

- Such other and further legal and equitable relief as the Court deems just and proper.

## IX. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: August 20, 2026

/s/ Jason H. Kim

Jason H. Kim (SBN 220279)
**SCHNEIDER WALLACE COTTRELL KIM LLP**
515 S. Figueroa Street, Suite 1060
Los Angeles, CA 90071
Tel: (415) 421-7100
jkim@schneiderwallace.com

Todd M. Schneider (SBN 158253)
Raymond S. Levine (SBN 348030)
**SCHNEIDER WALLACE COTTRELL KIM LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel: (415) 421-7100
tschneier@scheniderwallace.com
relevine@schneiderwallace.com

Noah A. Messing (*pro hac vice forthcoming*)
**MESSING & SPECTOR LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel: (212) 960-3720
nm@messingspector.com

Phillip M. Spector (*pro hac vice forthcoming*)
**MESSING & SPECTOR LLP**
145 West Ostend Street, Suite 600
Baltimore, MD 21230
Tel: (212) 960-3720
ps@messingspector.com

*Attorneys for Plaintiffs*