BEFORE THE
UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: RETAILER TARIFF LITIGATION | MDL No. 3202 |

MOVANTS' REPLY IN SUPPORT OF AMENDED MOTION FOR TRANSFER AND CENTRALIZATION PURSUANT TO 28 U.S.C. § 1407

Movants respectfully submit this reply in support of their Amended Motion for Transfer and Centralization Pursuant to 28 U.S.C. § 1407 and in response to briefs in support and opposition filed on or before September 10, 2026, respectfully state the following:

## I. INTRODUCTION

According to opponents of Movants' centralization motion, every action will include a determination of whether a particular defendant's prices rose because of International Emergency Economic Powers Act ("IEEPA") duties, or instead because of inflation, supplier costs, "market conditions," or "some combination of factors." *In re Retailer Tariff Litigation*, MDL No 3202, ECF No. 114[1] at 3.[2] They attempt to use that question as proof that individualized issues and defenses predominate and that the actions have nothing in common. The opposite is true. In every single case, the question of *why* a defendant's prices increased can only be answered by employing an econometric model that isolates the tariffs' effect from the effect of every other force that influenced the prices of defendants' consumer goods while the IEEPA duties were in effect. The model, its control variables, its event dates, and any associated *Daubert* and Rule 23 arguments will be the same in every case. Unless the Court centralizes these actions, that complex, expensive,

[1] Unless otherwise stated, references to ECF docket entries will pertain to *In re Retailer Tariff Litigation*, MDL No 3202.

[2] *See also,* ECF No. 108 at 1–2 (joint opposition) (each importer "made different decisions based on different factors as to whether, when, and how much to adjust prices"; discovery will address price adjustments "attributable to those tariff payments (if any)"); ECF No. 100 at 1, 12 (Target) ("how those tariffs affected pricing decisions (if at all)"; "[s]ome companies made pricing changes. Others made no tariff-related changes at all."); *id.* at 17 (Costco "did not raise prices on all products that were subject to the tariffs") (quoting Costco's *Briggs* motion); ECF No. 139 at 3 (Sony) (price statement cited "inflation and global economic pressures"); ECF No. 132 at 1–2 (Deckers) (companies chose "whether to bear that cost themselves, share it with suppliers, or pass it to consumers"); ECF No. 136 at 10 (Smucker) ("whether those tariffs had any effect on the specific goods purchased"); ECF No. 127 at 7 (Amazon) ("how each company chose to increase prices or otherwise offset tariff costs"); ECF No. 137 at 5 (Amazon plaintiffs) (pricing practices differed "as to amounts, timing, practices, and affected products"); ECF No. 126 at 2 (PUMA) ("how any tariff costs flowed from Defendant to retailer to consumer"); ECF No. 104 at 7 (*Briggs* plaintiffs) (whether a defendant "passed tariff costs through to consumers, [or] increased prices on non-tariffed goods"); ECF No. 134 at 5 (Stockov) (the "extent the IEEPA tariffs were passed through to consumers" must be determined "for each particular Defendant").

and outcome-determinative contest will be litigated multiple times, before different judges, with the prospect of inconsistent rulings on substantially similar methodologies.

The same is true of the evidence those models will rely on. Whether a defendant was the importer of record, what it paid and on which entries, and what it has sought or received as a tariff refund are recorded in one place—the data maintained by U.S. Customs and Border Protection ("CBP"). The defendants insist that each of them will produce their own slice of that entry and refund data and that procurement of government-held data will not be required.[3] However, defendants state that they did not always import the goods at issue. For example, Walmart concedes that its "third-party suppliers" imported some of its goods, and manufacturer defendants acknowledge that goods they imported were resold by retailer defendants.[4] Identifying who paid the duty on any given product therefore requires entry records beyond any single defendant's files, and CBP's regulations require a separate authorization for every demand in every case. 19 C.F.R. § 103.22(a), (c). Absent centralization of these cases, this process would prove to be unduly burdensome.

And CBP would likely wage a similar fight here to the one that the United States Drug Enforcement Agency ("DEA") did in *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio), regarding access to its ARCOS database. The DEA resisted producing that data at

---

[3] *See* ECF 108 at 3–4, 14. "To the extent information regarding the payment of the IEEPA tariffs bore on a Defendant's response, that information can be obtained from the Defendant that made those payments" …"nor is it likely that any discovery from the federal government will be required."

[4] *See* ECF No. 114 at 1 (Walmart) ("[S]ome of those goods are imported directly, while others are imported by Walmart's third-party suppliers—Walmart paid IEEPA tariffs on the former but not the latter."); ECF No. 139 at 2–3 (Sony) (describing itself as "an importer" whose consoles are "sold to consumers through third-party retailers, including several named as defendants (e.g., Target, Walmart, Costco, and Amazon)"); ECF No. 126 at 2–3 (PUMA) (joint venture formed "to import and distribute" PUMA products, which a named plaintiff bought "from a Costco store"); ECF No. 136 at 11–12 n.5 (Smucker) (discovery would address "what Smucker charged Costco, the extent to which that price reflected import tariffs on green coffee beans, and how Costco set the price"); see also ECF No. 108 at 7–8 (joint opposition) ("[S]ome manufacture products, some import from other suppliers, some operate principally as retailers, and some perform multiple roles.").

every turn, answering a 19-page *Touhy* request with "boilerplate" language, offering only "very limited, de-identified" data, and pressing twelve objections until the MDL court rejected its positions as "so implausible" as to be arbitrary and capricious.[5] Centralization would prevent an otherwise foreseeable fight over the same national entry and refund data in more than forty actions, before multiple judges who may rule differently, at the expense of every party, in every case.

Finally, the oppositions' premise that "[n]o documents produced by one defendant will be relevant to claims against a different defendant," ECF No. 108 at 4, is contradicted by the defendants' own submissions. For example, Sony's gaming consoles are sold "through third-party retailers, including several named as defendants (e.g., Target, Walmart, Costco, and Amazon)." ECF No. 139 at 2. [A]didas' products are sold by "Walmart, Target and Costco." ECF No. 118 at 1–2. Smucker concedes that discovery in its case will reach "what Smucker charged Costco . . . and how Costco set the price" the plaintiff paid. ECF No. 136 at 11–12. Some defendants are linked in the same distribution chains, and the same consumer purchases are at issue in multiple actions. The litigation has grown from the 26 actions in the amended motion to what the opponents describe as "forty Pending Actions against twenty-seven" defendants, ECF No. 137 at 1; ECF No. 134 at 6, and the only alternative any opponent offers is a series of single-defendant MDLs—an ill-suited approach to an inherently interconnected litigation. For the reasons set forth below, the Panel should centralize the actions in the Northern District of Illinois.

[5] ARCOS Order at 2–6, 13, 21.

## II. ARGUMENT

### A. TARIFF PASS-THROUGH IS A COMMON ECONOMETRIC QUESTION THAT SHOULD BE RESOLVED BY ONE COURT

#### 1. Opponents Agree that Tariff Attribution is a Central Question in Every Case

Opponents describe the core issue in nearly identical terms. The joint opposition, filed on behalf of eight defendants, identifies "the timing and amount of price adjustments of [a] defendant's specific products attributable to those tariff payments (if any)," ECF No. 108 at 2, as a central issue in this litigation. Target states that every action "will require a highly specific inquiry into whether particular tariffs applied to particular products, [and] how those tariffs affected pricing decisions (if at all)." ECF No. 100 at 1; *see id.* at 9. Walmart states that, for every product, the parties must determine "whether its price changed during the relevant period; and, if so, whether that change resulted from tariffs, supplier costs, **market conditions, competitive considerations, or some combination of factors**." ECF No. 114 at 3 (emphasis added). And Smucker frames the "glaring issue central to the claims" as "whether those tariffs had any effect on the specific goods purchased." ECF No. 136 at 10.

Movants agree, and that is precisely why centralization is needed. Whether a price change "resulted from tariffs, supplier costs, market conditions, competitive considerations, or some combination of factors" can be answered only by an econometric model that isolates the tariff's effect from every other variable. That model's methodology, controls, and *Daubert* challenges will be the same or substantially similar in every action. A single regression framework can be applied to each defendant's data to produce defendant-specific estimates, as the Ninth Circuit recognized when it approved a pooled model "to evaluate the overcharge specific to each individual defendant," even for a single large retailer, Walmart, while controlling for its bargaining power. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 672, 678 (9th Cir.

2022). The defendants' differences thus go to the *inputs* and *outputs* of a common model, not to whether the model can be commonly used.

Opponents also preview the competing explanations for price increases that every defendant will offer. Sony states that its price statement cited "inflation and global economic pressures" and did not mention tariffs. *See,* ECF No. 139 at 3. Deckers says companies "worked with suppliers to absorb the cost in whole or in part," calling supplier cost-sharing "yet another axis" of analysis. *See,* ECF No. 132 at 5. [A]didas alleges that it mitigated tariff costs through "sourcing changes, select price increases, and product mix adjustments." ECF No. 100 at 5 (quoting *Downs* complaint). Others point to timing, inventory, and selective pricing. ECF No. 137 at 5–6 (Amazon's "strategic forward inventory buys"; PUMA's delayed increases; Costco's selective increases). Deckers has already moved to dismiss for "failure to plead a tariff-attributable price increase," ECF No. 132 at 8, and Costco argues that plaintiffs cannot "plausibly link their specific purchases to prices affected by tariffs." ECF No. 100 at 17 (quoting Costco's *Briggs* motion). Every defendant, in other words, will likely contend that something other than IEEPA duties explains its prices. This should not prevent a centralized effort to determine whether this contention is true or not.

**2. The Same Economic Regression Methodology Can Govern Every Action**

Separating the effect of a cost increase from inflation, input costs, demand, and every other variable affecting price is the classic function of multiple regression. A properly specified model "isolate[s]" the effect of the challenged conduct "rather than . . . other variables that could affect prices" by controlling for "product characteristics, input costs, customer type, and variables related to consumer preference and demand, such as disposable income, seasonal effects, and geography." *Olean*, 31 F.4th at 671 (9th Cir. 2022). Such models "have been widely accepted as a generally

reliable econometric technique to control for the effects of the differences among class members and isolate the impact" of the challenged conduct on prices. *Id.* at 677. The same models then measure how much of an upstream cost was passed through to downstream purchasers. *Id.* at 683–84 (pass-through regressions to commercial and consumer purchasers, using retail scanner data).

Defendants in *In re Pork Antitrust Litigation* made the same argument defendants make here: that plaintiffs' experts "failed to distinguish lawful from unlawful factors," including "government action," "overseas demand," and "currency exchange rates." 665 F. Supp. 3d 967, 991 (D. Minn. 2023). The court resolved that dispute by examining whether the models controlled for those factors (corn costs, disease, and the Great Recession among them) and found that the experts had "accounted for dozens of variables that impact the market," *id.* at 991–93, rejecting defendants' argument, for every level of the distribution chain, that the models "ignore economic reality and failed to isolate the effects" of the challenged conduct. *Id.* at 1007.

Here, opponents raise that "[a]ny economic analysis must instead use each Retailer Defendant's own prices, costs, products, margins, sales, and timing," ECF No. 104 at 8, that "[e]xpert evidence in these cases will involve different analyses," ECF No. 134 at 7, and that "[e]ach actor, at every level, will require a separate analysis." ECF No. 136 at 6. These arguments conflate the <u>*data*</u> with the <u>*method*</u>. In *Olean*, a single pooled model was used to produce overcharge estimates "specific to each individual defendant," even for a single large retailer (Walmart), while controlling for its bargaining power. 31 F.4th at 672, 678.

Here, too, the methodology will be common in every respect that matters. Every model will rely on the same consumer and producer price indices, freight and shipping costs, exchange rates, and commodity input costs that apply identically to every defendant over the same period. Every model will also be built around the same event dates: the IEEPA tariffs' effective date; the

Supreme Court's decision in *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026) finding the tariffs void; and CBP's April 20, 2026 deployment of its refund system. And every model will likely compare tariffed and non-tariffed goods before and after the duties took effect based on country-of-origin and tariff-classification data.

The economic questions that follow are likewise common. Plaintiffs allege that tariff costs were also passed through to consumers via price increases on U.S.-sourced goods that were not subjected to IEEPA tariffs. Whether and how tariff expenditures were passed through to consumers of U.S.-sourced goods cannot be answered without examining (among other things) market-wide conditions that are universally applicable to all consumer tariff recovery cases. Where a manufacturer defendant's goods were sold by a retailer defendant, moreover, a pass-through economic model must be designed to allocate a single tariff cost between two defendants in two different actions. Those questions cannot be answered consistently if each is litigated separately.

### 3. The Analysis Is Complex, Costly, Outcome-Determinative, and Would Be Burdensome to Litigate in Every Action

Because a class damages model must measure only the harm attributable to the plaintiffs' theory, *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), a pass-through economic model will decide class certification in every action. In other words, "[n]o damages model, no predominance, no class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869, 725 F.3d 244, 253 (D.C. Cir. 2013).

The Cathode Ray Tube (CRT) Antitrust Litigation illustrates the judicial and financial burdens of developing a robust econometrics model. brought together roughly forty defendant entities and plaintiffs at every level of the distribution chain, including manufacturers of finished products, distributors, retailers such as Costco, Target, and Best Buy, and classes of consumers. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 U.S. Dist. LEXIS 137946, at

22–62 (N.D. Cal. Sept. 24, 2013). The consumers' economist used regression "to isolate the impact of the [defendants'] activities from other price determinants like demand, cost, and market structure," then ran "forty-seven regression studies" estimating "the pass-through rate at each level of the distribution chain," drawing on "more than 100 million price and cost observations." *Id*. at 74–76, 90. The transferee court resolved every challenge to that model in a single ruling after "[y]ears of contentious litigation." *Id.* at 64, 86–91; *see also, Olean*, 31 F.4th at 662, 683–84 (three-day evidentiary hearing on overcharge and pass-through regressions); *Pork*, 665 F. Supp. 3d at 1003–04 (pass-through corroborated with data from "thirty-nine industry participants").

Unlike *CRT*, where the charge at the top of the chain had to be estimated, here, the IEEPA duty is recorded, entry by entry, in CBP's data. What remains is the question *CRT* resolved: how much of that charge passed down each link to consumers, rather than being absorbed or explained by other market forces. *See CRT*, 2013 U.S. Dist. LEXIS 137946, at *72 (firms pass through "significant, non-transitory, industry-wide" cost increases but may absorb those that are "minimal, temporary, or narrow"). But unlike in *CRT*, the links of these chains are currently divided among defendants in different courts: Sony, Smucker, and PUMA (among others) at the manufacturer level, and Costco, Target, Walmart, and Amazon (among others) at the retail level.

Multiply that effort by forty actions and twenty-seven defendants and it becomes apparent that the burden and expense, on both plaintiffs and defendants, would be unnecessarily high, given the availability of centralization and uniform regression models. Without centralization, potentially, the same economists would be deposed repeatedly, the same or substantially similar methodologies would be briefed in court after court, and different judges could reach opposite conclusions when applying Rule 702 to proposed economic regression models. Opponents concede that shared experts justify centralization. *See* ECF No. 134 at 7 (*Hair Relaxer* was

centralized because "parties in all actions are likely to use many of the same experts") (quoting *In re Hair Relaxer Mktg., Sales Pracs., & Prods. Liab. Litig.*, 655 F. Supp. 3d 1374, 1376 (J.P.M.L. 2023)); ECF No. 104 at 8 (citing "overlapping . . . experts, discovery, and Daubert practice"). That is precisely the case in this litigation.

**4. The Panel Centralizes Litigation Against Competing Defendants to Secure a Single Ruling on a Common Expert Question**

The Panel has repeatedly centralized litigation, over the objection of competing defendants, so a common expert question receives one ruling. In *In re Acetaminophen—ASD/ADHD Products Liability Litigation*, nine competing retailers (including Walmart, Costco, and Target) opposed centralization; Walmart and Target asked for defendant-specific MDLs; and the retailers argued that each sold different products from different suppliers and that their status as competitors would complicate confidentiality. 637 F. Supp. 3d 1372, 1373–75 (J.P.M.L. 2022). The Panel rejected every argument, holding that "the issues concerning general causation, the background science, and regulatory history will be substantially the same in all actions," that "a single MDL encompassing all defendants is necessary," and that informal coordination "appears insufficient to address the risk of inconsistent rulings on core discovery issues, preemption, and general causation." *Id.* at 1374–76. Here, the pass-through attribution of the IEEPA tariffs plays the common question role general causation played *In re Acetaminophen ASD/ADHD Products Liability Litigation*. *See also In re 1980 Decennial Census Adjustment Litig.*, 506 F. Supp. 648, 650 (J.P.M.L. 1981) (centralizing over objection that local issues predominated, where actions shared "complex questions of fact concerning . . . the existence and utility of statistical methods to correct" a national undercount); *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*, 437 F. Supp. 3d 1365, 1366 (J.P.M.L. 2020) (centralizing over opposition because, although remaining discovery "may be case-specific, much of it may rely on common experts"); *In re Baby Food*

*Mktg., Sales Pracs. & Prods. Liab. Litig.*, 730 F. Supp. 3d 1371, 1373 (J.P.M.L. 2024) ("Common expert discovery, as to both plaintiffs and defendants, also is probable."); *In re Japanese Elec. Prods. Antitrust Litig.*, 388 F. Supp. 565, 567 (J.P.M.L. 1975) (centralizing to avoid duplicating discovery "on the economic . . . issues common to both actions").

## B. EVERY ACTION DEPENDS ON THE SAME CBP IMPORT AND REFUND DATA, WHICH SHOULD BE OBTAINED ONCE

### 1. Opponents Confirm that Importer of Record and Refund Data is Central

Every pass-through model depends on knowing which goods bore IEEPA duties, in what amounts, when duties were assessed, and who paid them. Opponents confirm that those facts are disputed and vary in ways that only entry-level data can resolve. Amazon states "there will be significant variation in the specific details of how each Retailer paid tariffs as the importer of record, on what products, in what amounts, and what refund amounts they expect to receive," and that some defendants sued for refunds, some used CBP's process, and some "may have chosen not to seek refunds through the CBP, or to limit their refund requests." ECF No. 127 at 7. The Amazon plaintiffs add that the products "came from different countries, and were thus subjected to different tariff rates." ECF No. 137 at 15. Target notes that "the time it takes to receive refunds will vary by company," ECF No. 100 at 3, and that the tariffs affected products differently "based on each imported product's country of origin." *Id.* at 12. Sony identifies "the entry of consoles into the United States, duties assessed at entry, and whether and how those duties factored into SIE's pricing decisions" as issues. ECF No. 139 at 2. The Costco action lists "the amount of unlawful tariff duties Costco receives as refunds" and "whether any refunds Costco may receive . . . relate to specific products Plaintiffs purchased" as key factual issues. ECF No. 134 at 3.

Critically, several defendants allege that they were not the importer of record for the goods at issue. Walmart states that some of its goods "are imported by Walmart's third-party suppliers—

Walmart paid IEEPA tariffs on the former but not the latter." ECF No. 114 at 1. PUMA states that products were imported by a joint venture and sold through retailers, so the parties must determine "which entity supplied which products." ECF No. 126 at 2–3. Smucker states that it imported green coffee beans that it sold as finished coffee through Costco. ECF No. 136 at 2. Deckers asks whether "Walmart's private-label vendors bore some portion of the burden." ECF No. 132 at 5–6. In each instance, a retailer's own records cannot show whether, or how much duty was paid on the goods it sold. That information sits in CBP's entry and refund records.

### 2. Piecemeal Production From Each Defendant Is the Approach the Opioid MDL Transferee Court Rejected

The oppositions insist that no government discovery will be needed because each defendant can produce its own customs records. ECF No. 108 at 3–4, 14; ECF No. 104 at 10–11; ECF No. 134 at 1, 5. But the defendants do not agree among themselves. Amazon concedes "there could be some common third-party discovery the parties will seek from the federal Government," ECF No. 127 at 10, while the Amazon plaintiffs call CBP's practices "largely irrelevant." ECF No. 137 at 4. And the piecemeal production opponents propose fails on its own terms: a retailer cannot produce the entry records of the supplier or manufacturer that actually imported its goods, and no defendant can produce another importer's confidential entry data.

The opioid MDL faced the same problem with the DEA's ARCOS database, which aggregates transaction reports that manufacturers and distributors are required to submit. The DEA argued that the data were "readily available from other sources; namely, the Defendants." ARCOS Order at 18. The transferee court rejected that argument:

> [I]t is not a valid objection to insist the data is available elsewhere, in small pieces. It would be unduly burdensome (if not impossible) to force Plaintiffs to recreate the ARCOS data by pursuing each defendant and potential defendant. Each defendant operates a separate [system], but they all submit the same data in a unified format for ARCOS inclusion, which is aggregated and validated by the

> DEA. The necessary breadth and depth of data Plaintiffs need to pursue their claims and settle this litigation is held only by DEA.

*Id.* at 19. The court emphasized that tracing "which manufacturers sent which drugs to which distributors, and which distributors sent which drugs to which pharmacies" was "critical not only to all of plaintiffs' claims, but also to the Court's understanding of the width and depth of this litigation." *Id.* at 8. The same is true here. Importers submit entry summaries, tariff classifications, country-of-origin data, and refund requests to CBP in a single, standardized format. Tracing which importer paid duty on which goods, and which retailer later sold them, is the vertical allocation question at the heart of the manufacturer and retailer actions.

**3. CBP Discovery Can Be Managed Only Through a Single Court**

CBP's regulations make parallel discovery in over forty courts impractical. In any civil proceeding to which CBP is not a party, no CBP employee may produce documents or testimony without the prior written approval of CBP's Chief Counsel. 19 C.F.R. § 103.22(a). Each requesting party must serve the demand with the summons and complaint and an affidavit summarizing the documents sought and their relevance "to the proceeding," and any authorization "shall be limited to the scope of the demand as summarized in such affidavit." *Id.* § 103.22(c). The result, absent centralization, is a separate demand, a separate authorization decision, and a separate potential dispute in every action, in courts that disagree even on the standard for reviewing an agency's refusal to comply. Importers' entry data is also confidential commercial information, requiring a protective regime that must be negotiated once, not forty times. *See id.* at 10–12 (discussing EPA's confidential-commercial-information and Trade Secrets Act objections to ARCOS production).

The opioid litigation shows why centralization matters. Before transfer, the originating court deliberately "tee[d] up" the agency's objections for resolution by the transferee court. ARCOS Order at 2. After transfer, the MDL court resolved all twelve of the DEA's objections in

one order, entered a single protective order, and noted that the DEA had withdrawn its objection to nationwide scope because the case was now part of an MDL "which now includes cases from across the country." *Id.* at 13–14, 22.. Here, the alternative that opponents support is CBP responding to dozens of demands from plaintiffs and defendants alike, under different protective orders and different rulings, about the same national dataset. Section 1407 centralization will achieve the objective of providing a more efficient solution.

## C. THE "DEFENDANT-SPECIFIC DISCOVERY" OBJECTION IS REFUTED BY THE DEFENDANTS' OWN SUBMISSIONS

### 1. Defendants Occupy Positions in the Same Distribution Chains, and the Same Purchases are at Issue in Multiple Actions

The joint opposition describes the defendants as occupying "different positions in the chain of commerce, from manufacturers or importers of record to online or brick-and-mortar retailers," and acknowledges that each defendant set prices "either to a distributor or retailer or directly to an end customer." ECF No. 108 at 1, 8. The separate briefs show that these positions are linked:

- **Sony**: consoles "overwhelmingly sold to consumers through third-party retailers, including several named as defendants (e.g., Target, Walmart, Costco, and Amazon)." ECF No. 139 at 2.
- **adidas**: the actions include "retailers that sell adidas products, such as Walmart, Target and Costco," and discovery would reach adidas's "agreements with retailers." ECF No. 118 at 1–2; *see* ECF No. 100 at 17 (Target) (quoting adidas's motion to dismiss in Hernandez, which argues that plaintiffs "purchased the shoes from third-party retailers")
- **Smucker**: the plaintiff bought Folgers at Costco, and discovery "would likely focus on manufacturer-retailer dynamics—what Smucker charged Costco, the extent to which that price reflected import tariffs . . . and how Costco set the price" the plaintiff paid. ECF No. 136 at 1, 11–12 n.5.
- **PUMA**: a named plaintiff bought PUMA products "from a Costco store," and liability turns on "how any tariff costs flowed from Defendant to retailer to consumer." ECF No. 126 at 2.
- **Microsoft**: the plaintiff "bought an Xbox console from a retailer." ECF No. 136 at 7 n.3 (quoting *Hastings* complaint); *see* ECF No. 112.

- **Walmart and Deckers**: goods imported by Walmart's suppliers, and the burden allegedly borne by "Walmart's private-label vendors." ECF No. 114 at 1; ECF No. 132 at 5–6.

These admissions cannot be reconciled with the oppositions' assertions that "[n]o documents produced by one defendant will be relevant to claims against a different defendant," ECF No. 108 at 4; *accord* ECF No. 132 at 11, that "no plaintiff alleges purchases from multiple defendants," ECF No. 137 at 10, or that "[n]o discovery in the actions against adidas . . . will be relevant to any of the other Actions." ECF No. 118 at 1.

The consequence is that the same consumer transaction will oftentimes be the subject of claims against a manufacturer in one court and a retailer in another. A Costco shopper who bought Folgers coffee or PUMA apparel falls within the putative classes in *Mulconrey*, *Lemense*, *Stockov*, *Briggs*, and *Ortiz*; a Target shopper who bought a PlayStation falls within the Sony and Target classes. Each court would be asked to decide how much of a single tariff cost was absorbed or passed on at each level, and each could award restitution for the same dollar—or conclude that the other defendant is responsible. That is the "indivisible" injury the defendants say is missing. *See* ECF No. 108 at 2; ECF No. 137 at 12. It is also why the Panel has centralized actions against manufacturers and their downstream sellers. *See Acetaminophen*, 637 F. Supp. 3d at 1374 & n.4 (common suppliers manufactured products for multiple retailer defendants); *In re Valsartan Prods. Liab. Litig.*, 433 F. Supp. 3d 1349, 1351–52 (J.P.M.L. 2019) (defendants "involved in the valsartan supply chain"); *In re Insulin Pricing Litig.*, 688 F. Supp. 3d 1372, 1375–76 (J.P.M.L. 2023) (manufacturers and pharmacy benefit managers); *In re Corrugated Container Antitrust Litig.*, 447 F. Supp. 468, 470–71 (J.P.M.L. 1978) (companies that were both defendants and putative class members; "antagonistic interests" are for the transferee judge).

**2. Overlapping Classes Already Exist, and Conflicting Class Rulings Are a Real Risk**

The oppositions argue that the putative classes are "defendant-specific," so there is "no risk of inconsistent rulings." ECF No. 108 at 12; ECF No. 100 at 16; ECF No. 132 at 9. That is wrong on the current record. Costco faces three federal actions on behalf of overlapping nationwide classes in Illinois, Washington, and Puerto Rico, plus a state-court action. ECF No. 135 at 1–2 & n.1. Target faces five. ECF No. 100 at 4. Amazon faces seven in six districts. ECF No. 127 at 2. "[T]he possibility for conflicting class determinations . . . is an important factor favoring transfer." *In re Pub. Air Travel Tariff Litig.*, 360 F. Supp. 1397, 1399 (J.P.M.L. 1973) (centralizing class actions against multiple airlines over federal tariff overcharges, despite argument that each ticket required individual proof). Even the Amazon plaintiffs invoke the Panel's concern with "conflicting, disorderly, chaotic judicial action." ECF No. 137 at 16 (quoting *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968)).

**3. Confidentiality and Defendant-Specific Issues are Routinely Managed Through Separate Tracks**

Confidentiality concerns raised by opponents, ECF No. 108 at 10–11; ECF No. 104 at 2, are managed through tiered protective orders, as the Panel recognized in centralizing competing retailers in *Acetaminophen*, 637 F. Supp. 3d at 1375, and in transferring Home Depot's action into an MDL already governed by protective orders for "competitively sensitive information." *In re Domestic Drywall Antitrust Litig.*, MDL No. 2437, 2018 U.S. Dist. LEXIS 220905, at 1–2 (J.P.M.L. 2018). Nor is the availability of separate tracks an "implicit concession," ECF No. 127 at 11; *see* ECF No. 104 at 12–13; ECF No. 137 at 19–20. The Panel acknowledged the "complexities that a multi-product and multi-defendant MDL . . . may entail" and centralized anyway, because "a transferee judge can employ any number of techniques, such as establishing separate discovery and motion tracks." *Baby Food*, 730 F. Supp. 3d at 1373. Here, a common track

for the econometric, CBP, and threshold issues, with defendant tracks for pricing decisions and communications, is the only structure that avoids forty parallels of the same work.

**D. MOVANTS' POSITION IN MDL NO. 3197 IS CONSISTENT WITH THIS MOTION**

The joint opposition accuses Movants of "gamesmanship" for opposing an Amazon-only MDL while seeking a broader one, ECF No. 108 at 4–5; *see* ECF Nos. 104, 109, 113, 123, 131, 137. ECF No. 100 at 1. Movants' positions in opposing the Amazon MDL and seeking a global MDL here are consistent. An Amazon-specific MDL would address one of twenty-seven defendants, leave Amazon's suppliers and competitors in other courts, and invite a series of parallel single-defendant MDLs litigating the same econometric and CBP questions.

Still, other parties favor defendant-specific MDLs or consolidation. *See* ECF 101 at 8-9; ECF 127 at 12-13; ECF 12 at 28. As noted herein, there is overlap between defendant-manufacturers and others who sell their products through retailers' websites. Movants oppose that approach because it is too narrow, not because coordination is unnecessary. EssilorLuxottica's description of this motion as a successor to a failed Amazon-only effort, ECF No. 123 at 1–2, is simply incorrect. MDL 3197 was initiated by other plaintiffs' attorneys, Movants opposed this motion, and it remains pending. Movants believe that a global MDL is the only and correct course of action given the complexity of the litigation.

**E. THE NORTHERN DISTRICT OF ILLINOIS IS THE APPROPRIATE TRANSFEREE DISTRICT**

Parties on both sides agree that the Northern District of Illinois is the right forum if the Panel centralizes these matters. Costco calls it "the centrally located Northern District of Illinois," a "convenient forum for this nationwide litigation" stretching "from Seattle to Puerto Rico." ECF No. 135 at 5. A Costco plaintiff "agrees with Movants that the Northern District of Illinois is the appropriate transferee court." ECF No. 134 at 1. At least seven related actions are pending there,

including actions against Costco, Temu, SHEIN, Smucker, IKEA, and Lenovo/Motorola—the latter headquartered in the district. ECF No. 140 at 5; ECF No. 137 at 18. Where, as here, the parties are dispersed nationwide, "the location of the currently filed cases is not a particularly important factor." *Acetaminophen*, 637 F. Supp. 3d at 1376. The district also has deep experience with exactly the econometric work this litigation requires. *See In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) (certifying direct, indirect, and end-user consumer classes and denying motions to exclude competing economic experts); *Pork*, 665 F. Supp. 3d at 991 (relying on *Broiler Chicken*).

The Amazon parties' preference for the Western District of Washington, ECF No. 127 at 13–14; ECF No. 137 at 16–19, rests on Amazon's headquarters and forum-selection clause, which should have no bearing on the decision of the appropriate transferee district and favors Amazon over twenty-seven other defendants.

**F. NO DEFENDANT SHOULD BE EXCLUDED**

The manufacturer defendants' requests for exclusion, ECF Nos. 112, 126, 132, 136, 139, have it backwards. Their products were sold by retailer defendants, and excluding them would leave the allocation of the same tariff costs to separate courts. Defendants whose cases are already consolidated, ECF Nos. 107, 122, 139, still overlap with the retailer actions. Defendants whose single cases are already pending in the proposed transferee district, ECF Nos. 117, 124, 136, face no burden from inclusion. And Amazon, a retailer of other defendants' products, ECF No. 139 at 2, should not proceed separately. *See S&P*, 949 F. Supp. 2d at 1362 (denying separate defendant's request for separation and remand); *In re Equity Funding Corp. of Am. Sec. Litig.*, 375 F. Supp. 1378, 1383–86 (J.P.M.L. 1974) (rejecting bifurcation into two MDLs where a common factual core "actuates the entire litigation").

## III. CONCLUSION

For these reasons and those stated in the amended motion, the Panel should transfer the actions, and any tag-along actions, to the Northern District of Illinois for coordinated or consolidated pretrial proceedings.

DATED: September 17, 2026

Respectfully submitted,

*/s/ Michael J. Fuller, Jr.*______________________

MICHAEL J. FULLER, JR.
**FARRELL & FULLER LAW**
270 Muñoz Rivera Avenue, Suite 201
San Juan, PR 00918
mike@farrellfuller.com

*Attorneys for Plaintiffs Tonysha Emerson, Sharon Lasseter, Zuania Martínez, and Parveen Sangha*

STUART A. DAVIDSON
**ROBBINS GELLER RUDMAN & DOWD LLP**
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
sdavidson@rgrdlaw.com

*Attorneys for Plaintiff Don Polistico*

HUNTER J. SHKOLNIK
**NAPOLI SHKOLNIK**
1302 Avenida Ponce de León
Santurce, PR 00907
Hunter@nsprlaw.com

*Attorneys for Plaintiffs Patricia Cavallaro, Gregory Rittenhouse, and Luisa Spadafino*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Movants' Reply In Support of Amended Motion for Transfer and Centralization Pursuant to 28 U.S.C. § 1407 was efiled on September 17, 2026 via the Court's CM/ECF System. A notice of electronic filing was sent to all parties registered in this action.

DATED: September 17, 2026

Respectfully submitted,

*/s/ Michael J. Fuller, Jr.*

MICHAEL J. FULLER, JR.
**FARRELL & FULLER LAW**
270 Muñoz Rivera Avenue, Suite 201
San Juan, PR 00918
mike@farrellfuller.com

*Attorneys for Plaintiffs Tonysha Emerson, Sharon Lasseter, Zuania Martínez, and Parveen Sangha*

STUART A. DAVIDSON
**ROBBINS GELLER RUDMAN & DOWD LLP**
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
sdavidson@rgrdlaw.com

*Attorneys for Plaintiff Don Polistico*

HUNTER J. SHKOLNIK
**NAPOLI SHKOLNIK**
1302 Avenida Ponce de León
Santurce, PR 00907
Hunter@nsprlaw.com

*Attorneys for Plaintiffs Patricia Cavallaro, Gregory Rittenhouse, and Luisa Spadafino*