Jason M. Ingber (SBN 318323)
**LEVI & KORSINSKY, LLP**
3580 Wilshire Boulevard, Suite 1260
Los Angeles, California 90010-2513
Telephone: (213) 805-8373
Email: jingber@zlk.com

[Additional Counsel on Signature Page]

*Attorney for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RYAN SCHAVRIEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TARGET CORPORATION,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Ryan Schavrien ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, brings this Class Action Complaint against Defendant Target Corporation ("Defendant" or "Target"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. This putative class action arises from Defendant's practice of increasing product prices charged to consumers in response to tariffs imposed pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50

U.S.C. § 1701 et seq. Defendant passed the costs associated with the unlawful IEEPA tariffs on to Plaintiff and the putative Class members through increased prices on imported goods as well as U.S.-sourced goods not subject to tariffs, spreading the tariff burden across its product lines, causing Plaintiff and the putative Class members to pay more for Defendant's products than they otherwise would have paid. Consequently, Plaintiff and the putative Class members paid inflated sums for Defendant's products while Defendant simultaneously reaped a massive financial benefit by securing hundreds of millions of dollars in federal tariff refunds.

2. Target is a general merchandise retailer. It operated 1,995 stores in the United States as of January 31, 2026, and reported net sales of approximately $104.8 billion for fiscal year 2025.[1] Approximately one-half of the merchandise Target offers is sourced from outside the United States, with China representing the largest country of origin for the merchandise Target imports.[2]

3. Plaintiff's allegations arise from Target unlawfully passing tariff costs on to consumers and subsequently recovering those same tariff payments from the government. Under 19 U.S.C. §§ 1484 and 1505, the importer of record is the party entitled to seek a refund of duties later determined to have been unlawfully collected. Target, and not its customers, is the importer of record. Target states in its Annual Report that it serves "as the importer of record for most owned and exclusive, and certain national brand merchandise," and that as importer of record it is "responsible for customs compliance, including but not limited to,

---

[1] *Annual Reports and Archive: 2025 Annual Report Target Corporation,* TARGET CORPORATE (Form 10-K for the fiscal year ended January 31, 2026, at 31, 45) https://corporate.target.com/getmedia/79214b4b-6331-4b1c-b76f-acff121b40f9/2025-Annual-Report-Target-Corporation.pdf ("Target Corp. 10-K") (last visited September 17, 2026).

[2] *Id.* at 5.

classification, import valuation, and payment of all applicable duties and fees."[3] Target passed the cost of those duties on to consumers through increased prices, requiring Plaintiff and the putative Class members to bear the economic burden of the tariffs. Although Target has recovered and continues to seek recovery of the tariff payments from the government, Plaintiff and the putative Class members, who bore those payments in economic terms, will recover nothing.

4. Following the United States Supreme Court's landmark decision invalidating all IEEPA-based tariffs as unauthorized,[4] thousands of companies have sought recovery of IEEPA tariff payments through proceedings before the U.S. Court of International Trade ("CIT"), and the CIT has determined that eligible importers may receive refunds, together with applicable interest, for unlawfully collected tariff amounts. On April 20, 2026, U.S. Customs and Border Protection ("CBP") deployed the Consolidated Administration and Processing of Entries ("CAPE") system, which permits importers of record to submit and process requests for refunds of IEEPA tariffs.[5]

5. As of July 10, 2026, approximately $121.75 billion in refund claims had been accepted for processing, and approximately $86.3 billion had been completed and sent to the U.S. Department of the Treasury for disbursement.[6] As to Target, in the quarterly report it filed for the period ended May 2, 2026, Target

---

[3] *Id.*

[4] *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 255 (2026).

[5] *International Emergency Economic Powers Act (IEEPA) Duty Refunds*, U.S. CUSTOMS & BORDER PROTECTION, https://www.cbp.gov/trade/programs-administration/trade-remedies/ieepa-duty-refunds (last visited September 17, 2026).

[6] Declaration of Brandon Lord ¶ 5, *Euro-Notions Florida, Inc. v. United States*, No. 1:25-cv-00595 (Ct. Int'l Trade), ECF No. 45 (July 13, 2026) https://www.courtlistener.com/docket/72034984/45/euro-notions-florida-inc-v-united-states/ (last visited September 17, 2026).

disclosed that "[a]s of May 2, 2026, no refunds had been received and no receivable was recorded," and that "[s]ubsequent to quarter-end, we began receiving refunds, which to date have not been material."[7] Three months later, Target reported that it had recognized $994 million in IEEPA tariff refunds received during the second quarter of 2026, recorded "as a reduction of Cost of Sales."[8]

6. On the Company's August 19, 2026, earnings call, Chief Financial Officer Jim Lee stated that "the tariff refund we recorded in Q2 accounts for the significant majority of IEEPA tariff refunds we applied for to date, and we do expect some more to come."[9]

7. This action seeks to recover monetary damages on behalf of Plaintiff and the putative Class members for the unlawful tariff overcharges they paid as a result of Target's pass-through of the IEEPA tariffs. Accordingly, Plaintiff, on behalf of himself and the putative Class, seeks damages representing the amounts by which Target's prices were increased to account for the unlawful tariff costs. Plaintiff further seeks interest running both before and after judgment, the costs of

---

[7] *Target Corporation, Quarterly Report (Form 10-Q) for the quarterly period ended May 2, 2026*, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, at 14, https://www.sec.gov/Archives/edgar/data/27419/000002741926000022/tgt-20260502.htm (last visited September 17, 2026) ("Target Corp., Q1 2026 Form 10-Q").

[8] *Target Corporation, Quarterly Report (Form 10-Q) for the quarterly period ended August 1, 2026,* UNITED STATES SECURITIES AND EXCHANGE COMMISSION, at 9, Note 3, Tariff Refunds, https://www.sec.gov/Archives/edgar/data/27419/000002741926000042/tgt-20260801.htm (last visited September 17, 2026) ("Target Corp., Q2 2026 Form 10-Q").

[9] *Q2 2026 Target Corp Earnings Call*, TARGET CORPORATE (Aug. 19, 2026) at 13, https://corporate.target.com/getmedia/d01cb805-63cb-4150-bae4-8d717f0d9ed3/Q2-2026-Target-Corp-Earnings-Call.pdf (last visited September 17, 2026) ("Target Corp., Q2 2026 Target Corp Earnings Call").

suit, an award of attorneys' fees, and such other and further relief as this Court deems just and proper.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs. The proposed Class comprises more than 100 members. At least one member of the Class is a citizen of a state different from Defendant's state of citizenship, and therefore minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

9. This Court has personal jurisdiction over Defendant because Target maintains a continuous and systematic business presence in this District, including the operation of several retail stores and the sale and distribution of general merchandise to consumers throughout this District.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District.

## PARTIES

11. Plaintiff Ryan Schavrien is a citizen and resident of the State of California, residing in Loma Linda, California. From February 1, 2025, to February 24, 2026 (the "Class Period"), Plaintiff purchased products, including several grocery items, from Target on more than forty separate occasions, totaling more than $2,000, through in-store purchases at Target's Redlands, Fontana, San Bernardino, and Kearny Mesa stores in California, and through online purchases on target.com and the Target app fulfilled by Drive Up, Order Pickup, and delivery.[10]

[10] During the times relevant to this action, Plaintiff's in-store purchases total $1,541.57; Plaintiff's online purchases total $655.43; Plaintiff's total purchases are $2,197.00.

Plaintiff paid a higher price for these products than Plaintiff would have paid but for Defendant's pass-through of the unlawful IEEPA tariff costs.

12. Plaintiff shops at Target on a weekly basis. During the Class Period, Plaintiff observed that prices for Target products had increased. Often, the increased price of an item affected Plaintiff's decision whether to purchase it, with Plaintiff considering whether the item was needed immediately or whether the purchase could be postponed. Plaintiff would not have purchased the products, or would have paid less for them, had Target disclosed that its prices reflected tariff costs that Target could recover from the government.

13. Defendant Target Corporation is a corporation organized under the laws of the State of Minnesota, with its principal place of business at 1000 Nicollet Mall, Minneapolis, Minnesota 55403. Target was incorporated in Minnesota in 1902. It sells and distributes general merchandise through its retail stores in the United States and online at https://www.target.com.[11]

## FACTUAL ALLEGATIONS

### I. OVERVIEW OF THE IEEPA TARIFF

14. During the 2024 presidential campaign, then-candidate Donald Trump publicly advocated for substantial tariffs on goods imported into the United States. Following the election, those proposals continued to form a central component of the Trump Administration's trade policy.[12]

15. A succession of executive orders beginning February 1, 2025, invoked IEEPA as authority for import duties. From April 10 to May 14, 2025, the baseline tax on imports from most global trading partners was held at 10 percent; however,

---

[11] Target Corp. 10-K at 2, 50.

[12] Alan Wm. Wolff, *Trump's proposed blanket tariffs would risk a global trade war*, PETERSON INST. FOR INT'L ECON. (May 29, 2024) https://www.piie.com/blogs/realtime-economics/2024/trumps-proposed-blanket-tariffs-would-risk-global-trade-war (last visited September 17, 2026).

tariffs on Chinese merchandise skyrocketed to a combined 145 percent, compounding a 20 percent supply-chain penalty with an aggressive 125 percent reciprocal tariff.[13]

16. On May 28, 2025, the U.S. Court of International Trade held that the President had exceeded the authority granted to him under IEEPA. *See V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025). The Federal Circuit affirmed in relevant part on August 29, 2025. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (*en banc*). On February 20, 2026, the Supreme Court held that IEEPA does not authorize the President to impose tariffs. *See Learning Resources, Inc. v. Trump*, 607 U.S. 229, 255 (2026).

17. On February 22, 2026, CBP announced that it would cease collecting duties imposed pursuant to IEEPA at 12:00 a.m. Eastern Time on February 24, 2026.[14]

---

[13] See Exec. Order No. 14193, *Imposing Duties to Address the Flow of Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 9113 (Feb. 1, 2025); Exec. Order No. 14194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 1, 2025); Exec. Order No. 14195, *Imposing Duties to Address Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025); Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041 (Apr. 2, 2025). *See also* Christopher A. Casey et al., *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, *Cong. Rsch. Serv. R45618*, CONGRESS.GOV (Sept. 1, 2025) https://www.congress.gov/crs-product/R45618 (last visited September 17, 2026).

[14] Exec. Order No. 14389, *Ending Certain Tariff Actions*, 91 Fed. Reg. 9437 (Feb. 20, 2026), *also available at: Ending Certain Tariff Actions: Executive Order 14389*, THE WHITE HOUSE (Feb. 2026), https://www.whitehouse.gov/presidential-actions/2026/02/ending-certain-tariff-actions/ (last visited September 17, 2026).

18. Collections under the program totaled approximately $166 billion across more than 53 million entries made by more than 330,000 importers.[15] Analysts estimated that U.S. consumers would bear approximately two-thirds of the cost of the tariffs.[16] Thus, although the tariffs were imposed and collected from importers at the border, a substantial portion of their economic burden was ultimately borne by consumers through higher prices.

## II. TARGET'S CONDUCT IN RESPONSE TO THE IEEPA TARIFFS

19. Target is a significant importer of consumer merchandise into the United States. Approximately one-half of the merchandise Target offers is sourced from outside the United States, either directly or through its vendors, with China as the single largest source of the merchandise Target imports.[17] Target generated approximately $104.8 billion in net sales in fiscal year 2025 and operates roughly 2,000 stores in addition to its digital sales channels. Target's scale, therefore, placed it among the retailers most substantially exposed to the IEEPA tariffs.[18]

20. Target also served as the importer of record for merchandise subject to the IEEPA tariffs, including merchandise sold under Target's owned and exclusive

---

[15] Declaration of Brandon Lord ¶ 12, *Atmus Filtration, Inc. v. United States*, No. 1:26-cv-01259 (Ct. Int'l Trade), ECF No. 31 (Mar. 6, 2026), https://www.courtlistener.com/docket/72339861/31/atmus-filtration-inc-v-united-states/ (last visited September 17, 2026).

[16] Nick Lichtenberg, *Goldman Sachs doubles down on tariff research that infuriated Trump, saying average Americans will bear two-thirds of the costs*, FORTUNE (Aug. 13, 2025), https://fortune.com/2025/08/13/goldman-sachs-tariffs-donald-trump-david-solomon-dj/ (last visited September 17, 2026).

[17] Target Corp. 10-K at 5, 15, 27.

[18] *Target Corporation Reports Fourth Quarter and Full-Year 2025 Earnings*, PR NEWSWIRE (Mar. 3, 2026), https://www.prnewswire.com/news-releases/target-corporation-reports-fourth-quarter-and-full-year-2025-earnings-302701681.html (last visited September 17, 2026).

brands. As importer of record, Target was responsible for customs compliance and for paying the applicable duties to CBP.

21. Target's own securities filings address both the increase in its costs and its pricing response. In its Annual Report, Target stated that tariffs imposed or threatened to be imposed on several countries in 2025, including China, India, Vietnam, and Bangladesh, "have resulted, and could continue to result, in us incurring substantial additional costs to procure a large portion of the merchandise we offer and impact the margin rate for certain products, raising prices on certain products, and starting new vendor relationships in other countries."[19]

22. Target has further stated that it employs "a range of tariff mitigation strategies, including supplier negotiations, sourcing diversification, and ongoing evaluation of assortment and pricing decisions."[20] Those disclosures confirm that Target did not merely incur tariff costs passively; it actively evaluated pricing and other commercial decisions in response to those costs.

23. Target's executives told the public that the tariffs would raise the prices its customers paid. On March 4, 2025, following the Company's fourth-quarter earnings announcement, then-Chief Executive Officer Brian Cornell stated that "the consumer will likely see price increases over the next couple of days" and that "[i]f there's a 25% tariff, those prices will go up."[21]

24. On the same day, Chief Commercial Officer Rick Gomez described how Target would allocate those increases across its assortment. As reported, Gomez explained that Target sells $3 Christmas ornaments and did not want that

[19] Target Corp. 10-K at 15.

[20] Target Corp. 10-K at 5.

[21] Sasha Rogelberg, *Target CEO joins swarm of Fortune 500 retail executives warning of bigger bills as Trump's tariff fallout hits the grocery aisle*, FORTUNE (Mar. 4, 2025), https://fortune.com/2025/03/04/target-fortune-500-ceo-trump-tariff-price-increase/ (last visited September 17, 2026).

price to rise to $3.60, so it might instead raise the price of holiday stockings, and that Target wanted to hold the price of its $5 T-shirts, so it might look to dresses, where there was more flexibility to raise prices. Gomez stated that "[i]t's not as simple as just flowing through cost," and that Target had "to think about this from a consumer perspective and make sure that our pricing architecture makes sense and puts us in a place where we have affordable options."[22]

25. Under the approach Gomez described, Target contemplated maintaining the price of certain products while increasing the price of different products. Thus, rather than simply passing increased costs through to the particular products affected, Target contemplated reallocating price increases across its broader assortment.

26. Target's tariff costs and its pricing response were reflected in its reported results. On Target's August 19, 2026, earnings call, Chief Financial Officer Jim Lee described Target's full-year adjusted operating margin rate of 4.6 percent in 2025 as reflecting "our investment in value in the face of meaningfully higher tariff costs we faced."[23] Target's disclosures therefore confirm both sides of the relevant economic relationship: the tariffs increased Target's costs, and Target made pricing decisions in response to those increased costs.

27. Following the Supreme Court's decision in *Learning Resources, Inc.*, Target disclosed that it was "evaluating the ruling and potential actions available to us" and that, because "the process, timing, and amount of any recovery are uncertain," it was "unable to estimate the financial effects, if any, at this time."[24]

---

[22] Anne D'Innocenzio, *Target posts strong Q4 profits and sales, but warns of cautious spending as tariffs take hold*, ASSOCIATED PRESS (Mar. 4, 2025), https://apnews.com/article/target-inflation-tariffs-economy-minnesota-345efc8c9edc03994f13dd6d624c719b (last visited September 17, 2026).
[23] Target Corp., Q2 2026 Target Corp Earnings Call at 8.
[24] Target Corp. 10-K at 27.

Target repeated that disclosure in substance in Note 28 to its consolidated financial statements, where it stated that "Target is the importer of record for certain merchandise that was previously subject to such tariffs under IEEPA."[25] The disclosure is significant because Target identified itself as the importer of record, and therefore the entity positioned to pursue recovery of duties that had been paid at the border, even though the economic burden of those duties had been reflected in prices paid by consumers.

28. Target thereafter obtained the refunds. In its quarterly report for the period ended May 2, 2026, Target stated that it was "following the established refund filing and validation process through the CAPE system," that no refunds had yet been received, and that "[s]ubsequent to quarter-end, we began receiving refunds."[26] For the quarter ended August 1, 2026, Target recognized $994 million in IEEPA tariff refunds as a reduction of Cost of Sales, and stated that it "continue[s] to pursue additional refund claims."[27]

29. Target reported those refunds to its shareholders as earnings. Target stated that its second-quarter 2026 results included "$994 million of pretax tariff refund benefits within gross margin and operating income," that those gains "contributed $752 million to net earnings and $1.65 to both GAAP and Adjusted EPS," and that second-quarter operating income, "which included a $994 million benefit from tariff refunds, was $2.6 billion, compared with prior-year operating income of $1.3 billion."[28] On the same day, Target raised its full-year earnings-per-

---

[25] *Id.* at 72 (Note 28, Subsequent Event).

[26] Target Corp., Q1 2026 Form 10-Q at 14.

[27] Target Corp., Q2 2026 Form 10-Q, Note 3, at 9.

[28] *Target Corporation Reports Second Quarter Earnings,* TARGET CORPORATE (Aug. 19, 2026), https://corporate.target.com/press/release/2026/08/target-corporation-reports-second-quarter-earnings (last visited September 17, 2026) ("Target Corp., Target Corporation Reports Second Quarter Earnings").

share guidance from a range of $7.50 to $8.50 to a range of $9.90 to $10.90, a range that includes the $1.65 per share attributable to the tariff refunds.[29] Thus, the refunds were not merely a theoretical future benefit: Target had already received and recognized nearly $1 billion of tariff refunds, and those refunds directly reduced its reported costs and increased its reported earnings.

30. Target has not returned any portion of the tariff-related overcharges to the consumers who paid them. Neither Target's Annual Report, nor its quarterly reports, nor its second-quarter 2026 earnings materials states that Target will refund, credit, or otherwise return to consumers any portion of the IEEPA tariff refunds it has received or expects to receive.[30] Nor has Target disclosed any mechanism by which consumers who bore the tariff-related price increases will receive any corresponding benefit from the refunds Target has obtained.

31. Target maintains transaction-level records through which the consumers who paid tariff-inflated prices, and the amounts they paid, may be identified, including point-of-sale records, digital order histories, and records associated with its Target Circle loyalty program and Target Circle Card. Those records include information concerning the merchandise purchased, the prices charged, the timing of the transactions, and, for many transactions, the identity of the purchaser. Target already uses this information for pricing, merchandising, and customer-management purposes.

32. Target's own statements and subsequent conduct therefore establish a straightforward sequence. Target incurred IEEPA tariff costs as an importer of record; Target told consumers that tariffs would result in higher prices; Target expressly described spreading tariff-related costs across its assortment; consumers

---

[29] Target Corp., Q2 2026 Target Corp Earnings Call at 9.

[30] Target Corp. 10-K at 72; Target Corp., Q2 2026 Form 10-Q, Note 3, at 9; Target Corp., Target Corporation Reports Second Quarter Earnings.

paid those higher prices; the Supreme Court subsequently held that the IEEPA tariffs were unauthorized; and Target then began recovering the duties it had previously paid.

33. The result is that Target has recovered, and continues to pursue recovery of, tariff amounts for which consumers had already borne an economic charge through the prices they paid. Target's receipt of $994 million in refunds, and its continued pursuit of additional refunds, demonstrates that the recovery is concrete rather than speculative. Unless those recoveries are returned or otherwise credited to the consumers who funded the tariff-related price increases, Target will retain both the amounts collected through those increased prices and the corresponding refunds received from the government.

34. Target was also aware, well before the Supreme Court's decision, that the legality of the IEEPA tariffs was being challenged in federal court. The litigation challenging the tariffs was public throughout the period in which Target was assessing tariff costs, adjusting prices, and collecting those costs from consumers. Accordingly, Target had reason to understand that the duties it was collecting from consumers could later be subject to refund, yet its public disclosures concerning the anticipated refunds did not identify any plan to return the corresponding amounts to consumers.

## CLASS ALLEGATIONS

35. Plaintiff brings these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class and Subclass:

> **Nationwide Class:**
> All natural persons in the United States who, between February 1, 2025, and February 24, 2026, purchased from Target one or more products whose price was increased as a result of the IEEPA tariffs imposed on that product or other products.
>
> **California Subclass:**
> All members of the Nationwide Class who purchased from Target one or more products while located in the State of California.

36. Specifically excluded from the Class are Defendant and its officers, directors, agents, trustees, parents, subsidiaries, affiliates, successors, and assigns; all persons who make a timely election to be excluded from the Class; and the judge assigned to this action and any member of the judge's immediate family.

37. Plaintiff reserves the right to amend the Class and Subclass definitions if further investigation and discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified.

38. **NUMEROSITY:** The exact number of Class members is unknown to Plaintiff at this time but is believed to number in the millions, given that Target operated 1,995 stores in the United States as of January 31, 2026, and reported net sales of approximately $104.8 billion in fiscal year 2025. The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members and their identities may be ascertained from records maintained by Defendant.

39. **COMMONALITY:** Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common questions include, but are not limited to:

a. Whether Defendant increased prices on products sold to Class members in response to the IEEPA tariffs;

b. Whether Defendant recovered the IEEPA tariff costs it incurred on imported merchandise by increasing prices on merchandise that was not itself subject to those tariffs;

c. Whether the IEEPA tariffs were unlawful;

d. Whether Defendant sought and received refunds from the United States government for the unlawful IEEPA tariff payments;

e. Whether Defendant retained the benefit of both the price increases charged to consumers and the tariff refunds received from the government;

f. Whether Defendant's conduct was deceptive, unfair, or unconscionable within the meaning of the applicable consumer protection statutes;

g. Whether Defendant was unjustly enriched at the expense of the Class;

h. The proper measure of damages or restitution; and

i. Whether Plaintiff and the Class are entitled to injunctive or declaratory relief.

40. **TYPICALITY:** Plaintiff's claims are typical of the claims of the Class members because Plaintiff, like all Class members, purchased products from Target at prices that were inflated by the pass-through of unlawful IEEPA tariff costs and was thereby injured in the same manner as all other Class members.

41. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has no interests that are antagonistic to or in conflict with the Class. Plaintiff has retained attorneys experienced in class action litigation who will adequately represent the interests of the Class.

42. **SUPERIORITY:** A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The damages suffered by individual Class members are small relative to the burden and expense of individual litigation, making it impracticable for Class members to seek redress individually. Individual litigation would impose an undue burden upon the courts and would create a risk of inconsistent or contradictory rulings, which a class action would avoid. Defendant has acted on grounds generally applicable to the Class, making class-wide relief appropriate under Rule 23(b)(2). The common questions of law and fact identified above predominate over any individual issues, and a class action is a superior method for resolving this controversy under Rule 23(b)(3).

## CAUSES OF ACTION

## COUNT I

### Unjust Enrichment
### (On Behalf of Plaintiff and the Nationwide Class)

43. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

44. Plaintiff brings this cause of action individually and on behalf of all members of the Nationwide Class.

45. Defendant received a tangible economic benefit from the Class by increasing prices on consumer merchandise in order to recoup the costs of the unlawful IEEPA tariffs. The price increases resulted in Plaintiff and the Nationwide Class paying more for Target's products than they otherwise would have paid.

46. Defendant has also sought and obtained refunds of those same IEEPA tariff payments from the United States government. Target recognized $994 million in IEEPA tariff refunds received during the second quarter of 2026, and its Chief

Financial Officer stated that this amount "accounts for the significant majority of IEEPA tariff refunds we applied for to date."[31]

47. Defendant thus retains the benefit of both the overcharges collected from consumers and the refunds recovered from the government for the identical tariff obligations.

48. It would be unjust and inequitable for Defendant to retain the price increases collected from consumers when Defendant has recovered—and continues to seek recovery of—the same tariff costs from the government. Equity and good conscience require that Defendant disgorge or make restitution of the amounts by which it was unjustly enriched.

49. Plaintiff and the Nationwide Class lack an adequate remedy at law and are entitled to restitution and/or disgorgement of all amounts by which Defendant was unjustly enriched.

**COUNT II**

**Money Had and Received**
**(On Behalf of Plaintiff and the Nationwide Class)**

50. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

51. Plaintiff brings this cause of action individually and on behalf of all members of the Nationwide Class.

52. Target recouped a substantial portion of the IEEPA duties it remitted to CBP through increased prices on merchandise sold to Plaintiff and the Class. As a result, the economic burden of those duties was borne by Target's customers rather than by Target.

[31] Target Corp., Q2 2026 Target Corp Earnings Call at 13.

53. The IEEPA tariffs were held unlawful by the Supreme Court of the United States. *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 255 (2026). CBP has established a process through which importers of record may obtain refunds of IEEPA duties, and Target has obtained such refunds.[32]

54. Target has received refunds of IEEPA duties it paid, including $994 million recognized during the second quarter of fiscal 2026.[33] To the extent Target retains the corresponding price increases collected from consumers, it retains money for a cost it no longer bears.

55. Target received money belonging to Plaintiff and the Nationwide Class, benefited from its receipt, and under principles of equity and good conscience should not be permitted to retain it. Plaintiff and the Nationwide Class members are entitled to recover that money in an amount to be determined at trial.

## COUNT III

**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200 et seq.**
**(On Behalf of Plaintiff and the California Subclass)**

56. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

57. Plaintiff brings this cause of action individually and on behalf of all members of the California Subclass.

58. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Plaintiff proceeds under each of the UCL's three prongs.

59. Defendant engaged in unlawful, unfair, and fraudulent business practices by increasing the prices of its products in order to recoup the costs of the

---

[32] Target Corp., Q2 2026 Form 10-Q, Note 3, at 9.
[33] *Id.*

unlawful IEEPA tariffs and by then seeking and receiving refunds of those same tariff payments from the United States government, all while failing to return the overcharges to the consumers who bore them.

60. Plaintiff has standing under the UCL because Plaintiff lost money or property as a result of Defendant's business practices: Plaintiff paid more for Defendant's products than Plaintiff otherwise would have paid. Cal. Bus. & Prof. Code § 17204.

61. Defendant's omissions were material. Target did not disclose to Plaintiff and the California Subclass members that it could recover the tariff costs it was passing through, or that consumers would receive no portion of any such recovery. Plaintiff and the California Subclass members would not have purchased Defendant's products, or would have paid significantly less for them, had they known these facts.

62. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent business practices, Plaintiff and the California Subclass members have been injured in that they paid more for Defendant's products than they would have paid absent the unlawful tariff pass-through.

63. Plaintiff and the California Subclass members lack an adequate remedy at law and seek all available relief under the UCL, including restitution of the amounts by which Defendant was unjustly enriched at their expense, injunctive relief, and reasonable attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5. See Cal. Bus. & Prof. Code § 17203.

## COUNT IV

**Violation of the Minnesota Consumer Fraud Act**
**Minn. Stat. §§ 325F.68 et seq.; Minn. Stat. § 8.31, subd. 3a**
**(On Behalf of Plaintiff and the Nationwide Class)**

64. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

65. Plaintiff brings this cause of action individually and on behalf of all members of the Nationwide Class.

66. The Minnesota Consumer Fraud Act ("MCFA") prohibits "[t]he act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69, subd. 1. Minnesota's private attorney general statute permits "any person injured by a violation" of the MCFA to "bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court." Minn. Stat. § 8.31, subd. 3a.

67. Target is a Minnesota corporation headquartered in Minneapolis, Minnesota. The pricing decisions challenged in this Complaint, including the decision to recover IEEPA tariff costs through increased retail prices and the decision to retain the resulting overcharges after obtaining tariff refunds from the government, were made at and directed from Target's Minnesota headquarters.

68. Target engaged in unfair and unconscionable practices, and made misleading statements and material omissions, in connection with the sale of merchandise by increasing the prices of its products in order to recoup the costs of the unlawful IEEPA tariffs, and by then seeking and obtaining refunds of those

same tariff payments from the United States government while failing to return the overcharges to the consumers who bore them.

69. Target's omissions were material. Target did not disclose to Plaintiff and the Nationwide Class members that it could recover the tariff costs it was passing through, or that consumers would receive no portion of any such recovery. Plaintiff and the Nationwide Class members would not have purchased Target's products, or would have paid significantly less for them, had they known these facts.

70. The conduct alleged affected millions of consumers who purchased merchandise from Target during the Class Period, and the relief sought would require Target to return tariff-related overcharges collected from the public at large rather than from a single purchaser in an isolated transaction.

71. The relief sought provides a public benefit by remedying deceptive retail pricing disclosures and pass-through surcharge retention affecting the public at large.

72. As a direct and proximate result of Target's conduct, Plaintiff and the Nationwide Class members have been injured in that they paid more for Target's products than they would have paid absent the unlawful tariff pass-through.

73. Plaintiff and the Nationwide Class members lack an adequate remedy at law and seek all relief available under Minn. Stat. § 8.31, subd. 3a, including damages, injunctive and other equitable relief, costs and disbursements, costs of investigation, and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. An order certifying the Class and Subclass as defined herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

b. An order declaring that Defendant's conduct, as described herein, violates the statutes and common law principles referenced herein;

c. An award of compensatory damages to Plaintiff and the Class in an amount to be determined at trial, representing the tariff-related overcharges paid by the Class;

d. An order of restitution and/or disgorgement requiring Defendant to disgorge all amounts by which it was unjustly enriched through the dual recovery of tariff costs from consumers and tariff refunds from the government;

e. An award of statutory damages, and/or penalties to the extent available under applicable law;

f. An award of pre-judgment and post-judgment interest on all amounts awarded;

g. An award of reasonable attorneys' fees and costs;

h. Injunctive relief requiring Defendant to return to consumers the tariff-related overcharges upon receipt of tariff refunds from the government; and

i. Such other and further relief as this Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: September 17, 2026

**LEVI & KORSINSKY, LLP**

By: */s/ Jason M. Ingber*
Jason M. Ingber (SBN 318323)
3580 Wilshire Boulevard, Suite 1260
Los Angeles, California 90010-2513
Telephone: (213) 805-8373
Email: jingber@zlk.com

Mark Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mjensen@zlk.com

*Attorneys for Plaintiff and the Proposed Class*

**pro hac vice* forthcoming

ACCO,(ACCVx),DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Eastern Division − Riverside)
# CIVIL DOCKET FOR CASE #: 5:26−cv−05427−JGB−ACCV

Ryan Schavrien v. Target Corporation
Assigned to: Judge Jesus G. Bernal
Referred to: Magistrate Judge Angela C. C. Viramontes
Cause: 28:1332 Diversity−Personal Injury

Date Filed: 09/17/2026
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Ryan Schavrien**
*individually and on behalf of all others similarly situated*

represented by **Jason M. Ingber**
Levi and Korsinsky, LLP
3580 Wilshire Boulevard, Ste 1260
Los Angeles, CA 90010
310−270−0089
Fax: 212−363−7500
Email: jingber@zlk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Target Corporation**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/17/2026 | 1 | COMPLAINT Receipt No: ACACDC−43340634 − Fee: $405, filed by Plaintiff RYAN SCHAVRIEN. (Attorney Jason M. Ingber added to party RYAN SCHAVRIEN(pty:pla))(Ingber, Jason) (Entered: 09/17/2026) |
| 09/17/2026 | 2 | CIVIL COVER SHEET filed by Plaintiff RYAN SCHAVRIEN. (Ingber, Jason) (Entered: 09/17/2026) |
| 09/17/2026 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff RYAN SCHAVRIEN. (Ingber, Jason) (Entered: 09/17/2026) |
| 09/28/2026 | 4 | WAIVER OF SERVICE Returned Executed filed by Plaintiff RYAN SCHAVRIEN. upon TARGET CORPORATION waiver sent by Plaintiff on 9/22/2026, answer due 11/23/2026. Waiver of Service signed by Meredith C. Slawe. (Ingber, Jason) (Entered: 09/28/2026) |
| 09/29/2026 | 5 | NOTICE OF ASSIGNMENT to District Judge Jesus G. Bernal and Magistrate Judge Angela C. C. Viramontes. (jp) (Entered: 09/29/2026) |
| 09/29/2026 | 6 | NOTICE TO PARTIES OF COURT−DIRECTED ADR PROGRAM filed. (jp) (Entered: 09/29/2026) |
| 09/29/2026 | 7 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (jp) (Entered: 09/29/2026) |
| 10/01/2026 | 8 | STANDING ORDER upon filing of the complaint by Judge Jesus G. Bernal. (ima) (Entered: 10/01/2026) |