## U.S. District Court
## Middle District of Florida (Tampa)
## CIVIL DOCKET FOR CASE #: 8:26-cv-02642-JSM-GDP

Mauldin v. Walmart, Inc.
Assigned to: Judge James S. Moody, Jr
Referred to: Magistrate Judge Gregory D. Pizzo
Cause: 28:1332 Diversity-Deceptive Trade Practices

Date Filed: 09/10/2026
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Kathy Mauldin** represented by **Michael Jay Fuller , Jr**
Farrell & Fuller LLC
270 Munoz Rivera Avenue
Suite 201
San Juan
Puerto Rico
939-293-8244
Fax: 939-293-8245
Email: mike@farrellfuller.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Walmart, Inc.**

| # | Docket Text | Date Filed |
|---|---|---|
| 1 | COMPLAINT against Walmart, Inc. with Jury Demand (Filing fee $405 receipt number AFLMDC-25531611) filed by Kathy Mauldin. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons )(Fuller, Michael) Modified text on 9/14/2026 (LSS). (Entered: 09/10/2026) | 09/10/2026 |
| 2 | NEW CASE ASSIGNED to Judge James S. Moody, Jr and Magistrate Judge Gregory D. Pizzo. New case number: 8:26-cv-02642-JSM-GDP. (LSS) (Entered: 09/14/2026) | 09/14/2026 |
| 3 | SUMMONS issued as to Walmart, Inc. (LSS) (Entered: 09/14/2026) | 09/14/2026 |
| 4 | RETURN of service executed on 09/23/2026 by Kathy Mauldin as to Walmart, Inc.. (Fuller, Michael) (Entered: 09/25/2026) | 09/25/2026 |
| 5 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint by Walmart, Inc.. (Webb, Joshua) (Entered: 10/07/2026) | 10/07/2026 |
| 6 | ENDORSED ORDER granting 5 Motion for Extension of Time to Answer. Walmart, Inc.'s deadline to respond to the Complaint is extended up to and including November 20, 2026. Signed by Judge James S. Moody, Jr on 10/7/2026. (JG) (Entered: 10/07/2026) | 10/07/2026 |
| 7 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Kathy Mauldin. (Fuller, Michael) (Entered: 10/20/2026) | 10/20/2026 |
| 8 | Unopposed MOTION for Carolyn Anne DeLone to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC-25736389 for $150 by All Defendants. (Webb, Joshua) Motions referred to Magistrate Judge Gregory D. Pizzo. (Entered: 10/21/2026) | 10/21/2026 |
| 9 | Unopposed MOTION for Rebecca Wilton to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC-25736498 for $150 by All Defendants. (Webb, Joshua) Motions referred to Magistrate Judge Gregory D. Pizzo. (Entered: 10/21/2026) | 10/21/2026 |
| 10 | Unopposed MOTION for Katherine Wellington to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC-25736532 for $150 by All Defendants. (Webb, Joshua) Motions referred to Magistrate Judge Gregory D. Pizzo. (Entered: 10/21/2026) | 10/21/2026 |
| 11 | DISCLOSURE STATEMENT under Rule 7.1, Federal Rules of Civil Procedure, and Local Rule 3.03 by Walmart, Inc.. (Webb, Joshua) (Entered: 10/21/2026) | 10/21/2026 |
| 12 | ENDORSED ORDER granting [8] Motion to Appear Pro Hac Vice by Carolyn Anne DeLone; granting [9] Motion to Appear Pro Hac Vice by Rebecca Wilton; granting [10] Motion to Appear Pro Hac Vice by Katherine Wellington. Signed by Magistrate Judge Gregory D. Pizzo on 10/23/2026. (MEM) (Entered: 10/23/2026) | 10/23/2026 |

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**HILLSBOROUGH DIVISION**

KATHY MAULDIN, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

Case No.:

v.

**COMPLAINT AND**
**JURY TRIAL DEMANDED**

WALMART, INC.,

Defendant.

____________________________________/

## COMPLAINT

Plaintiff Kathy Mauldin ("Plaintiff") on behalf of herself and all others similarly situated, by and through undersigned counsel, bring this action against Defendant Walmart, Inc. ("Defendant"). The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to themselves and their own actions and counsel's investigations, and upon information and belief as to all the other matters, are as follows:

## I. INTRODUCTION

1. This action is brought on behalf of Plaintiff, and others similarly situated, that purchased goods sold by Defendant throughout the United States, who bore the economic burden of tariffs imposed by the President Donald Trump ("Trump") Administration's under the International Emergency Economic Powers Act ("IEEPA") (50 U.S.C. § 1701, et seq.), and against Defendant who shifted the economic burden of the IEEPA tariffs to consumers throughout the United States by increasing prices on imported goods as well as U.S.-sourced goods not subject to the tariffs. Defendant now receives an inequitable windfall by recovering from the federal

government tariff costs that Defendant passed on to consumers, like Plaintiff, who purchased goods from Defendant, and therefore, are the real parties in interest to the IEEPA tariff refunds.

2. Walmart, Inc. collected hundreds of millions of dollars in unlawful tariffs from consumers by raising prices on imported goods and U.S.-sourced goods while the Trump Administration IEEPA tariffs were in effect.

3. The tariff refund process, set in place by the federal government after the United States Supreme Court struck down the IEEPA tariffs, permits only the importer of record ("IOR") to apply for and receive a refund for any moneys paid for the import of goods. However, Defendant, as IOR, shifted the cost of these tariffs to its customers by way of price increases to products subject to tariffs and items not subjected to tariffs. Thus, it is Plaintiff and similarly situated consumers who bore the tariff costs in the first place.

4. Defendant has not returned *any* portion of those costs it passed on to consumers, and it has no intention of doing so. It has, in short, generated and retained a windfall from unlawful government action, and consumers—not Defendant—are the ones left paying for it.

5. This dispute arises from a fundamental inequity in the tariff refund process. Only the IOR may seek a refund for an unlawfully assessed tariff—but IORs merely advance the tariff cost at the border and recoup all or a substantial part of it through higher consumer prices. In economic reality, the consumer paid the illegal tariff.

6. This inequity is compounded when, as here, a tariff is struck down by the courts. Consumers, who bore the true economic burden, have no direct avenue for redress—they both lack a statutory cause of action in the Court of International Trade ("CIT") and standing to seek a refund. That right belongs exclusively to Defendant as the IOR, regardless of who actually paid. As designed, the refund process establishes that large corporations that passed the entire tariff cost

Case MDL No. 3202 Document 1-3 Filed 06/11/26 Page 4 of 22

onto their customers remain exclusively entitled to recover a full refund of tariffs the Supreme Court has since declared unlawful.

7. This lawsuit seeks to force Defendant to return funds collected from millions of consumers to cover IEEPA tariffs between February 2025 and February 2026. Defendant has made no commitment to compensate consumers for those payments. This act fails to reimburse consumers for the portion of the unlawful tariff that was forced upon them by Defendant's across-the-board price increases, and also unfairly enriches Defendant at the expense of consumers.

8. Plaintiff seeks a judgment that requires Defendant to return to Plaintiff, and others similarly situated, all IEEPA duties passed on to customers in the form of higher prices on products, with interest.

9. Plaintiff also seeks restitution of the tariff and tariff-related overcharges she, and others similarly situated, paid, or a proportionate share of any tariff refund Defendant recovers, together with interest, reasonable attorneys' fees, and costs.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events, omissions, and misrepresentations giving rise to Plaintiff's claims occurred in this District. Defendant has marketed, advertised, made available for sale, and shipped products subject to IEEPA tariffs within this District.

Case MDL No. 3202 Document 1-3 Filed 11/02/26 Page 5 of 22

## III. PARTIES

### A. Plaintiff

12. Plaintiff Kathy Mauldin is a resident of Ruskin, Florida. During the Class Period, Plaintiff purchased goods such as groceries and packaged foods and beverages, household cleaning and paper products, health and personal-care products, apparel and accessories, home goods, and pet supplies, directly from Defendant at its retail store located at 4928 State Road 674, Wimauma, FL 33598, and through Defendant's other retail channels. Some or all of these products were imported from countries subject to IEEPA tariffs and sold at prices inflated by Defendant's pass-through of IEEPA tariff costs. Plaintiff also purchased other products that were sourced from within the United States and, while not subject to tariffs, were sold at inflated prices, due to Defendant spreading the IEEPA tariff costs across its product line, so that purchasers of non-tariffed domestic goods also bore the tariff burden.

### B. Defendant

13. Walmart, Inc. ("Walmart") is an American national consumer goods company that conducts business in all 50 states. Defendant is a Delaware corporation with principal executive offices located at 1 Customer Drive, Bentonville, Arkansas 72716. Walmart, Inc. is one of the world's largest retail companies. At all relevant times, Defendant operated a brick and mortar and online store through which it sold imported products and U.S.-sourced products directly to consumers. Between February 4, 2025, and February 20, 2026, Defendant collected tariff costs from those consumers on goods subject to tariffs imposed under the IEEPA as well as goods not subject to tariffs imposed under IEEPA. On information and belief, the misconduct alleged herein originated from and was directed out of Defendant's headquarters and principal place of business in Bentonville, Arkansas.

## IV. FACTUAL ALLEGATIONS

### A. Defendant is an Enormous Retailer of Imported Good and U.S.-Sourced Goods

14. Defendant is a major retailer that imports a substantial volume of consumer goods into the United States and sells them to consumers throughout the country through both its physical locations and its online store.

15. Defendant purchases the goods it sells wholesale from vendors, suppliers, and manufacturers, including but not limited to, a substantial volume of goods imported from outside the United States, and resells them to consumers in its brick and mortar and online stores. Defendant owns the inventory it offers for sale and sets the retail prices its customers pay.

16. For the imported goods it sells, Defendant's involvement begins before the goods enter the United States. Defendant acts as the IOR who signs the customs declaration, takes legal responsibility for compliance, and pays the tariff to U.S. Customs and Border Protection ("CBP"). On information and belief, Defendant serves as the IOR for a substantial portion of the imported goods it sells.

17. Defendant's product line is not limited to imported goods. Defendant also sources, stocks, and sells a substantial volume of consumer goods that originate within the United States and are not subject to IEEPA tariffs. Defendant offers these U.S.-sourced goods to consumers in its brick and mortar and online stores, alongside its imported goods. As with its imported goods, Defendant owns this inventory and sets the retail prices its customers pay.

18. The IEEPA tariffs increased the costs Defendant incurred on the imported goods for which it serves as the IOR. On information and belief, rather than absorbing those increased costs or confining them to the imported goods that generated them, Defendant recovered the tariff costs by raising prices across its product line, including on U.S.-sourced goods that were never subject to IEEPA tariffs.

19. As a result, Defendant sold its imported goods at prices inflated by its direct pass-through of IEEPA tariff costs and sold its U.S.-sourced goods at prices likewise inflated by Defendant's decision to spread those same tariff costs across its product line.

20. Consumers who purchased U.S.-sourced goods from Defendant therefore bore a portion of the IEEPA tariffs that Defendant incurred on imported goods those consumers never purchased.

**B. The Trump Administration Invokes the IEEPA to Implement Tariffs**

21. On February 4, 2025, Trump issued an executive order imposing a 10% tariff on Chinese imports.[1] In March 2025, Trump issued two more executive orders imposing a 25% tariff on goods imported from Canada and Mexico respectively.[2] By April 2025, the Trump Administration had imposed tariffs on imports from most other U.S. trading partners.

22. The Trump Administration invoked the IEEPA as the legal basis for these tariffs. The IEEPA was originally designed to allow the President to regulate international commerce during declared national emergencies.[3] The Trump Administration pointed to drug trafficking across U.S. borders and the persistent American trade deficit as the legal emergencies justifying the IEEPA tariffs.[4]

23. The IEEPA tariffs did not operate in isolation. For example, for much of 2025, the effective rate on most Chinese electronics was approximately 45%: a 20% IEEPA layer on top of

---

[1] Andrea Shalal; Trump launches trade war with tariffs on Mexico, Canada and China. Reuters (Feb. 1, 2025) (https://www.reuters.com/business/trump-readies-order-steep-tariffs-goods-mexico-canada-china-2025-02-01/)
[2] *Id.*
[3] Christopher A. Casey, Library of Congress, R-45618, The International Emergency Economic Powers Act: Origins, Evolution, and Use (https://www.congress.gov/crs-product/R45618)
[4] Id. at *supra* note 1.

an already existing 25% Section 301 tariff.[5] At the peak of the escalation in early May 2025, average U.S. tariffs on Chinese imports reached 127.2%.[6]

24. On April 3, 2025, within days of the IEEPA tariffs going into effect, the first lawsuit challenging their legality was filed.[7] Despite palpable fear from business groups of incurring Trump's wrath,[8] other lawsuits would eventually follow.[9] These filings were widely reported and as a major retailer, Defendant certainly tracked their progress.[10]

25. On February 20, 2026, the U.S. Supreme Court issued its opinion in *Learning Resources, Inc. v. Trump* holding that the IEEPA did not authorize the President to impose the IEEPA tariffs and that they were void, *ab initio*.[11]

26. The Supreme Court's decision in *Learning Resources* eliminated the legal basis for the IEEPA tariffs and created a pathway for IORs like Defendant to seek refunds of the tariffs previously collected by the federal government.

### C. Consumers Incurred Price Increases on Defendant's Products While the IEEPA Tariffs Were in Effect

27. The IEEPA tariffs increased the costs that retailers, including Defendant, incurred on imported goods. Across the retail industry, companies responded by passing those increased costs on to consumers through higher prices. A survey of U.S. CEOs found that a majority had

---

[5] Section 301 of the US Trade Act of 1974 authorizes the President to take all appropriate action, including tariffs, to remove a foreign government's practice that violates an international trade agreement and that restricts US commerce. 19 U.S.C. § 2411. Trump implemented Section 301 tariffs in 2018.

[6] Chad P. Bown, US-China Trade War Tariffs: An Up-to-Date Chart, Peterson Institute for International Economics (Nov. 14, 2025) (https://www.piie.com/research/piie-charts/2019/us-china-trade-war-tariffs-date-chart)

[7] *Emily Ley, Paper, Inc., d/b/a Simplified v. Trump*, No. 3:25-cv-464-TKW-ZCB (N.D. Fla. Apr. 3, 2025).

[8] Caitlin Oprysko¸ 'Everyone is terrified': Business and government officials are afraid to cross Trump on tariffs, Politico (Apr. 4, 2025) (https://www.politico.com/news/2025/04/04/trump-tariffs-fear-lobby-business-congress-00006608)

[9] See. e.g. Doug Palmer¸ Trump's tariffs could face more than one legal challenge, Politico (Apr. 3, 2025), (https://www.politico.com/news/2025/04/04/first-lawsuit-filed-against-trumps-tariffs-00273646) Larry Neumeister, A dozen states sue the Trump administration to stop tariff policy, Associated Press (Apr. 23, 2025) (https://apnews.com/article/tariffs-lawsuit-what-states-sue-0d6531b7f60aaa2f7c6c35e0a944d4a9)

[10] *Id.*

[11] *Learning Resources, Inc. v. Trump*, 607 U.S. ___, 146 S. Ct. 628 (2026) (slip op. at 20).

already raised prices or were considering doing so in response to the tariffs,[12] and major retailers publicly announced tariff-driven price increases throughout 2025 and into 2026.[13]

28. Independent economic analysis confirms that a substantial portion of the tariff costs was passed through to U.S. consumers during the relevant period. The Federal Reserve found that pass-through to consumers for goods imported from China was at least 30 percent between April and December 2025.[14] Federal Reserve Bank of New York research found that U.S. businesses and consumers together bore nearly 90 percent of the cost of the 2025 tariffs.[15]

29. These price increases were not confined to imported goods. Analyses of retail pricing found that prices rose on both imported and domestically produced goods as retailers spread tariff-related costs across their product lines.[16] Researchers estimated that tariff pass-through added roughly 0.7 percentage points to the Consumer Price Index by September 2025, and that the lowest-priced product varieties saw the steepest increases (around 5 percent) because retailers had the least room to absorb the cost in their margins.[17]

30. The cumulative burden on consumers was enormous. After years of moderating prices, consumer goods prices rose throughout 2025 and into 2026.[18] According to the Budget Lab at Yale University, tariffs accounted for an estimated 86% of the rise in prices for imported

---

[12] *Here Are the Retailers Raising Prices as Trump Tariffs Take Hold*, CNBC (May 31, 2025), (https://www.cnbc.com/2025/05/31/trump-tariffs-here-are-the-retailers-raising-prices.html) (reporting the Chief Executive Group/AlixPartners survey of U.S. CEOs and individual retailer price-increase announcements).

[13] Megan Cerullo, *Walmart and Other Big Companies Say Tariffs Are Forcing Them to Hike Prices*, CBS News (Feb. 20, 2026) (https://www.cbsnews.com/news/walmart-trump-tariffs-general-merchandise-inflation/)

[14] *The Slow Climb: How Tariffs Gradually Raised Retail Prices in 2025*, Bd. of Governors of the Fed. Reserve Sys., FEDS Notes (Mar. 5, 2026) (https://www.federalreserve.gov/econres/notes/feds-notes/the-slow-climb-how-tariffs-gradually-raised-retail-prices-in-2025-20260305.html)

[15] Cerullo, *Walmart and Other Big Companies*, supra (reporting Federal Reserve Bank of New York research that U.S. businesses and consumers together bore nearly 90% of the cost of the 2025 tariffs).

[16] *Are Tariffs Raising U.S. Retail Prices?* (updated), Econofact (Dec. 5, 2025) (https://econofact.org/are-tariffs-raising-u-s-retail-prices) (summarizing the Cavallo/Harvard Business School Pricing Lab analysis of online pricing at five major U.S. retailers, including price increases on domestically produced goods).

[17] *Id.*

[18] Yale Budget Lab, *Tracking the Economic Effects of Tariffs* (https://budgetlab.yale.edu/research/tracking-economic-effects-tariffs)

household goods, with the effect most pronounced for long-lasting durable goods such as cars, appliances, and furniture.[19] American consumers paid more than $231 billion in tariff costs between February 2025 and January 2026, an average of roughly $1,745 per family.[20]

31. Defendant's product line is not limited to imported goods. Defendant also sources, stocks, and sells a substantial volume of consumer goods that originate within the United States and are not subject to IEEPA tariffs, which it offers to consumers alongside its imported goods. As with its imported goods, Defendant owns this inventory and sets the retail prices its customers pay.

32. The IEEPA tariffs increased the costs Defendant incurred on the imported goods for which it serves as the IOR. On information and belief, rather than absorbing those increased costs or confining them to the imported goods that generated them, Defendant (like other major retailers) made a business decision to recover the tariff costs by raising prices across its product line, including on U.S.-sourced goods that were never subject to IEEPA tariffs.

33. As a result, Defendant sold its imported goods at prices inflated by its direct pass-through of IEEPA tariff costs and sold its U.S.-sourced goods at prices likewise inflated by its decision to spread those same tariff costs across its product line. Consumers who purchased U.S.-sourced goods from Defendant therefore bore a portion of the IEEPA tariffs that Defendant incurred on imported goods those consumers never purchased.

34. Defendant maintains detailed transaction, pricing, and customer records, including point-of-sale data, online order histories, and payment and loyalty-program records, through which

---

[19] *Id.*

[20] *American Families Have Paid More Than $1,700 Each in Tariff Costs Since Trump Entered Office*, Joint Economic Committee Minority (Feb. 2026) (https://www.jec.senate.gov/public/_cache/files/7cc03e65-d40a-465f-9e88-09dd53d3502f/jec-fact-sheet-on-cost-of-tariffs-for-families-update.pdf)

Defendant is able to identify the consumers who paid tariff-inflated prices during the Class Period and the amount of the increase attributable to the IEEPA tariffs.

35. Within weeks of the IEEPA tariffs taking effect, Defendant stated that it could not absorb the tariff costs and that consumer prices would rise as a result. Douglas McMillon ("McMillon"), Walmart's CEO at the time, stated: "We will do our best to keep our prices as low as possible. But given the magnitude of the tariffs, even at the reduced levels announced this week, we aren't able to absorb all the pressure given the reality of narrow retail margins."[21] He summarized the point without qualification later in the same remarks: "even at the reduced levels, the higher tariffs will result in higher prices".[22]

36. McMillon confirmed that tariffs across Walmart's major import markets were already creating cost pressure, that the pressure began in late April 2025 and accelerated in May 2025, and that the Chinese tariffs had the largest impact:

> The merchandise that we import comes from all over the world from dozens of countries. Other than the US, the other large markets are China, Mexico, Vietnam, India, and Canada. China, in particular, represents a lot of volume in certain categories like electronics and toys. All of the tariffs create cost pressure for us, but the larger tariffs on China have the biggest impact. The cost pressure from all the tariff impacted markets started in late April, and it accelerated in May.

*Q1 2026 Earnings Call Transcript*, Walmart, Inc., at 5. May 15, 2025

37. McMillon further described Walmart's approach to the tariffs, stating: "In some cases, we'll absorb costs within a category or department and not simply pass on a tariff cost attributable to each item individually. We'll be managing mix across items, categories and businesses."[23] Upon information and belief, Defendant also raised prices on U.S.-sourced goods that were not subject to the IEEPA tariffs in order to absorb and recover tariff costs incurred on

---

[21] *Q1 2026 Earnings Call Transcript*, Walmart, Inc., at 4. May 15, 2025.
[22] *Id.* at 4-5.
[23] *Id.* at 5.

imported merchandise, with the result that consumers purchasing U.S.-sourced products not subject to tariffs still paid a share of tariffs assessed on goods they never purchased.

38. Defendant's CFO John Rainey cautioned investors that "[t]he level and speed at which tariff-impacted prices could go up is more extreme than in normal periods."[24]

39. Defendant paid the IEEPA duties directly, at the border, as the goods entered the United States. McMillon explained the mechanics to investors: "When you have an imported item, you pay the tariff at the time it comes through customs. And so the cost is higher, even if the tariff rate comes down later, the cost has been elevated."[25]

40. Defendant was the IOR for merchandise it sold to Plaintiff and the Class. As IOR, Defendant was the party that paid IEEPA duties to the CBP at the time the goods entered the United States.

> ***Gain Contingencies***
>
> The Company engaged in the process established by the U.S. Customs and Border Protection ("CBP") for refunds of tariffs that the Company paid as the importer of record under the International Emergency Economic Powers Act. The Company accounts for such refunds as gain contingencies and recognizes any recovery when the gain is realized or realizable and the related contingencies have been substantially resolved. During the quarter ended July 31, 2026, the Company received approximately $2.9 billion in tariff refunds, primarily in the Walmart U.S. segment, which were recorded as a reduction to cost of sales and represent substantially all of the refunds requested by the Company.

*Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934*.
Walmart, Inc., for the period ended July 31, 2026.[26]

41. Defendant filed for tariff refunds with the CBP and has recovered $2.9 billion in tariff refunds to date.

42. Defendant has not established, announced, or offered any process by which Plaintiff or any Class member may obtain a refund of the tariff costs they paid. Defendant has not invited

[24] *Id.* at 8.
[25] *Id.* at 21.
[26] Retrieved from: https://www.sec.gov/Archives/edgar/data/104169/000010416926000154/wmt-20260731.htm

claims and has not returned any portion of the $2.9 billion in tariff refunds they received from CBP.

43. Plaintiff and Class members paid tariff-inflated prices to Defendant during the Class Period. Defendant now seeks to retain the benefit of those consumer payments while also recovering, and keeping for itself, the government's refund of the same tariffs.

**D. Defendant will receive an unjust windfall from IEEPA Tariff Refunds**

44. Following the Supreme Court's decision in *Learning Resources*, nearly 2,000 importers began attempting to recover tariff refunds from the federal government. On March 4, 2026, the CIT ordered refunds of IEEPA tariffs, holding that "[a]ll importers of record" are "entitled to the benefit" of the Supreme Court ruling that struck down the IEEPA tariffs.[27] The Court ordered CBP to liquidate any and all unliquidated entries subject to IEEPA tariffs "without regard to IEEPA duties," and ordered that "[a]ny liquidated entries for which liquidation is not final shall be reliquidated without regard to IEEPA duties."[28]

45. The Executive Director of CBP's Trade Programs Directorate estimated that as of March 4, 2026, the total amount of IEEPA duties and estimated duty deposits collected pursuant to IEEPA is approximately $166 billion.[29] Given Defendant's size, Defendant is likely entitled to collect hundreds of millions of dollars in refunds on behalf of consumers.

46. Despite being well aware of the numerous challenges to the legality of the IEEPA tariffs, Defendant deceived consumers by not informing consumers that it would not refund duties paid by consumers to cover IEEPA tariffs even if they were later invalidated.

[27] *Atmus Filtration, Inc. v. United States*, No. 1:26-01259, Order at 1 (U.S. Ct. Int'l Trade Mar. 4, 2026), ECF No. 21.
[28] *Id* at 2-3
[29] Atmus, ECF No. 31 at 6.

47. These funds were wrongfully taken from consumers to cover IEEPA tariffs that have since been invalidated.

## V. CLASS ALLEGATIONS

48. Plaintiff brings this action on behalf of herself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief pursuant to federal and state law on behalf of the members of the following Class:

a. **Imported Product Subclass**: All persons who, during the period beginning on February 4, 2025 through February 20, 2026, purchased from Defendant a good that was itself subject to IEEPA tariffs, at a price that Defendant increased to pass through the IEEPA tariffs assessed on that good.

b. **US-Sourced Product Subclass**: All persons who, during the period beginning on February 4, 2025 through February 20, 2026, purchased from Defendant a U.S.-sourced good that was not itself subject to IEEPA tariffs, at a price that Defendant increased to spread, recover, or offset across its product line the IEEPA tariff costs it incurred on its imported goods.

49. Excluded from the Class are the Defendant and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

50. The identity of all products encompassed within the Class definition, i.e., Class Products, are readily identifiable from Defendant's records. The identity of Class members and their purchase records are available through multiple sources, including Class members' own transaction and payment records, Defendant's records of Class Product purchases, and records maintained by PayPal, credit card companies, and other financial institutions.

51. **Numerosity**. Members of the Class are so numerous that joinder is impracticable. Plaintiff believes that there are tens of millions of members of the Class (if not more),

geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

52. **Typicality**. Plaintiff's claims are typical of the claims of other Class members. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiff and all other members of the proposed Class.

53. **Adequate representation**. Plaintiff will represent and protect the interests of the proposed Class both fairly and adequately. She has retained counsel competent and experienced in complex class-action litigation. Plaintiff has no interests that are antagonistic to those of the proposed Class, and her interests do not conflict with the interests of the proposed Class members she seeks to represent.

54. **Commonality**. Common questions of law and fact predominate over questions that may affect only individual Class members because Defendant has acted on grounds generally applicable to the Class and because Class members share a common injury. Determining damages on a class-wide basis is therefore appropriate. The overcharge injuries incurred by Plaintiff and each Class member arose from the same conduct alleged herein.

55. There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

a. Whether the higher prices that consumers paid for products sold by Defendant are attributable to the cost of IEEPA tariffs;

b. Whether Defendant is obligated to return the cost of IEEPA tariffs to the consumers who paid them in the form of higher prices;

c. Whether Defendant's retention of elevated consumer payments constitutes unjust enrichment;

d. Whether Defendant's use of IEEPA tariff-related funds to benefit Defendant's business and political interests was unlawful;

e. Whether Defendant acted unlawfully by upcharging consumers in response to IEEPA tariff-related costs while making statements to the contrary;

f. Whether Defendant's conduct constitutes an unlawful practice under consumer protection statutes by collecting tariff-related surcharges from consumers while misrepresenting its pricing practices and failing to establish a consumer refund mechanism;

g. Whether Defendant's conduct has harmed Plaintiff and the Class uniformly; and

h. The measure of damages available to Plaintiff and the Class due to increased prices caused by Defendant's IEEPA tariff pass-through.

56. Prevention of inconsistent or varying adjudications: Individual prosecution of the claims alleged herein would likely yield inconsistent or varying results, establishing incompatible standards of conduct for Defendant. Certification of the proposed Class would prevent this outcome.

57. **Injunctive Relief**. By way of its conduct described in this complaint, Defendant has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

58. **Predominance and superiority**. A class action is superior to other available means for the fair and efficient adjudication of the Class's claims. The damages suffered by individual Class members are relatively small compared to the burden of individual prosecution of this complex litigation. Individual lawsuits would risk inconsistent judgments and increase delay and expense for all parties. A class action presents fewer administrative difficulties. Class members

are ascertainable through methods typical of class action practice, including Defendant's own records and consumers' proof of purchase.

## VI. CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA") Fla. Stat. §§ 501.201–501.213

59. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 58 as though fully set forth herein.

60. Plaintiff brings this Count on behalf of all Class members.

61. The FDUTPA prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. §501.204.

62. FDUTPA is remedial in nature and is intended to protect consumers and legitimate business enterprises from those who engage in unfair methods of competition or unconscionable, deceptive, or unfair acts or practices in the conduct of trade or commerce. Fla. Stat. §501.202.

63. The elements of a FDUTPA claim are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006).

64. Defendant has committed unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. §501.204, by: (a) increasing charges to Plaintiff and the Class that were the result of illegal tariffs and the retention of sums gained through illegal collection, which is a *per se* violation of FDUTPA; (b) unlawfully and unfairly charging customers inflated prices to cover the costs of IEPPA tariffs while representing that Defendant's prices were not increasing in response to the IEEPA tariffs; and (c) failing to disclose to consumers that it did not intend to seek a refund of IEEPA tariff payments from the federal government even if those

tariffs were illegal and would instead use consumers' funds to pursue its own business interests and seek favorable treatment from Trump. This information is material to Plaintiff's purchasing decisions and if not for Defendant's deceptive and unfair conduct, Plaintiff and the Class would not have purchased products from Defendant.

65. Defendant's practices, as alleged herein, are injurious to the public interest as they have the capacity to injure other persons, including the millions of consumers who shop in Defendant's brick-and-mortar and/or online stores.

66. Plaintiff and the class have been injured by paying more for products sold by Defendant than they should have paid, or would have been willing to pay, were it fully disclosed that the IEEPA tariffs were illegal *ab initio*.

67. There is a causal link between the unfair or deceptive acts complained of and the injuries alleged.

68. Defendant is liable to Plaintiff for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under FDUTPA.

**COUNT II – FALSE AND MISLEADING ADVERTISING IN VIOLATION OF FLA. STAT. § 817.41**

69. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 58 as though fully set forth herein.

70. Plaintiff brings this Count on behalf of all Class members.

71. Florida law prohibits the making, publication, dissemination, circulation, or placement before the public of any misleading advertisement. *See* Fla. Stat. § 817.41.

72. The purpose of Fla. Stat. §817.41 is to protect consumers from advertisements and promotional statements that are deceptive, misleading, or likely to induce consumers to purchase goods based upon false or incomplete information.

73. A claim under Fla. Stat. §817.41 may be established through affirmative misrepresentations of material fact or through the concealment or omission of material facts where such omissions render statements misleading.

74. At all relevant times, Defendant engaged in the regular course of trade and commerce in Florida by marketing, distributing, supplying, offering for sale, and/or selling merchandise to consumers in Florida.

75. Defendant unlawfully and unfairly charged customers inflated prices to cover the costs of IEEPA tariffs while representing that Defendant's prices were not increasing in response to the IEEPA tariffs. Defendant also failed to disclose to consumers that it did not intend to seek a refund of IEEPA tariff payments from the federal government even if those tariffs were illegal and instead would use consumers' funds to pursue its own business interests and seek favorable treatment from Trump. This information was material to Plaintiff's purchasing decisions, and but for Defendant's misleading advertisements, representations, and omissions, Plaintiff and the Class would not have purchased products from Defendant or would have paid less for such products.

76. Defendant's representations, omissions, advertisements, and marketing practices constituted misleading advertising within the meaning of Fla. Stat. § 817.41 because they were likely to mislead reasonable consumers regarding the nature, basis, and justification for Defendant's pricing practices.

77. Defendant's practices, as alleged herein, are injurious to the public interest as they have the capacity to injure other persons, including the millions of consumers who shop in Defendant's brick-and-mortar and/or online stores.

78. Plaintiff and the Class reasonably relied upon Defendant's misleading advertisements, representations, and omissions and suffered injury in their business or property as a result.

79. As a direct and proximate result of Defendant's misleading advertising and deceptive conduct, Plaintiff and the Class suffered damages in an amount to be proven at trial.

80. Defendant is liable to Plaintiff and the Class for all damages available under Florida law, together with costs, interest, and such other relief as the Court deems just and proper.

**COUNT III – UNJUST ENRICHMENT**

81. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 58 as though fully set forth herein.

82. Plaintiff brings this Count on behalf of all Class members.

83. Plaintiff and the Class have conferred a benefit upon Defendant in the form of money paid through tariff-inflated prices on goods during the period February 4, 2025, through February 20, 2026.

84. Defendant received and accepted that benefit and was thereby enriched. Defendant has retained the benefit conferred by Plaintiff without paying or otherwise compensating Plaintiff for its value.

85. The circumstances surrounding Defendant's receipt and retention of this benefit make it unjust and inequitable for Defendant to retain it without payment to Plaintiff. Defendant obtained these funds through price increases on goods subject to unlawful tariffs and has retained the resulting profits.

86. Under principles of equity and good conscience, Defendant should not be permitted to retain those ill-gotten profits when Defendant is seeking a refund of the duties it paid.

87. Plaintiff and the Class have no adequate remedy at law.

88. Under Florida law, Plaintiff and the Class are entitled to full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT IV – MONEY HAD AND RECEIVED**

89. Plaintiff incorporates by reference all preceding allegations in paragraphs 1 through 58 as though fully set forth herein.

90. Plaintiff brings this Count on behalf of all Class members.

91. Defendant received funds from Plaintiff and from each member of the putative Class in the form of an IEEPA tariff surcharge. The Supreme Court has determined that the IEEPA tariffs were unlawful.

92. The funds belonged to Plaintiff and to each member of the putative Class.

93. Defendant has not returned the funds. Under principles of equity and good conscience, Defendant should not be permitted to retain those ill-gotten funds. Plaintiff seeks the return of the funds in an amount to be proven at trial.

94. Plaintiff seeks all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to them.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant, as follows:

A. Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel;

B. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged herein;

C. Declaratory relief that Defendant must return to Plaintiff and the Proposed Class all funds paid by consumers to cover a IEEPA tariff surcharge, with interest;

D. Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

E. An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

F. An award of costs and attorneys' fees; and

G. Such other or further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated: September 10, 2026

Respectfully submitted,

**KATHY MAULDIN, Individually And on Behalf of All Others Similarly Situated**

By: /s/ *Michael J. Fuller, Jr.*_______________

Michael J. Fuller, Jr., FL Bar No. 173797
**Farrell & Fuller Law**
270 Munoz Rivera Ave. Ste. 201
San Juan, PR 00918
T: 939-293-8244 /F: 939-293-8245
mike@farrellfuller.com

*Attorney for Plaintiff*